KC **FILED**

NOV 1 6 2007

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| BLUE RIDGE SALVAGE COMPANY, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) |
| TRIBUNE MEDIA SERVICES, INC. | ) |
| | ) |
| Defendant. | ) |

07CV6497
JUDGE NORGLE
MAGISTRATE JUDGE MASON

Jury Demanded

# COMPLAINT FOR DECLARATORY JUDGMENT

Now comes the Plaintiff, Blue Ridge Salvage Company, Inc., by its attorneys, Kevin B. Salam of Wolf Holland & Solovy, LLP, and complains against Defendant, Tribune Media Services, Inc., as follows:

## Parties, Jurisdiction and Venue.

1.    Plaintiff is Blue Ridge Salvage Company, Inc., ("Blue Ridge"). Blue Ridge is incorporated under the laws of the State of Virginia having its principal place of business in Flint Hill, Virginia.

2.    Defendant is Tribune Media Services, Inc., ("TMS"). TMS is incorporated under the laws of the State of Delaware and has its principal place of business in Illinois.

1

3.    This is an action for a declaratory judgment pursuant to 28 U.S.C. § 2201. Jurisdiction of this court is based upon diversity of citizenship pursuant to 28 U.S.C. § 1332 in that the parties are citizens of different states and the amount in controversy, exclusive of interest and costs, exceeds the sum of $75,000.

4.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a) in that TMS conducts business in and from Chicago, Illinois.

## Facts.

5.    Jeffrey K. MacNelly ("Jeff MacNelly") drew his first cartoon strip in 1969 as a political cartoonist for a weekly paper in Chapel Hill, NC. In 1970, he relocated to The Richmond News Leader in Virginia and in 1972 he was awarded his first of three Pulitzer Prizes.

6.    In 1977, Jeff MacNelly started drawing the cartoon strip SHOE.  The strip featured a gang of wisecracking birds who run a newspaper called The Tree Top Tattler-Tribune.  The comic became and continues to be immensely popular.  It twice received the prestigious Reuben Award from the National Cartoonists Society.  It continues to be published in approximately 600 newspapers.

7.    In 1982, Jeff MacNelly started working for the Chicago Tribune, where he received his third Pulitzer, and was honored three times as the "best in the business" among political cartoonists, in 1987, '89, and '93.

8.    On or about March 10, 1986, Jeff MacNelly, as "Artist" entered into a written agreement with TMS pursuant to which he would provide the SHOE cartoon strip

2

(the "Feature") to TMS and TMS would have certain rights to syndicate, distribute, reproduce, sell, license ancillary rights and otherwise exploit the use of the Feature.

9.    On or before August 25, 1995, Blue Ridge Salvage Company, Inc. was formed. Blue Ridge was and is currently wholly owned by Susan MacNelly, its president. Susan MacNelly is the widow of Jeff MacNelly.

10.    On or about August 25, 1995, upon information and belief, Blue Ridge and Jeff MacNelly entered into an agreement with TMS that superseded the March 10, 1986 agreement referred to in paragraph 8. Blue Ridge cannot locate a fully executed copy. The August 25, 1995 agreement ("Syndication Agreement") was between Blue Ridge and Jeffrey K. MacNelly, (collectively referred to therein as "Artist") and TMS. A copy of the Syndication Agreement executed by TMS but not by Blue Ridge or Jeff MacNelly, is attached hereto as **Exhibit A**.

11.    The Syndication Agreement provided in part for Blue Ridge and Jeff MacNelly to provide the Feature to TMS and for TMS to have the exclusive rights to syndicate, distribute, reproduce, sell, license ancillary rights and otherwise exploit and authorize the use of the Feature and all of its elements.

12.    Paragraph 18 of the Syndication Agreement titled "Status of MacNelly" recognized that Jeffrey MacNelly and not Blue Ridge was actually the artist responsible for drawing the Feature and was solely an agent of Blue Ridge and not an agent or employee of TMS.

13.    Paragraph 12 of the Syndication Agreement, titled "Death" provides for the termination of the Syndication Agreement upon the death of Jeff MacNelly.

3

14.     On June 8, 2000, at the age of 52, Jeff MacNelly died. At the time of his death, Lawrence Van Gelder wrote in the New York Times, "Mr. MacNelly was regarded as one of the nation's foremost political cartoonists, a profession that calls for the combined talents of artist, casual critic, political analyst and humorist." Howard A. Tyner, a vice president at Tribune Media wrote, "There are cartoonists who have the technical skills to draw very well, cartoonists with sharp political minds, and cartoonists who are just plain funny. Jeff MacNelly was all of those."

15.     On September 20, 2000, David Williams, then TMS' President and CEO, sent a proposed letter agreement to Susan MacNelly, the widow of Jeff MacNelly, which was executed by Susan MacNelly on behalf of Blue Ridge and the Estate of Jeffrey K. MacNelly. A copy of the executed September 20, 2000 letter agreement is attached hereto as **Exhibit B**.

16.     The September 20, 2000 letter agreement recognized that the Syndication Agreement terminated by its own terms upon the death of Jeff MacNelly.

17.     Pursuant to the September 20, 2000 letter agreement, Blue Ridge and TMS agreed that Blue Ridge would now provide the Feature and TMS would have sole rights to syndicate the Feature. Unlike paragraph 2 of the terminated Syndication Agreement, which addressed both "Syndication and Ancillary rights," the September 20, 2000 letter agreement only granted TMS syndication rights.

18.     The September 20, 2000 letter agreement incorporated by reference to the Syndication Agreement a March 31, 2008 termination date. The September 20, 2007 letter agreement also incorporated by reference the compensation provision of the then terminated Syndication Agreement. The September 20, 2000 letter agreement does not

contain any right of first refusal nor did it incorporate the right of first refusal contained in paragraph 5 of the terminated Syndication Agreement.

19. In or about early 2004, Susan MacNelly, President of Blue Ridge, expressed her concern to TMS that TMS had no interest in working with Blue Ridge to develop the licensing potential or otherwise exploit the Feature beyond merely syndicating the Feature.

20. In response to Susan MacNelly's concerns, TMS lead Blue Ridge to believe that it was developing a team to better exploit licensing opportunities and that this team would work with Blue Ridge on licensing opportunities for the Feature.

21. However, on or about September of 2004, TMS informed Blue Ridge that it did not have a licensing department like other syndication companies and that TMS' licensing department consisted of only two (2) people and they only had time to work on licensing deals for TMS "owned" features, which did not include SHOE.

22. Susan MacNelly was shocked and dismayed by TMS' deception as well as TMS' lack of any licensing infrastructure and TMS' short-sightedness.

23. Susan MacNelly sought confirmation that Blue Ridge had the right to proceed on its own in licensing and exploiting other ancillary rights in the Feature.

24. On or about late 2004 or early 2005, TMS confirmed that Blue Ridge had all ancillary rights in the Feature.

25. In 2004, Susan MacNelly of Blue Ridge, on her own, undertook to obtain a contract with Andrew McMeel Publishing to publish a compilation of SHOE strips from the prior 27 years titled "27 Years of Shoe: World Ends at Ten, Details at Eleven." This book was published in September 2004 and Blue Ridge, and not TMS received all

the proceeds payable from Andrew McMeel Publishing. To the extent some of the proceeds were paid by Andrew McMeel Publishing to TMS, TMS remitted any payments it received from the publisher to Blue Ridge.

26.    Pursuant to paragraph 12, the Syndication Agreement terminated by its terms on June 8, 2000 upon the death of Jeff MacNelly. The September 20, 2000 letter agreement terminates on March 31, 2008.

27.    The September 20, 2000 letter agreement by which Blue Ridge agreed to continue to produce the Feature and for TMS to exercise "sole syndication rights" does not contain any right of first refusal.

28.    TMS has informed Blue Ridge that TMS claims a right of first refusal in the Feature.

29.    While not agreeing that TMS has any right of first refusal, Blue Ridge agreed to TMS' request that Blue Ridge send TMS the "written proposal" from King Features pursuant to TMS' claimed right of first refusal. Consequently on or about August 15, 2007, Blue Ridge, through its attorney, sent a copy of the written proposal Blue Ridge had received from King Features. Copies of the August 15, 2007 letter and written proposal from King Features referred to therein are attached hereto as **Exhibit C**.

30.    The August 15, 2007 letter from Blue Ridge explained that the "written proposal" was both the August 8, 2007 "cover letter" from King Features and the written "proposal for Representation of SHOE Comic Strip 8/8/07" included therewith.

31.    The August 15, 2007 letter asked for TMS to explain how it could provide the same type and breadth of services that were contemplated in the King Features' proposal. Blue Ridge was seriously and rightly concerned about TMS' ability to fully

6

exploit the ancillary rights in the Feature.  For the 20 years prior to Jeff MacNelly's

death, TMS did almost nothing with any of the ancillary rights that TMS had in the

Feature.  And upon Jeff MacNelly's death, TMS only sought syndication rights in the

Feature in its September 20, 2000 letter agreement.

      32.     Blue Ridge's August 15, 2007 letter to TMS expressed the same concerns

raised over three years earlier by Susan MacNelly.  It was these concerns, ignored by

TMS, which Blue Ridge felt were addressed by the King Features' proposal.

      33.     TMS' inability and lack of any plan to exploit the alternative media and

delivery platforms, let alone the well established markets for licensing the Feature for use

in such basic products as clothing and coffee mugs was and is of great concern to Blue

Ridge.  Simply put, it appears to Blue Ridge that TMS does not know how or even desire

to make the best use of the ancillary rights in the Feature.

      34.     TMS responded to Blue Ridge's August 15, 2007 letter on August 24,

2007.  First, TMS again ignored Blue Ridge's legitimate concerns when TMS failed to

address the terms or services described in the King Features cover letter of August 8,

2007.  The August 15, 2007 letter had explicitly defined this cover letter as part of the

"written proposal" and asked TMS to address the services described therein.  Second,

TMS, while attempting to exercise its claimed right of first refusal, sent a new

syndication agreement ("TMS 8/24/07 Proposed Syndication Agreement") that was

materially different than the written proposal from King Features.  A copy of TMS'

August 24, 2007 response and the TMS 8/24/07 Proposed Syndication Agreement

included therewith are attached hereto as **Exhibit D**.

35.    Among the materially different terms contained in the TMS 8/24/07 Proposed Syndication Agreement is an oppressive post termination payment provision that requires Blue Ridge to pay TMS "fifty percent (50%) of the Feature's total Net Receipts for the month previous to such termination or non-renewal, such payment to be made for a period of twelve (12) months after the date of termination." The King Features' proposal did not contain a similar post termination provision.

36.    Blue Ridge contends that TMS had no right of first refusal. However, to the extent TMS is determined to have a right of first refusal, TMS failed to accept the terms and conditions of the King Features' proposal within the 30 days referred to in the Syndication Agreement's right of first refusal because TMS proposed a new syndication agreement that was materially different than the King Features' proposal.

37.    TMS has repeatedly asserted that it has exercised its right of first refusal under the Syndication Agreement and demanded that Blue Ridge execute the TMS 8/24/007 Proposed Syndication Agreement.

38.    To the extent TMS claims it had a right of first refusal, Blue Ridge contends that TMS has failed to properly exercise its right of first refusal.

39.    Upon being notified of Blue Ridge's position, TMS again sent an executed syndication agreement and removed the post termination provision claiming the post termination provision was "immaterial." TMS again demanded that that Blue Ridge execute a new syndication agreement with TMS.

40.    To the extent TMS had a right first refusal under paragraph 5 of the Syndication Agreement, TMS' attempt to cure its failure by removing the post

termination payment provision was beyond the 30 day time period contained in paragraph 5 of the Syndication Agreement.

41.    TMS told Blue Ridge that it would be a breach of the current Syndication Agreement with TMS if Blue Ridge "attempts, or purports to attempt, to enter into a binding agreement with King Features for the "Shoe Comic Strip."

42.    Blue Ridge refuses to execute any syndication agreement with TMS for the Feature beyond the current March 31, 2008 termination date of the September 2000 letter agreement.

43.    Blue Ridge and King Features desire to enter into a binding syndication agreement consistent with the King Features written proposal of August 8, 2007 for the syndication and exploitation of other ancillary rights in the Feature for a period of 20 years commencing after the March 31, 2008 termination of the current agreement between Blue Ridge and TMS.

44.    There exists an actual controversy between Blue Ridge and TMS concerning what rights if any TMS has in and to the Feature after March 31, 2008.

FOR RELIEF, Plaintiff, Blue Ridge Salvage Company, Inc., respectfully requests that this Court declare that TMS has no right of first refusal in the Feature and to the extent it is determined that TMS has a right of first refusal in the Feature, TMS failed to properly or timely exercise its right of first refusal and that Blue Ridge is not obligated to enter into any syndication or other agreement with TMS with respect to the Feature after March 31, 2008, and for such further relief that this Court deems appropriate.

[Signature page follows.]

Respectfully submitted,

Blue Ridge Salvage Company, Inc.
by its attorney, Kevin B. Salam

Kevin B. Salam
**Wolf Holland & Solovy, LLP**
40 Skokie Blvd., Ste. 105
Northbrook, IL 60062
224-330-1717 (Tel.)
224-330-1715 (Fax)

## INDEX TO EXHIBITS

**EXHIBIT A:** A copy of the August 25, 1995 Syndication Agreement.

**EXHIBIT B:** September 20, 2000 letter from TMS to Susan MacNelly.

**EXHIBIT C:** August 15, 2007 letter from Steven B. Wolf to TMS, enclosing August 8, 2007 letter from T.R. Shepard of King Features to Bob Vladem and also enclosing "Proposal doe Representation of SHOE Comic Strip 8/8/07."

**EXHIBIT D:** August 24, 2007 letter from Salvador K. Karottki to Steven B. Wolf enclosing a proposed syndication agreement.

**EXHIBIT A**

.

**EXHIBIT A**

<u>SYNDICATION AGREEMENT</u>

This Agreement is entered into as of the 25th day of August, 1995 between **Tribune Media Services, Inc.,** a Delaware corporation ("TMS"), **Blue Ridge Salvage Company, Inc.,** a Virginia corporation  and **Jeffrey K. MacNelly** (collectively referred to as "Artist") and, upon its Effective Date (defined below), supersedes the March 10, 1986 agreement between the parties regarding the syndication of the "Shoe" cartoon feature and all amendments thereto.  The parties agree as follows:

1.    <u>The Feature</u>.

During each week of the term of this Agreement, Artist agrees to prepare and furnish to TMS six (6) cartoon panels in black and white suitable for daily newspaper publication and one (1) page per week of cartoon drawings of the Feature in color suitable for Sunday newspaper publication (the "Feature").  The Feature shall be furnished in accordance with the following provisions:

(a)    The Feature shall be entitled "SHOE" or such other title as TMS and Artist shall mutually agree upon .  The Feature shall be based upon characters similar to those portrayed in the " Shoe" cartoon feature that Artist has heretofore submitted for publication through TMS.

(b)    The Feature shall be of the highest quality Artist is capable of producing, shall be suitable for publication in major daily newspapers and shall be of a quality equal to that he has heretofore submitted for publication.

(c)    The Feature shall be delivered to TMS at a place to be designated by TMS, the expense of such delivery to be borne by Artist.



EXHIBIT

A

ALL-STATE LEGAL SUPPLY CO.

(d)    The Feature shall be delivered to TMS at least eight (8) weeks in advance of the date of publication. Artist acknowledges that TMS is obligated to deliver the Feature to its syndicate customers regularly and at fixed times and that a failure to make such regular and timely delivery might subject TMS to liability. Accordingly, it is expressly agreed that the time for delivery of the Feature to TMS shall be of the essence of this Agreement. Artist further agrees to indemnify TMS against any liability or expense (including reasonable attorneys' fees) caused by any failure by Artist to make such regular and timely delivery.

2.    <u>Syndication and Ancillary Rights</u>.

During the term of this Agreement, and except as otherwise expressly provided herein, TMS shall have the sole right throughout the world to syndicate, distribute, reproduce, sell, license ancillary rights, or otherwise exploit and authorize the use of the Feature and all its elements in print, electronic, or any other media application, and to take such other action, if any, to exploit the Feature as TMS, in its sole discretion, deems appropriate. TMS shall have absolute discretion in selecting purchasers (which may be affiliates of TMS) of any rights in the Feature and in determining prices and terms of sale in any media provided, however, that any arrangements between TMS and purchasers of the Feature who are affiliates of TMS shall be on an arm's length and bona fide basis. All or any part of TMS's rights hereunder may be assigned or reassigned from time to time to any foreign sales or foreign syndication agency or agencies (which may be affiliates of TMS), which may act with respect to the assigned rights in its or their own name or names. TMS shall use good faith and due diligence in marketing the Feature and in exercising the rights set forth herein.

3.    Compensation.

(a)    Beginning upon the Effective Date (defined below in paragraph 4), in consideration of the satisfactory performance by Artist of the obligations assumed by Artist under this Agreement, and the rights granted to TMS herein, TMS shall pay to Artist an amount equal to sixty percent (60%) of the "Net Receipts," as defined below, from the syndication of the Feature during the term of this Agreement.    TMS guarantees that the amounts payable to Artist pursuant to this Agreement shall not be less than Eight Hundred Dollars ($800.00) per week, less any amounts due to TMS pursuant to paragraph 3(e), during the term of this Agreement.

(b)    "Net Receipts" as used herein shall mean revenues actually received by TMS from the sale and syndication of the Feature, less the sum of:

(i)    Costs of duplicating, proofs, printing, paper, reproduction, transmission costs, and other similar production, editing, and distribution charges;

(ii)    Commissions, fees or other sales expenses relating to foreign sales or syndication of the Feature;

(iii)    Bad debts arising out of the sale or syndication of the Feature;

(iv)    Rebates or allowances paid or allowed by TMS, or its assignees, to any purchaser of any rights in the Feature;

(v)    Actual promotion expenses; and

(vi)    Other costs, expenses, and liabilities which, pursuant to any provision of this Agreement, are to be deducted from gross revenues.

Within twenty (20) days after the close of each accounting period of TMS (each accounting period being either four (4) or five (5) weeks, as determined by TMS), TMS shall

3

determine and pay to Artist the amount, if any, payable pursuant to subparagraph 3(a) for the "Net Receipts" received by TMS during such accounting period.

(c)    If TMS grants to a third party (including affiliates of TMS) the right to publish the Feature in book form or TMS licenses to a third party the right to reproduce, use or otherwise exploit the Feature or certain fanciful characters contained therein in connection with the manufacture, sale, distribution, presentation or production of merchandise, theatrical or stage plays, television or radio dramatizations or representations or motion pictures (collectively, "Licensing Agreements"), then TMS shall pay to Artist sixty Percent (60%) of the gross amounts actually received by TMS from such third party for the grant of rights, including all advances and royalties, after the deduction of all of TMS's direct and reasonable expenses, if any, in connection with the granting of such rights and the collection of such amounts. Payments pursuant to this subparagraph 3(c) shall be made within thirty (30) days following TMS's receipt of amounts giving rise to such payments.

(d)    TMS shall keep accurate books and records reflecting amounts accrued from the sale of the Feature and shall furnish to Artist monthly statements which shall disclose all sales of the Feature, the purchasers, and the amounts actually received. Artist shall have the right, in person or by duly authorized agents, to examine TMS's records in which the accounts and information relative to this Agreement are maintained and to make photocopies of said records, provided such inspection shall be made during normal business hours and upon reasonable notice.

(e)    In connection with this Agreement and in further consideration of the Artist's satisfactory performance of his obligations and the rights granted to TMS herein and upon fulfillment of conditions in related conditions in related escrow agreement, TMS will loan Blue Ridge Salvage Company (" Blue Ridge" ) $500,000 (in two separate consecutive loans)

4

and the parties will execute appropriate Promissory Notes, a Security Agreements, Trademark Assignments and Copyright Assignments (the "Loan Documents") in connection with those loans. All amounts due from Artist pursuant to the Loan Documents shall be deducted from the payments due to Artist under paragraphs 3(a) through 3(c) of this Agreement.

4.    Term of Agreement.

(a)    The term of this Agreement shall commence on the Effective Date and shall continue until March 31, 2008, subject to subparagraphs 4(b) and 4(c) below. The Effective Date for this Agreement shall be the date on which the contingencies described in that certain escrow agreement dated August 25, 1995 are fulfilled and the escrowed documents, including this Agreement, are released from escrow.

(b)    If, during any two (2) consecutive accounting periods of the term of this Agreement, the average of the amounts of Net Receipts generated by the Feature shall be less than Eight Hundred Dollars ($800.00) per week, then either TMS or Artist may terminate this Agreement by written notice to the other party given no later than sixty (60) days following the end of the second such accounting period, provided, however, that Artist may not elect to terminate under this provision unless Artist has satisfied all of his obligations under the Loan Documents and he has fully repaid all principal and accrued interest thereunder. Notwithstanding the foregoing, if Artist elects to terminate this Agreement pursuant to this subparagraph 4(b), TMS may keep this Agreement in effect by notifying Artist that TMS will cause payments to Artist pursuant to subparagraph 3(a) to be not less than the minimum weekly guarantee as set forth in subparagraph 3(a) above. TMS may keep this Agreement in effect for so long as TMS maintains such payments, less any amount due pursuant to paragraph 3(e). If this Agreement is terminated pursuant to

5

this subparagraph 4(b), the termination shall be effective thirty (30) days following the date of notice.

    5.    <u>Rights of First Refusal</u>

    (a)    During the term of this Agreement, including renewals and extensions thereof, Artist grants to TMS a right of first refusal to acquire such rights as TMS is acquiring in the Feature in any new feature created by Artist for syndication to newspapers or other print media or for electronic transmission. Artist shall not enter into an agreement for the exploitation of the said new feature without offering to TMS the right to match a bona fide offer received by Artist with respect to said new feature. For purposes of this paragraph, a bona fide offer shall consist of a written bid or proposed contract submitted to Artist by a financially responsible third party. TMS shall have thirty (30) business days from its receipt of such bona fide offer and Artist's request for acceptance or rejection thereof by TMS to respond. The terms of the bona fide offer forwarded by Artist and the acceptance by TMS shall constitute a binding agreement. If TMS does not accept said terms and conditions, then Artist may grant the rights contained in the bona fide offer to the offeror; provided, however, that Artist shall not make any such grant on terms more favorable to such other party than the terms specified in Artist's notice of a bona fide offer to TMS without giving TMS another similar opportunity to accept said terms.

    (b)    If Artist desires to grant to anyone the rights to syndicate and distribute the Feature following the expiration of the term of this Agreement, then Artist shall first offer to TMS the right to match a bona fide offer received by Artist for the Feature. If TMS notifies Artist within thirty (30) days after the receipt of such notice that it accepts the terms and conditions so specified in the bona fide offer to Artist, the notice from Artist and the acceptance by TMS shall constitute a binding agreement. If TMS does not accept said

terms and conditions, then Artist may grant the right previously offered to TMS to any other party; provided, however, that Artist shall not make any such grant on terms more favorable to such other party than the terms specified in Artist's notice to TMS without giving TMS another similar opportunity to accept said terms.

(c)　MacNelly currently produces editorial cartoons pursuant to an employment agreement with Chicago Tribune Company dated March 1, 1990. Upon termination of MacNelly's employment with Chicago Tribune for any reason, Artist grants TMS for a term that is conterminous with the term of this Agreement the sole right throughout the world to syndicate, distribute, reproduce, sell, license ancillary rights, or otherwise exploit and authorize the use of Artist's editorial cartoons and all of their elements in print, electronic, or any other media application, and to take such other action, if any, to exploit the Feature as TMS, in its sole discretion, deems appropriate. In exchange for those rights, Artist will receive fifty percent (50%) of the net receipts for those editorial cartoons pursuant to the same terms as set forth in paragraph three of this Agreement.

6.　Independent Contractor.

It is understood and agreed that this Agreement is for the purchase of certain rights only and that Artist is an independent contractor. Artist shall do the work required to produce the Feature on his own time, at his own expense, in his own way, using his own supplies, and he shall furnish his own place of work and his own assistants, if any are required, free from direction and control by TMS. The means of producing the Feature shall be solely within Artist's control. Artist agrees to discharge all obligations imposed upon employers and self-employed persons under any applicable union agreement or federal, state, or local law, regulations, or order now or hereafter in force, including, but not limited to, taxes, unemployment compensation or insurance, workers' compensation, and

7

social security, and including the filing of all returns and reports required of any employer and the payment of all assessments, taxes, contributions, or other sums required, since Artist shall not be treated as an employee of TMS for federal, state, or local tax purposes. To the extent permitted by law, Artist further agrees to indemnify and hold TMS harmless against all claims and demands resulting from Artist's failure to comply with the provisions of this paragraph. This Agreement shall not in any way constitute the parties as partners or joint venturers, nor as principal and agent.

7.    Editorial Supervision.

(a)    TMS shall have the entire editorial supervision of the Feature and may make changes, deletions, or additions in or to the Feature with the approval of Artist, which shall not be unreasonably withheld. In the event that TMS and Artist shall be unable to mutually agree on edits, changes, deletions, or additions to the Feature, Artist agrees to furnish a substitute strip for the strip in question.

(b)    TMS shall not be obligated to accept, syndicate, or pay for any materials for the Feature which do not comply with the requirements set forth herein or which in TMS's reasonable opinion might subject TMS to any claim by any third party.

(c)    In the event of rejection of any material for the Feature by TMS, TMS shall give Artist written notice of its reason for rejection and Artist shall be given reasonable time to produce and deliver substitute material; provided, however, that upon the inability or failure of Artist to submit revised material to TMS at least four (4) weeks in advance of the date of publication with respect to daily cartoon panels, and at least six (6) weeks in advance of the date of publication with respect to Sunday color pages, the provisions of paragraphs 1(d) and 15 herein shall apply.

8.    Ownership of Feature.

8

(a)  As between Artist and TMS, Artist shall be the owner of the Feature, including, but not limited to, all materials furnished by Artist to TMS pursuant to this Agreement, and all trademarks and all copyrights and renewals and extensions thereof. Notwithstanding the foregoing, during the term of this Agreement, TMS shall have the sole and exclusive right to exercise all subsidiary rights in the Feature of any kind, and TMS shall have the sole and exclusive right to publish and authorize the publishing and distribution of the Feature in print and other media (including, without limitation, publication and distribution in book, booklet, pamphlet, CD-ROM, cabletext, videotex, audiotex, and electronic data base form, and other forms of electronic transmission) and TMS shall have exclusive stage, motion picture, radio, television, animation, mechanical reproduction, and commercial exploitation rights (including, without limitation, merchandising rights), and may exercise all other rights in the Feature throughout the world. The parties agree that the Feature syndicated to newspapers shall contain the following notice: © "19___, Tribune Media Services, Inc. All Rights Reserved." Artist agrees to execute and deliver to TMS, promptly on request, any documents which TMS may reasonably request to evidence TMS's exclusive rights as provided in this paragraph. It is understood and agreed that revenues derived by TMS, during the term hereof, in connection with TMS's exercise of its rights pursuant to this paragraph, after deduction of TMS's direct and reasonable expenses, if any, in connection with the granting of such rights and collection of such amounts, shall be included in calculating Net Receipts pursuant to paragraph 3(a) hereof.

(b)  Notwithstanding the foregoing, TMS shall be entitled to its share of revenues received after the expiration of this Agreement pursuant to Licensing Agreements entered into by TMS during the term of this Agreement including all extensions and renewals.

9

9.    Exclusivity.

So long as this Agreement shall be in effect (including any time during which Artist may be in default hereunder or in breach hereof), Artist shall not enter into any contract, agreement, understanding, or arrangement to prepare any material similar to the Feature for any newspaper or newspapers or magazines distributed with newspapers or for distribution by cabletext, videotape, audiotex, or other form of electronic transmission. Artist and TMS agree that, in the event of any breach of the covenants contained in this paragraph, TMS will not have an adequate remedy at law and shall, in addition to any other appropriate equitable or legal relief, be entitled to an injunction from a court of competent jurisdiction restraining Artist from any such breach.

10.    Enforcement of TMS's Rights.

Artist hereby appoints TMS (and such substitutes as TMS may from time to time select) as Artist's irrevocable attorney in fact, with the right, but not the obligation, to enforce and protect all rights herein granted to or acquired by TMS, and to prevent infringement of any copyrights and trademarks, and to litigate, collect, and receipt for all damages arising from any infringement of such rights, to use Artist's name as being plaintiff or defendant in any proceeding, and Artist agrees to execute such further instruments as TMS may deem appropriate to carry out the provisions of this paragraph.

10

11.  <u>Warranty</u>.

Artist represents and warrants that Artist has the full power and authority to enter into and perform this Agreement, that there is no contract, agreement, or understanding with any other person, firm, or corporation which would interfere with the obligations assumed by Artist hereunder, and that the Feature and all materials furnished to TMS hereunder will be new, original, and unpublished, and that the Feature will not infringe upon or violate any copyright, trademark, tradename, literary, artistic, or other property right, right of privacy, or any other right of any person, firm, or corporation and will not contain any libelous or unlawful material. Artist agrees to indemnify and hold harmless TMS, its employees, officers, directors, stockholders, licensees, successors, and assigns, from and against any and all losses, damages, costs, and expenses, including the legal fees and expenses incident thereto, arising from any suit, claim, or demand based upon any breach or alleged breach of the warranties contained in this paragraph.

12.  <u>Death</u>.

In the event of the death of MacNelly while this Agreement is in effect, (a) payments pursuant to subparagraph 3(a) hereof shall continue through the date on which material prepared by MacNelly prior to MacNelly's death and not previously published and acceptable to TMS for publication shall be published, and (b) all payments due to Artist hereunder shall be made to Artist's legal representatives and TMS shall have no further liability hereunder to Artist's legal representatives, heirs, legatees, or assigns, except to pay Artist's share of revenues received by TMS from materials prepared by Artist prior to Artist's death.

13.  <u>Use of Name; Promotion</u>.

11

During the term of this Agreement, TMS shall have the right, subject to Artist's prior approval which shall not be unreasonably withheld, to use MacNelly's name, likeness, and biography in connection with the Feature and the promotion and sale of the Feature.

14.    Termination.

The obligations assumed by Artist in paragraphs 5(b), 6, 8(b), 10, and 11 hereof shall survive any termination or cancellation of this Agreement.

15.    Failure to Furnish Feature.

If Artist fails to furnish the Feature as required hereunder, TMS shall have the right, at its discretion, to obtain or prepare substitute copy through any means and in whatever manner it chooses.   In such event, TMS shall make reasonable efforts to consult with Artist and make arrangements for the preparation of substitute copy satisfactory to Artist.   TMS may deduct the expenses or the loss of income occasioned by Artist's default from any money then or thereafter due Artist.  If the failure to furnish the Feature continues for a period of fourteen (14) consecutive days, TMS shall have the right to terminate this Agreement by written notice to Artist, unless such failure is caused by Artist's inability to produce the Feature due to disability or serious illness.  In the event that Artist is unable to produce the Feature due to disability or serious illness and the period of such inability exceeds sixty (60) days, TMS shall have the right to terminate this Agreement by written notice delivered to the other party.

16.    Notices.

All notices, requests, consents, and other communications required or permitted to be given hereunder shall be in writing and delivered personally or sent by certified mail, return receipt requested, postage prepaid, as follows:

12

If to Artist:        Jeffrey MacNelly
                     P.O. Box 188
                     Flint Hill, VA 22627

If to TMS:           Tribune Media Services, Inc.
                     435 N. Michigan Avenue, Suite 1500
                     Chicago, Illinois 60611
                     Attn:  David D. Williams, President/CEO

cc:                  Dale Cohen
                     Senior Counsel
                     Tribune Company
                     435 N. Michigan Avenue
                     Suite 600
                     Chicago, Illinois  60611

Any notice so given shall be deemed received when delivered personally, or, if mailed, when deposited, postage prepaid, in the United States mail.  Either party may change the address to which notices are to be sent by giving written notice of such change of address to the other party in the manner herein provided for giving notice.

17.    General.

(a)    This Agreement shall be governed by and construed and enforced in accordance with the laws of the State of Illinois applicable to agreements made and to be performed entirely in Illinois.

(b)    The section headings contained herein are for reference purposes only and shall not in any way affect the meaning or interpretation of this Agreement.

(c)    This Agreement sets forth the entire agreement and understanding of the parties hereto concerning the subject matter hereof, and supersedes all prior agreements, arrangements, and understandings between the parties hereto.

(d)    TMS may assign its rights and obligations under this Agreement to any corporation or other entity controlled by, or under common control with, Tribune Company,

13

or to any entity which succeeds to substantially all of the business and assets of TMS. This Agreement is personal to Artist, however, and neither this Agreement nor any of Artist's rights or obligations hereunder may be assigned, pledged, or encumbered without the prior written approval of TMS.

(e)    This Agreement may be amended, modified, superseded, or cancelled, and the terms and covenants hereof may be waived, only by a written instrument executed by both of the parties hereto, or, in the case of a waiver, by the party waiving compliance. The failure of either party at any time or times to require performance of any provision hereof shall in no manner affect the right at a later time to enforce the same. No waiver by either party of the breach of any term or covenant contained in this Agreement, whether by conduct or otherwise, in any one or more instances, shall be deemed to be, or construed as, a further or continuing waiver of any such breach or a waiver of the breach of any other term or covenant contained in this Agreement.

18.    Status of MacNelly

The parties recognize and acknowledge that MacNelly is the artist responsible for drawing the feature pursuant to an agreement with Blue Ridge. The parties further acknowledge that MacNelly is solely an agent of Blue Ridge and is not an employee or agent of TMS with respect to the activities contemplated by this Agreement. MacNelly has executed this Agreement for the limited purposes of evidencing his consent to the Agreement in his status as Artist of the Feature, evidencing his willingness to grant such rights to Blue Ridge and agreeing to observe such restrictions as maybe imposed upon him by Blue Ridge as may be reasonably necessary to enable Blue Ridge to comply with the provisions of this Agreement.

14

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date shown above.

TRIBUNE MEDIA SERVICES, INC.

By: _____

DAVID D. WILLIAMS, President/CEO

BLUE RIDGE SALVAGE COMPANY

By: _____

_____

Jeffrey K. MacNelly

\20336\030\MACNELLY.WP5

19

**EXHIBIT B**

**EXHIBIT B**



**TRIBUNE**
MEDIA SERVICES
www.tms.tribune.com

**David D. Williams**
President and
Chief Executive Officer
312.222.8658 (phone)
312.329.9818 (fax)
ddwilliams@tribune.com

September 20, 2000

Ms. Susan MacNelly
322 Ben Venue Road
Flint Hill, VA 22627

Dear Susie:

I am writing to confirm some matters related to the current Syndication Agreement for SHOE.

Tribune Media Services and Blue Ridge Salvage will maintain their relationship under the Syndication Agreement. Blue Ridge will continue to provide the Feature, and TMS will retain sole syndication rights through the term of the Agreement. In addition, the financial arrangements (60% of Net Receipts subject to repayment of the loan and permitted deductions) will also stay in place.

Would you please indicate your agreement with these arrangements by signing below and returning this letter back to me. Of course, please do not hesitate to call me if you have any questions at all.

Hope all is well.

Sincerely,

David D. Williams
President and CEO

Agreed on behalf of
the Estate of Jeff MacNelly and
Blue Ridge Salvage Company

By: _Susan MacNelly_

Date: _9/20/2000_

**EXHIBIT**
B
ALL-STATE LEGAL SUPPLY CO.

**EXHIBIT C**

**EXHIBIT C**

**WOLF**
**HOLLAND &**
**MATERN LLP**
Attorneys at Law

REPLY TO:
500 LAKE COOK ROAD
SUITE 130
DEERFIELD, ILLINOIS 60015
(847) 374-0600
FACSIMILE (847) 374-0601

CHICAGO OFFICE
205 WEST WACKER DRIVE
SUITE 1600
CHICAGO, ILLINOIS 60606
(312) 236-3510
FACSIMILE (312) 236-3820

August 15, 2007

VIA FACSIMILE TRANSMISSION AND FIRST CLASS MAIL

Ms. Beth Fulkerson
Tribune Company
435 N. Michigan Avenue
Chicago, Illinois 60611-4066

Dear Beth:

As we move forward, in order to minimize any risk of miscommunications or misunderstandings, I respectfully request that you refrain from directing any further communications to my client, Blue Ridge Salvage Company, Inc., including Susie MacNelly and Robert J. Vladem. Please put all communications in written form and direct them to me without copy to my clients.

As to your letter of August 14, 2007, I do not believe Tribune Media has a right of first refusal in light of its letter of September 20, 2000. However, we need not address that issue at this time. If Tribune Media will not or cannot match the King Features proposal, then there is no need to address the existence of any right of first refusal.

In the interest of a prompt resolution of this matter, I am forwarding a letter of August 8, 2007 from the President of King Features to Mr. Robert Vladem with an attachment titled "Proposal for Representation of SHOE Comic Strip 8/8/07" sent in response to our request. We consider the letter and attachment to be the written proposal. Please indicate whether Tribune Media is willing to and can meet each and every one of the terms therein. To the extent Tribune Media believes it can meet each of these terms, I must request that you explain in writing how Tribune Media expects to provide the same services to my client as contemplated under the King Features proposal.

Lastly, I do not agree to your proposed changes to the NDA. I prefer to just move forward without an NDA.

With best regards,

Steven B. Wolf

Enclosure



EXHIBIT
C
ALL-STATE LEGAL SUPPLY CO.

A Partnership including Professional Corporations

bcc:    Blue Ridge Salvage Company, Inc.

**T.R. SHEPARD III**
PRESIDENT

August 8, 2007

Mr. Bob Vladem
Manager
SHOE
853 Sheridan Road
Winnetka, IL 60093

Dear Bob:

Attached is a proposal for the representation of the Shoe comic strip. This proposal was requested by Blue Ridge Salvage Company, Inc. for the purpose of entering into an agreement with King Features after the expiration of the current TMS contract.

Other benefits to Shoe are the following: King Features has 20 international syndication agents covering 122 countries. Our international syndication sales manager also handles 18 direct accounts in 18 Caribbean countries. King Features has 19 international licensing agents covering 70 countries. Shoe would be added to the robust kingfeatures.com website to build both syndication and licensing awareness. Shoe would be able to link the cartoonist's website from either location. King Features would include Shoe in our consumer subscription site, dailyink.com, and in our store powered by Café Press which offers "on demand" product such as tee shirts, coffee mugs, character art, cartoonist favorite strips, etc. able to be ordered online, by phone, or by mail.

Of course, no other syndicate has the overall domestic (US and Canada) syndication and licensing sales prowess of King Features.

Please let me know if you have any other questions.

Sincerely,

*[signature]*

# KING FEATURES

A UNIT OF THE HEARST CORPORATION

300 W. 57TH ST., NEW YORK, NY 10019-5238

TEL: (212) 969-7547   FAX: (548) 280-1547   EMAIL: TRSHEPARD@HEARST.COM

WWW.KINGFEATURES.COM

Proposal for Representation of SHOE Comic Strip
8/8/07

1.   Rights: Syndicate to represent all rights (syndication, merchandising, and entertainment) on an exclusive basis.

2.   Territory: Worldwide

3.   Term: 20 years

4.   First Negotiation/Matching Rights: 45 day right of first negotiation and then right to match any third party offer for the continued syndication and licensing of the feature.

5.   Revenue Splits: 50/50 (except pre-existing syndication deals which shall be 65/35) based on the gross receipts from all syndication, merchandising and entertainment rights licensing, less foreign agent commissions, and currency conversion (and for syndication receipts only, less costs and expenses for color separations and proofs).

6.   Signing Bonus: $350,000, non-recoupable, payable ½ on signing of representation agreement and ½ on commencement date of the term.

7.   Ownership: Blue Ridge to own

8.   Approvals: Blue Ridge to have right to approve the terms of all merchandising and entertainment licenses.

**EXHIBIT D**

**EXHIBIT D**

Salvador K. Karottki
Senior Counsel/Intellectual Property & Interactive
312/222-3290

# TRIBUNE

Tribune Company
435 North Michigan Avenue
Chicago, Illinois 60611-4066
fax: 312/222-4206
e-mail: skarottki@tribune.com

August 24, 2007

**VIA FACSIMILE, CERTIFIED MAIL, AND ELECTRONIC MAIL**

Steven B. Wolf
Wolf Holland & Matern LLP
500 Lake Cook Road, Suite 130
Deerfield, Illinois 60015

**Re:**     **Acceptance of Offer to Artist and Response to Your Letter of August 15, 2007**

Dear Mr. Wolf:

I am responding on behalf of Tribune Media Services, Inc. ("TMS") to your letter dated August 15, 2007, giving notice to TMS of a bona fide offer from King Features to your client, Blue Ridge Salvage Company, Inc. ("Blue Ridge"), and attaching such bona fide offer (entitled "Proposal for Representation of SHOE Comic Strip 8/8/07"). Pursuant to Section 5(b) of the Syndication Agreement between TMS and your client dated August 25, 1995, TMS hereby notifies Blue Ridge that it accepts the terms and conditions specified in the bona fide offer that Blue Ridge received from King Features. Accordingly, pursuant to the Syndication Agreement, your notice to TMS and this acceptance "constitute a binding agreement." In light of the foregoing and to memorialize the agreement, we have attached a signed Syndication Agreement that we believe incorporates all of the terms of King Features' offer. Please contact us if you have any questions and to coordinate signatures on the document. We sent this acceptance letter directly to you because you expressly stated in your letter that you and your client want all communications on this matter to be sent to you.

Your letter also addresses a September 20, 2000, letter that expressly reiterates the continuance of the Syndication Agreement between the parties. You seem to imply that this letter has some impact on TMS' right of first refusal under Section 5(b) of the Syndication Agreement. So there is no miscommunication on this point, TMS rejects any such implication. Section 5(b) of the Syndication Agreement between the parties clearly grants TMS a right of first refusal, which TMS has hereby exercised. Nothing in the September 20, 2000, letter alters this right of first refusal. We assume any implication by you to the contrary was unintentional or mistaken.

In light of TMS' acceptance of the offer you sent us on behalf of Blue Ridge, TMS looks forward to working with Blue Ridge for the mutual benefit of both parties during the next phase of our relationship under the new terms accepted herein.

Very truly yours,

Salvador K. Karotttki

Encl.

cc:     David D. Williams
       John C. Twohey
       Beth A. Fulkerson





# SYNDICATION AGREEMENT

This Agreement is entered into as of the Effective Date (defined below) between **TRIBUNE MEDIA SERVICES, INC.**, a Delaware corporation ("TMS"), and **BLUE RIDGE SALVAGE COMPANY, INC.**, a Virginia corporation ("Blue Ridge Salvage"), and supersedes the September 25, 1995, agreement between the parties regarding the syndication of the "Shoe" cartoon feature and all amendments thereto. The parties agree as follows:

1.     The Feature.

During each week of the term of this Agreement, Blue Ridge Salvage agrees to furnish to TMS six (6) comic strips in black and white suitable for publication in daily newspapers and on their companion websites and one (1) color version of the comic strip suitable for publication in Sunday newspapers and on their companion websites (the "Feature"). The Feature supplied to TMS by Blue Ridge Salvage pursuant to this Agreement shall be furnished in accordance with the following provisions:

(a)     The Feature shall be entitled **"Shoe"**;

(b)     The Monday-through-Saturday versions of the Feature shall be provided to TMS in black and white. The Sunday version shall be provided in color and shall be prepared in standard Sunday comic-section formats.

(c)     Each daily and Sunday version of the Feature shall be of the highest quality Blue Ridge Salvage is capable of producing and shall be suitable for publication

in major daily newspapers in the United States and abroad, and for posting on their companion websites.

(d)     The Feature shall be delivered to TMS at a place to be designated by TMS, the expense of such delivery to be borne by Blue Ridge Salvage.

(e)     The daily and Sunday versions of the Feature shall be delivered to TMS at least eight (8) weeks in advance of the dates of publication. Blue Ridge Salvage acknowledges that TMS is obligated to deliver the Feature to its syndicate customers regularly and at fixed times, and a failure to make such regular and timely deliveries might subject TMS to liability. Accordingly, it is expressly agreed that the time for delivery of the Feature to TMS shall be of the essence of this Agreement. Blue Ridge Salvage further agrees to indemnify TMS against any liability or expense (including reasonable attorneys' fees) caused by any failure by Blue Ridge Salvage to make such regular and timely deliveries.

2.     TMS Rights.

During the term of this Agreement and except as otherwise expressly provided herein:

(a)     TMS shall have the sole and exclusive right to sell, license or otherwise authorize the use of the Feature by newspapers published and circulated throughout the world, and by those newspapers' companion websites, and in all other media worldwide, and to take such other action, if any, to exploit the Feature as TMS, in its sole discretion, deems appropriate.

(b)     TMS shall have the sole and exclusive right to publish or authorize the publication of the Feature on websites and in books, booklets, pamphlets and CD-ROMs,

2

and via electronic databases, online electronic services, wireless services, or any other forms of electronic or mechanical publication or transmission, whether now existing or hereafter developed.

(c)    TMS shall be the owner of all exploitation rights in and to the Feature, including, without limitation, all merchandising and entertainment rights of any kind, including stage, motion picture, radio, television, consumer products and commercial exploitation rights. Notwithstanding the rights granted to TMS herein, Blue Ridge Salvage shall have the right to approve the terms of all merchandising and entertainment licenses, which approval shall not be unreasonably withheld.

(d)    TMS shall have the absolute discretion in selecting purchasers or customers (which may be affiliates of TMS) of any rights in the Feature and in determining prices and terms of sale to any media. All or any part of TMS' rights hereunder may be assigned or reassigned from time to time to any foreign or domestic sales, marketing or syndication agency or agencies (which may be affiliates of TMS), which may act with respect to the assigned rights in its or their own name or names.

3.    Compensation.

(a)    TMS shall provide Blue Ridge Salvage with a signing bonus of $350,000 payable in two installments: A $175,000 payment upon the signing of this Agreement by both parties, and a $175,000 payment on the Effective Date of this Agreement.

(b)    In consideration of the satisfactory performance by Blue Ridge Salvage of the obligations assumed by Blue Ridge Salvage under this Agreement, and of the rights granted to TMS herein, TMS shall pay to Blue Ridge Salvage (i) sixty-five percent (65%) of the "Net Receipts," as hereinafter defined, received by TMS during the term of this

Agreement from (a) entities whose license agreements to publish the Feature were entered into prior to the Effective Date of this Agreement and (b) other sources of revenue under the September 25, 1995, agreement between the parties prior to the Effective Date of this Agreement; and (ii) fifty percent (50%) of the "Net Receipts" received by TMS during the term of this Agreement from (a) entities whose license agreements to publish the Feature are entered into after April 1, 2008, the Effective Date of this Agreement, and (b) all new sources of revenue that enter into contracts with TMS in connection with the Feature after April 1, 2008.

(c)    "Net Receipts" as used herein shall mean gross receipts from all syndication, merchandising and entertainment-rights licensing, less the sum of:

(i)    The costs and expenses for color separations and proofs (for syndication receipts only);

(ii)    Foreign agent commissions; and

(iii)    Currency conversions.

(d)    Within twenty (20) days after the close of each accounting period of TMS (each accounting period being either four (4) or five (5) weeks, as determined by TMS), TMS shall determine and pay to Blue Ridge Salvage the amount, if any, payable pursuant to subparagraph 3(b) hereof for the "Net Receipts" received by TMS during such accounting period.

(e)    TMS shall keep accurate books and records reflecting amounts accrued from the syndication and sale of the Feature, and from all other revenue-generating activities, and shall furnish to Blue Ridge Salvage monthly statements, which shall disclose all sales of the Feature, and the purchases and the amounts actually received.

4

Blue Ridge Salvage shall have the right, in person or by duly authorized agents, to examine TMS' records in which the accounts and information relative to this Agreement are maintained, provided such inspection shall be made during normal business hours and upon reasonable notice.

4.    Term and Termination.

(a)    The term of this Agreement shall begin on April 1, 2008 (the "Effective Date") and shall end on March 31, 2028.

(b)    If Blue Ridge Salvage fails to furnish the Feature as required in this Agreement or fails to furnish the Feature for a period of fourteen (14) consecutive days, TMS shall have the right to terminate this Agreement on thirty (30) days' prior written notice to Blue Ridge Salvage.

(c)    In the event of termination, if Blue Ridge Salvage elects to continue syndication of the Feature in any form or through any means, Blue Ridge Salvage shall pay TMS, as compensation for benefits that will inure to Blue Ridge Salvage as a result of Blue Ridge Salvage's association with TMS, a monthly sum equal to fifty percent (50%) of the Feature's total Net Receipts for the month previous to such termination or non-renewal, such payment to be made for a period of twelve (12) months after the date of termination.

(d)    The indemnification obligations assumed by Blue Ridge Salvage shall survive termination or expiration of this Agreement.

5.    Rights of First Negotiation and First Refusal.

(a)    For forty-five (45) days following the expiration of the term of this Agreement, Blue Ridge Salvage grants to TMS the right of first negotiation to continue its relationship with Blue Ridge Salvage hereunder and to continue, among other things, syndicating the Feature.

(b)    Thereafter, if Blue Ridge Salvage desires to grant to anyone the rights to syndicate and distribute the Feature within twelve (12) months following the expiration of the term of this Agreement, then Blue Ridge Salvage shall first offer to TMS the right to match a bona fide offer received by Blue Ridge Salvage for the Feature. For purposes of this Agreement, a bona fide offer shall consist of a written bid or proposed contract submitted to Blue Ridge Salvage by a financially responsible third party. If TMS notifies Blue Ridge Salvage within thirty (30) days after the receipt of such notice that it accepts the terms and conditions so specified in the bona fide offer to Blue Ridge Salvage, the notice from Blue Ridge Salvage and the acceptance by TMS shall constitute a binding agreement. If TMS does not accept said terms and conditions, then Blue Ridge Salvage may grant the right previously offered to TMS to any other party, provided, however, that Blue Ridge Salvage shall not make any such grant on terms more favorable to such other party than the terms specified in Blue Ridge Salvage's notice to TMS without giving TMS another similar opportunity to accept said terms.

6.    Independent Contractor.

It is understood and agreed that this Agreement is for the purchase of certain rights only and that Blue Ridge Salvage is an independent contractor. Blue Ridge Salvage shall do the work required to produce the Feature on Blue Ridge Salvage's own

time, at Blue Ridge Salvage's own expense, in Blue Ridge Salvage's own way, using Blue Ridge Salvage's own supplies, and Blue Ridge Salvage shall furnish Blue Ridge Salvage's own place of work and Blue Ridge Salvage's own assistants, if any are required, free from direction and control by TMS. The means of producing the Feature shall be solely within Blue Ridge Salvage's control. Blue Ridge Salvage agrees to discharge all obligations imposed upon employers and self-employed persons under any applicable union agreement or federal, state, or local law, regulation, or order now or hereafter in force including, but not limited to, taxes, unemployment compensation or insurance, workers' compensation, and Social Security, and including the filing of all returns and reports required of any self-employed person or employer and the payment of all assessments, taxes, contributions, or other sums required, since Blue Ridge Salvage shall not be treated as an employee of TMS for federal, state, or local taxation purposes. To the extent permitted by law, Blue Ridge Salvage further agrees to indemnify and hold TMS harmless against all claims and demands resulting from Blue Ridge Salvage's failure to comply with the provisions of this paragraph. This Agreement shall not in any way constitute the parties as partners or participants in a joint venture, or as principal and agent.

      7.     Editorial Supervision.

     (a)     TMS shall have the entire editorial supervision of the Feature, provided that TMS shall use commercially reasonable efforts to consult with Blue Ridge Salvage prior to making any changes, deletions, or additions in or to the Feature, subject to TMS' deadlines.

(b)    TMS shall not be obligated to accept, syndicate or pay for any versions of the Feature which in TMS' reasonable opinion might subject TMS to any claim by any third party.

(c)    If TMS rejects or declines to accept, syndicate or pay for any material for the reason cited in 7(b), TMS shall so notify Blue Ridge Salvage and shall give Blue Ridge Salvage a reasonable opportunity to cure or remove the basis for said claim and, upon resubmission by Blue Ridge Salvage, shall reasonably reconsider acceptance of said material; provided, however, that upon the inability or failure of Blue Ridge Salvage to submit revised material to TMS at least four (4) weeks in advance of the date of publication with respect to daily cartoon panels, and at least six (6) weeks in advance of the date of publication with respect to Sunday color versions, the provisions of paragraphs 1(d) and 15 herein shall apply.

8.    <u>Ownership of Feature.</u>

(a)    Blue Ridge Salvage shall be the owner of the Feature including, but not limited to, all materials furnished by Blue Ridge Salvage to TMS pursuant to this Agreement. Notwithstanding the foregoing, during the term of this Agreement, TMS shall have the sole and exclusive right to exercise all publication and subsidiary rights in the Feature, as outlined in Paragraph 2. The parties agree that the Feature syndicated to newspapers and their companion websites shall contain the following notice: "Copyright (c) 20__ [year] Tribune Media Services, Inc. All Rights Reserved."

(b)    TMS shall have the right to receive or participate in its share of revenues received after termination of this Agreement pursuant to agreements entered into by Blue Ridge Salvage or TMS prior to termination of this Agreement.  All third-party

agreements made by TMS pursuant to this Agreement shall survive termination of this Agreement and shall bind Blue Ridge Salvage and TMS. For the avoidance of confusion, all third-party license agreements, for example, shall survive termination of the parties' syndication relationship.

9.    Exclusivity.

So long as this Agreement shall be in effect (including any time during which Blue Ridge Salvage may be in default hereunder or in breach hereof), Blue Ridge Salvage shall not enter into any contract, agreement, understanding, or arrangement to prepare any material similar to the Feature for any newspaper or newspapers or their companion websites or for magazines distributed with newspapers, or for distribution by cabletext, videotex, audiotex, the Internet or other forms of electronic transmission covered by this Agreement. Blue Ridge Salvage agrees that, in the event of any breach of this provision, TMS will not have an adequate remedy at law and shall, in addition to any other appropriate equitable or legal relief, be entitled to an injunction from a court of competent jurisdiction restraining Blue Ridge Salvage from any such breach.

10.    Enforcement of TMS' Rights.

Blue Ridge Salvage hereby appoints TMS (and such substitutes as TMS may from time to time select) as Blue Ridge Salvage's attorney-in-fact, with the right, but not the obligation, to (a) enforce and protect all rights herein granted to or acquired by TMS, (b) prevent infringement of any copyrights and trademarks, (c) litigate any ensuing claims, (d) collect all damages arising from any infringement of such rights, and (e) use Blue Ridge Salvage's name as being plaintiff or defendant in any proceeding. Blue Ridge

Salvage agrees to execute such further instruments as TMS may reasonably deem appropriate to carry out the provisions of this paragraph.

      11.    Warranty.

      Blue Ridge Salvage represents and warrants that Blue Ridge Salvage has the full power and authority to enter into and perform this Agreement, that there is no contract, agreement, or understanding with any other person, firm, or corporation which would interfere with the obligations assumed by Blue Ridge Salvage hereunder, and that the Feature and all materials furnished to TMS hereunder will be new, original, and previously unpublished, and that those materials will not infringe upon or violate any copyright, trademark, trade name, literary, artistic, or other property right, right of privacy, or any other right of any person, firm, or corporation, and will not contain any libelous or unlawful material. Blue Ridge Salvage agrees to indemnify and hold harmless TMS, its employees, officers, directors, stockholders, licensees, successors, and assigns, from and against any and all losses, damages, costs, and expenses, including the reasonable attorneys' fees and expenses incident thereto, arising from any suit, claim, or demand based upon any breach or alleged breach of the warranties contained in this paragraph, or based in any respect on the contents of the Feature syndicated and published pursuant to this Agreement.

      12.    Use of Names.

      TMS shall have the right to use in connection with the promotion and sale of the Feature Susan MacNelly's name, likeness and biography. Likewise, it shall have the right to use the names, likenesses and biographies of those associates of Ms. MacNelly engaged in the production of the Feature for the same purposes.

13.    <u>Failure to Furnish Feature.</u>

If Blue Ridge Salvage fails to furnish the Feature as required hereunder, TMS shall have the right, at its discretion, to obtain or prepare substitute artwork and copy through any means and in whatever manner it chooses.  In such event, TMS shall make reasonable efforts to consult with Blue Ridge Salvage and to make arrangements for the preparation of substitute artwork and copy satisfactory to Blue Ridge Salvage. TMS may deduct the expenses occasioned by Blue Ridge Salvage's default from any money then or thereafter due Blue Ridge Salvage.

14.    <u>Notices.</u>

All notices, requests, consents, and other communications required or permitted to be given hereunder shall be in writing and delivered personally, by courier service, by telegraph, or by certified U.S. mail, return receipt requested postage prepaid, as follows:

(a)    If to Blue Ridge Salvage, to:  Susan MacNelly
P.O. Box 188
Flint Hill, Virginia 22627

with a copy to:    Robert J. Vladem
Blue Ridge Salvage Company, Inc.
853 Sheridan Road
Winnetka, Illinois 60093

(b)    If to TMS, to:    Tribune Media Services, Inc.
435 N. Michigan Avenue, Suite 1500
Chicago, Illinois 60611
Attn: David D. Williams, President/CEO

with a copy to:    General Counsel
Tribune Company
435 N. Michigan Avenue, Suite 600
Chicago, Illinois 60611

Notice so given shall be deemed received when delivered personally or by courier, or, if mailed, five (5) days after the date of deposit, postage prepaid, in the United States mail. Either party may change the address to which notices are to be sent by giving written notice of such change of address to the other party in the manner herein provided for giving notice.

14.    <u>General</u>.

(a)    This Agreement shall be governed by and construed and enforced in accordance with the laws of the State of Illinois applicable to agreements made and to be performed entirely in Illinois.

(b)    The section headings contained herein are for reference purposes only and shall not in any way affect the meaning or interpretation of this Agreement.

(c)    This Agreement sets forth the entire agreement and understanding of the parties hereto, and supersedes all prior agreements, arrangements, and understandings between the parties hereto.

(d)    TMS may assign its rights and obligations under this Agreement to any corporation or other entity controlled by, or under common control with, Tribune Company or to any entity that succeeds to substantially all of the business and assets of TMS. This Agreement is personal to Blue Ridge Salvage, however, and neither this Agreement nor any of Blue Ridge Salvage's rights or obligations hereunder may be assigned, pledged, or encumbered by Blue Ridge Salvage without the prior written approval of TMS.

(e)    This Agreement may be amended, modified, superseded, or canceled, and the terms or covenants hereof may be waived, only by written instrument executed by

both of the parties hereto, or, in the case of a waiver, by the party waiving compliance. The failure of either party at any time or times to require performance of any provision hereof shall in no manner affect the right at a later time to enforce the same. No waiver by either party or the breach of any term or covenant contained in this Agreement, whether by conduct or otherwise, in any one or more instances, shall be deemed to be, or construed as, a further or continuing waiver of any such breach or a waiver of the breach of any other term or covenant contained in this Agreement. This Agreement, and all rights and obligations hereunder, shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, executors, administrators, personal representatives, successors, licensees, and permitted assigns.

[BALANCE OF THIS PAGE INTENTIONALLY LEFT BLANK]

13

**IN WITNESS WHEREOF**, the parties have executed this Agreement as of the dates shown below.

TRIBUNE MEDIA SERVICES, INC.

By: _____

David D. Williams, President/CEO

Date: _8/23/07_____

**BLUE RIDGE SALVAGE COMPANY, INC.**

By: _____

Susan MacNelly

Date: _____

[SIGNATURE PAGE TO SYNDICATION AGREEMENT]