## IN THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| BLUE RIDGE SALVAGE COMPANY, INC. | ) ) ) | |
| Plaintiff, | ) ) ) | No. 07 C 6497<br>District Judge Norgle |
| v. | ) ) | Magistrate Judge Mason |
| TRIBUNE MEDIA SERVICES, INC. | ) ) | |
| Defendant. | ) | |

## DEFENDANT'S ANSWER AND COUNTERCLAIM

Defendant Tribune Media Services, Inc. ("TMS"), by its undersigned counsel, hereby Answers the Complaint for Declaratory Judgment ("Complaint") filed by Blue Ridge Salvage Company, Inc. ("Blue Ridge"), and states as follows:

1.    Plaintiff is Blue Ridge Salvage Company, Inc. ("Blue Ridge"). Blue Ridge is incorporated under the laws of the State of Virginia having its principal place of business in Flint Hill, Virginia.

**ANSWER:**    TMS admits the allegations of paragraph 1.

2.    Defendant is Tribune Media Services, Inc. ("TMS"). TMS is incorporated under the laws of the State of Delaware and has its principal place of business in Illinois.

**ANSWER:**    TMS admits the allegations of paragraph 2.

3.    This is an action for a declaratory judgment pursuant to 28 U.S.C. § 2201. Jurisdiction of this court is based upon diversity of citizenship pursuant to 28 U.S.C. § 1332 in that the parties are citizens of different states and the amount in controversy, exclusive of interest and costs, exceeds the sum of $75,000.

**ANSWER:**    TMS admits the allegations of paragraph 3.

4.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a) in that TMS conducts business in and from Chicago, Illinois.

**ANSWER:**     TMS admits the allegations of paragraph 4.

5.      Jeffrey K. MacNelly ("Jeff MacNelly") drew his first cartoon strip in 1969 as a political cartoonist for a weekly paper in Chapel Hill, NC. In 1970, he relocated to The Richmond News Leader in Virginia and in 1972 he was awarded his first of three Pulitzer Prizes.

**ANSWER:**     TMS admits the allegations of paragraph 5.

6.      In 1977, Jeff MacNelly started drawing the cartoon strip SHOE. The strip featured a gang of wisecracking birds who run a newspaper called The Tree Top Tattler-Tribune. The comic became and continues to be immensely popular. It twice received the prestigious Reuben Award from the National Cartoonists Society. It continues to be published in approximately 600 newspapers.

**ANSWER:**     TMS admits the allegations of paragraph 6.

7.      In 1982, Jeff MacNelly started working for the Chicago Tribune, where he received his third Pulitzer, and was honored three times as the "best in the business" among political cartoonists, in 1987, '89, and '93.

**ANSWER:**     TMS admits the allegations of paragraph 7.

8.      On or about March 10, 1986, Jeff MacNelly, as "Artist" entered into a written agreement with TMS pursuant to which he would provide the SHOE cartoon strip (the "Feature") to TMS and TMS would have certain rights to syndicate, distribute, reproduce, sell, license ancillary rights and otherwise exploit the use of the Feature.

**ANSWER:**     TMS admits that on or about March 10, 1986, Jeff MacNelly entered into a written agreement with TMS pursuant to which he would provide the "Feature" to TMS and TMS would have certain rights to syndicate, distribute, reproduce, sell, license ancillary

2

rights and otherwise exploit the use of the Feature, all as set forth in that written agreement.

TMS denies the remaining allegations of paragraph 8.

> 9.  On or before August 25, 1995, Blue Ridge Salvage Company, Inc. was formed. Blue Ridge was and is currently wholly owned by Susan MacNelly, its president. Susan MacNelly is the widow of Jeff MacNelly.

**ANSWER:**    TMS admits that Susan MacNelly is the widow of Jeff MacNelly. TMS

lacks knowledge sufficient to form a belief as to the truth of the remaining allegations of

paragraph 9.

> 10.  On or about August 25, 1995, upon information and belief, Blue Ridge and Jeff MacNelly entered into an agreement with TMS that superseded the March 10, 1986 agreement referred to in paragraph 8. Blue Ridge cannot locate a fully executed copy. The August 25, 1995 agreement ("Syndication Agreement") was between Blue Ridge and Jeffrey K. MacNelly (collectively referred to therein as "Artist") and TMS. A copy of the Syndication Agreement executed by TMS but not by Blue Ridge or Jeff MacNelly, is attached hereto as Exhibit A.

**ANSWER:**    TMS lacks knowledge sufficient to form a belief as to the truth of the

allegation that Blue Ridge cannot locate a fully executed copy of the Syndication Agreement.

TMS admits the remaining allegations of paragraph 10.

> 11.  The Syndication Agreement provided in part for Blue Ridge and Jeff MacNelly to provide the Feature to TMS and for TMS to have the exclusive rights to syndicate, distribute, reproduce, sell, license ancillary rights and otherwise exploit and authorize the use of the Feature and all of its elements.

**ANSWER:**    TMS states that the Syndication Agreement speaks for itself, that Blue

Ridge's summary thereof is inaccurate, and therefore TMS denies the allegations of

paragraph 11. TMS further states that in the Syndication Agreement, Blue Ridge and Jeff

MacNelly are collectively referred to as Artist, and that Artist agreed to provide the Feature to TMS.

> 12.   Paragraph 18 of the Syndication Agreement titled "Status of MacNelly" recognized that Jeffrey MacNelly and not Blue Ridge was actually the artist responsible for drawing the Feature and was solely an agent of Blue Ridge and not an agent or employee of TMS.

**ANSWER:**   TMS states that the Syndication Agreement speaks for itself, that Blue Ridge's summary thereof is inaccurate, and therefore TMS denies the allegations of paragraph 12. TMS also states that at the time the Syndication Agreement was signed, Jeff MacNelly was not the only artist working for Blue Ridge on the Feature.

> 13.   Paragraph 12 of the Syndication Agreement, titled "Death" provides for the termination of the Syndication Agreement upon the death of Jeff MacNelly.

**ANSWER:**   TMS denies the allegations of paragraph 13.   Further answering, under Paragraph 14 of the Syndication Agreement, the obligations of Artist set forth in Paragraph 5(b) survived any purported termination of the Syndication Agreement.

> 14.   On June 8, 2000, at the age of 52, Jeff MacNelly died. At the time of his death, Lawrence Van Gelder wrote in the New York Times, "Mr. MacNelly was regarded as one of the nation's foremost political cartoonists, a profession that calls for the combined talents of artist, casual critic, political analyst and humorist." Howard A. Tyner, a vice president at Tribune Media wrote, "There are cartoonists who have the technical skills to draw very well, cartoonists with sharp political minds, and cartoonists who are just plain funny. Jeff MacNelly was all of those."

**ANSWER:**   TMS denies that Howard A. Tyner was a vice president of Tribune Media, or of TMS, and admits the remaining allegations of paragraph 14.

> 15.   On September 20, 2000, David Williams, then TMS' President and CEO, sent a proposed letter agreement to Susan MacNelly, the widow of Jeff MacNelly, which

> was executed by Susan MacNelly on behalf of Blue
> Ridge and the Estate of Jeffrey K. MacNelly. A copy of
> the executed September 20, 2000 letter agreement is
> attached hereto as Exhibit B.

**ANSWER:**    TMS admits that on or about September 20, 2000, David Williams, then

TMS' President and CEO, sent a letter to Susan MacNelly, that the letter was signed and

agreed to on behalf of the Estate of Jeffrey K. MacNelly and Blue Ridge, and that a copy of

the letter is attached to the Complaint as Exhibit B. TMS denies the remaining allegations of

paragraph 15. Further answering, the purpose of the letter was to alleviate Susan MacNelly's

concerns, specifically, to assure her that the Syndication Agreement was not terminated by

the death of Jeff MacNelly, that TMS would continue to accept the Feature as drawn by the

remaining Blue Ridge artists, and that TMS would continue to pay the royalty rate stated in

the Syndication Agreement despite the death of Jeff MacNelly.

> 16.    The September 20, 2000 letter agreement recognized that
> the Syndication Agreement terminated by its own terms
> upon the death of Jeff MacNelly.

**ANSWER:**    TMS denies the allegations of paragraph 16.  Further answering, under

Paragraph 14 of the Syndication Agreement, the obligations of Artist set forth in Paragraph

5(b) survived any purported termination of the Syndication Agreement.

> 17.    Pursuant to the September 20, 2000 letter agreement,
> Blue Ridge and TMS agreed that Blue Ridge would now
> provide the Feature and TMS would have sole rights to
> syndicate the Feature. Unlike paragraph 2 of the
> terminated Syndication Agreement, which addressed
> both "Syndication and Ancillary rights," the September
> 20, 2000 letter agreement only granted TMS syndication
> rights.

**ANSWER:**    TMS denies the allegations of paragraph 17.  Further answering, TMS states

that the letter of September 20, 2000 provided that "Blue Ridge will continue to provide the

Feature, and TMS will retain sole syndication rights through the term of the Agreement."

18.   The September 20, 2000 letter agreement incorporated by reference to the Syndication Agreement a March 31, 2008 termination date. The September 20, 2007 [sic] letter agreement also incorporated by reference the compensation provision of the then terminated Syndication Agreement. The September 20, 2000 letter agreement does not contain any right of first refusal nor did it incorporate the right of first refusal contained in paragraph 5 of the terminated Syndication Agreement.

**ANSWER:**   TMS denies the allegations of paragraph 18, and further states that the legal

arguments set forth in paragraph 18 are erroneous.

19.   In or about early 2004, Susan MacNelly, President of Blue Ridge, expressed her concern to TMS that TMS had no interest in working with Blue Ridge to develop the licensing potential or otherwise exploit the Feature beyond merely syndicating the Feature.

**ANSWER:**   TMS admits that Susan MacNelly complained from time to time that TMS

should be doing more to license the Feature.  TMS lacks knowledge sufficient to form a

belief as to the truth of the remaining allegations of paragraph 19.

20.   In response to Susan MacNelly's concerns, TMS lead [sic] Blue Ridge to believe that it was developing a team to better exploit licensing opportunities and that this team would work with Blue Ridge on licensing opportunities for the Feature.

**ANSWER:**   TMS admits that in or about March of 2004, its new vice president for

licensing met with Susan MacNelly regarding licensing of the Feature.  TMS lacks

knowledge sufficient to form a belief as to the truth of the allegation about what Blue Ridge

believed, and denies the remaining allegations of paragraph 20.

21.   However, on or about September of 2004, TMS informed Blue Ridge that it did not have a licensing department like other syndication companies and that TMS' licensing department consisted of only two (2) people and they only had time to work on licensing deals for TMS "owned" features, which did not include SHOE.

**ANSWER:**    TMS denies the allegations of paragraph 21.

> 22.    Susan MacNelly was shocked and dismayed by TMS'
> deception as well as TMS' lack of any licensing
> infrastructure and TMS' short-sightedness.

**ANSWER:**    TMS denies that it engaged in any deceptive conduct, denies that it lacks

"licensing infrastructure," and denies that it is "short-sighted." TMS lacks knowledge

sufficient to form a belief as to the truth of the remaining allegations of paragraph 22.

> 23.    Susan MacNelly sought confirmation that Blue Ridge
> had the right to proceed on its own in licensing and
> exploiting other ancillary rights in the Feature.

**ANSWER:**    TMS admits that Susan MacNelly sent a letter to David Williams in or about

November 2004, and that the letter speaks for itself.  TMS denies any allegations in

paragraph 23 that are inconsistent with the letter.

> 24.    On or about late 2004 or early 2005, TMS confirmed that
> Blue Ridge had all ancillary rights in the Feature.

**ANSWER:**    TMS denies the allegations of paragraph 24.  Further answering, TMS states

that it sent a letter to Susan MacNelly on or about November 12, 2004, stating that "if you

wish to pursue your licensing opportunities on your own, feel free to do so. As of this date

we will no longer be involved in licensing Shoe. . . I also have no desire to argue any legal

point on this subject."

> 25.    In 2004, Susan MacNelly of Blue Ridge, on her own,
> undertook to obtain a contract with Andrew McMeel
> Publishing to publish a compilation of SHOE strips from
> the prior 27 years titled "27 Years of Shoe: World Ends
> at Ten, Details at Eleven." This book was published in
> September 2004 and Blue Ridge, and not TMS received
> all the proceeds payable from Andrew McMeel
> Publishing. To the extent some of the proceeds were paid
> by Andrew McMeel Publishing to TMS, TMS remitted
> any payments it received from the publisher to Blue
> Ridge.

**ANSWER:**    TMS admits the allegations of paragraph 25.    Further answering, the

November 12, 2004 letter referred to in TMS' answer to paragraph 24 stated that "the small

book deal with Andrews & McMeel made it difficult for us to find other opportunities in the

book market. We pitched Shoe to Barnes and Noble, Random House and others to no avail.

No one will publish a book when a competing volume is already in the works."

26.    Pursuant to paragraph 12, the Syndication Agreement terminated by its terms on June 8, 2000 upon the death of Jeff MacNelly. The September 20, 2000 letter agreement terminates on March 31, 2008.

**ANSWER:**    TMS denies the allegations of paragraph 26.

27.    The September 20, 2000 letter agreement by which Blue Ridge agreed to continue to produce the Feature and for TMS to exercise "sole syndication rights" does not contain any right of first refusal.

**ANSWER:**    TMS denies the allegations of paragraph 27 and the legal characterizations

contained therein.

28.    TMS has informed Blue Ridge that TMS claims a right of first refusal in the Feature.

**ANSWER:**    TMS admits the allegations of paragraph 28.

29.    While not agreeing that TMS has any right of first refusal, Blue Ridge agreed to TMS' request that Blue Ridge send TMS the "written proposal" from King Features pursuant to TMS' claimed right of first refusal. Consequently on or about August 15, 2007, Blue Ridge, through its attorney, sent a copy of the written proposal Blue Ridge had received from King Features. Copies of the August 15, 2007 letter and written proposal from King Features referred to therein are attached hereto as Exhibit C.

**ANSWER:**    TMS admits that while not agreeing that TMS has any right of first refusal,

Blue Ridge sent TMS certain documents Blue Ridge received from King Features, and that

these documents are attached as Exhibit C.   TMS denies the remaining allegations of

paragraph 29.

> 30.   The August 15, 2007 letter from Blue Ridge explained
> that the "written proposal" was both the August 8, 2007
> "cover letter" from King Features and the written
> "proposal for Representation of SHOE Comic Strip
> 8/8/07" included therewith.

**ANSWER:**   TMS admits that the August 15, 2007 letter from Blue Ridge expressed the

opinion of Blue Ridge that the "written proposal" was both the August 8, 2007 "cover letter"

from King Features and the written "proposal for Representation of SHOE Comic Strip

8/8/07" included therewith, but denies that Blue Ridge's opinion is valid or correct.

> 31.   The August 15, 2007 letter asked for TMS to explain
> how it could provide the same type and breadth of
> services that were contemplated in the King Features'
> proposal. Blue Ridge was seriously and rightly
> concerned about TMS' ability to fully exploit the
> ancillary rights in the Feature. For the 20 years prior to
> Jeff MacNelly's death, TMS did almost nothing with any
> of the ancillary rights that TMS had in the Feature. And
> upon Jeff MacNelly's death, TMS only sought
> syndication rights in the Feature in its September 20,
> 2000 letter agreement.

**ANSWER:**   TMS states that the August 15, 2007 letter stated, among other things:

"Please indicate whether Tribune Media is willing to and can meet each and every one of the

terms therein." TMS denies the remaining allegations of paragraph 31.

> 32.   Blue Ridge's August 15, 2007 letter to TMS expressed
> the same concerns raised over three years earlier by
> Susan MacNelly. It was these concerns, ignored by TMS,
> which Blue Ridge felt were addressed by the King
> Features' proposal.

**ANSWER:**   TMS denies that it ignored Susan MacNelly's purported concerns.   TMS

lacks knowledge sufficient to form a belief as to the truth of the remaining allegations of

paragraph 32.

33.    TMS' inability and lack of any plan to exploit the alternative media and delivery platforms, let alone the well established markets for licensing the Feature for use in such basic products as clothing and coffee mugs was and is of great concern to Blue Ridge. Simply put, it appears to Blue Ridge that TMS does not know how or even desire to make the best use of the ancillary rights in the Feature.

**ANSWER:**    TMS lacks knowledge sufficient to form a belief as to the truth of the allegations of paragraph 33 about Blue Ridge's concerns.    TMS denies the remaining allegations of paragraph 33.

34.    TMS responded to Blue Ridge's August 15, 2007 letter on August 24, 2007. First, TMS again ignored Blue Ridge's legitimate concerns when TMS failed to address the terms or services described in the King Features cover letter of August 8, 2007. The August 15, 2007 letter had explicitly defined this cover letter as part of the "written proposal" and asked TMS to address the services described therein. Second, TMS, while attempting to exercise its claimed right of first refusal, sent a new syndication agreement ("TMS 8/24/07 Proposed Syndication Agreement") that was materially different than the written proposal from King Features. A copy of TMS' August 24, 2007 response and the TMS 8/24/07 Proposed Syndication Agreement included therewith are attached hereto as Exhibit D.

**ANSWER:**    TMS admits that it responded to Blue Ridge's August 15, 2007 letter on August 24, 2007, and that a copy of TMS' August 24, 2007 response and the TMS 8/24/07 Proposed Syndication Agreement included therewith are attached as Exhibit D. TMS denies the remaining allegations of paragraph 34. Further answering, TMS states that the new syndication agreement sent to Blue Ridge dated August 24, 2007 met each of the terms of the King Features' proposal.

35.    Among the materially different terms contained in the TMS 8/24/07 Proposed Syndication Agreement is an oppressive post termination payment provision that

requires Blue Ridge to pay TMS "fifty percent (50%) of the Feature's total Net Receipts for the month previous to such termination or non-renewal, such payment to be made for a period of twelve (12) months after the date of termination." The King Features' proposal did not contain a similar post termination provision.

**ANSWER:**    TMS admits the King Features' proposal did not contain a post termination provision, just as it did not contain numerous commercial provisions Blue Ridge and TMS had previously agreed to, nor numerous commercial provisions that King Features would certainly have insisted upon before executing a binding agreement with Blue Ridge. TMS denies the remaining allegations of paragraph 35.

36.    Blue Ridge contends that TMS had no right of first refusal. However, to the extent TMS is determined to have a right of first refusal, TMS failed to accept the terms and conditions of the King Features' proposal within the 30 days referred to in the Syndication Agreement's right of first refusal because TMS proposed a new syndication agreement that was materially different than the King Features' proposal.

**ANSWER:**    TMS admits that Blue Ridge contends that TMS has no right of first refusal. TMS denies the remaining allegations of paragraph 36. Further answering, TMS states that TMS explicitly accepted each of the terms and conditions of the King Features' proposal, and that TMS' proposed syndication agreement was not materially different than the King Features' proposal.

37.    TMS has repeatedly asserted that it has exercised its right of first refusal under the Syndication Agreement and demanded that Blue Ridge execute the TMS 8/24/007 Proposed Syndication Agreement.

**ANSWER:**    TMS admits the allegations of paragraph 37.

38.    To the extent TMS claims it had a right of first refusal, Blue Ridge contends that TMS has failed to properly exercise its right of first refusal.

11

**ANSWER:**    TMS admits that Blue Ridge contends that TMS failed to properly exercise its right of first refusal, but denies that Blue Ridge's contention is correct, and therefore denies the allegations and implications of paragraph 38.

39.    Upon being notified of Blue Ridge's position, TMS again sent an executed syndication agreement and removed the post termination provision claiming the post termination provision was "immaterial." TMS again demanded that that Blue Ridge execute a new syndication agreement with TMS.

**ANSWER:**    TMS admits the allegations of paragraph 39.

40.    To the extent TMS had a right first refusal under paragraph 5 of the Syndication Agreement, TMS' attempt to cure its failure by removing the post termination payment provision was beyond the 30 day time period contained in paragraph 5 of the Syndication Agreement.

**ANSWER:**    TMS denies the allegations and implications of paragraph 40.

41.    TMS told Blue Ridge that it would be a breach of the current Syndication Agreement with TMS if Blue Ridge "attempts, or purports to attempt, to enter into a binding agreement with King Features for the Shoe Comic Strip."

**ANSWER:**    TMS admits the allegations of paragraph 41.

42.    Blue Ridge refuses to execute any syndication agreement with TMS for the Feature beyond the current March 31, 2008 termination date of the September 2000 letter agreement.

**ANSWER:**    TMS denies the September 2000 letter contained a termination date, and lacks knowledge sufficient to form a belief as to the truth of the remaining allegations of paragraph 42.

43.    Blue Ridge and King Features desire to enter into a binding syndication agreement consistent with the King Features written proposal of August 8, 2007 for the syndication and exploitation of other ancillary rights in the Feature for a period of 20 years commencing after

the March 31, 2008 termination of the current agreement
between Blue Ridge and TMS.

**ANSWER:**    TMS lacks knowledge sufficient to form a belief as to the truth of the

allegations of paragraph 43.

      44.    There exists an actual controversy between Blue Ridge
            and TMS concerning what rights if any TMS has in and
            to the Feature after March 31, 2008.

**ANSWER:**    TMS admits the allegations of paragraph 44.

## AFFIRMATIVE DEFENSE

## Breach of Implied Covenant of Good Faith and Fair Dealing

1.    Blue Ridge's deliberate and premeditated actions in refusing to honor

TMS' right of first refusal under the parties' contract, and Blue Ridge's efforts to prevent

TMS from exercising its right of first refusal, are a breach of the implied covenant of good

faith and fair dealing.

2.    On multiple occasions TMS has made clear to Blue Ridge its intention

to exercise the right of first refusal contained within the Syndication Agreement.

3.    Despite TMS' rights under the contract, Blue Ridge has acted arbitrarily

and capriciously in deeming TMS' explicit acceptance of the terms of third party King

Features' offer insufficient to exercise TMS' right of first refusal.

WHEREFORE, Tribune Media Services, Inc., prays that the Complaint for

Declaratory Judgment be dismissed with prejudice, and that Tribune Media Services, Inc., be

awarded its attorneys' fees and costs incurred herein, and all other and further relief deemed

appropriate by the Court.

## COUNTERCLAIM FOR DECLARATORY JUDGMENT

Counterplaintiff Tribune Media Services, Inc., by its undersigned attorneys, hereby brings this Counterclaim for Declaratory Judgment against Counterdefendant Blue Ridge Salvage Company, Inc., and alleges and states as follows:

### NATURE OF THE CASE

1.     This case is about a contractual right of first refusal granted to the counterplaintiff in 1995, counterplaintiff's timely and effective exercise of that right of first refusal in 2007, and the counterdefendant's breach of its contractual obligations when it premeditatedly reneged upon its obligations to honor the right of first refusal. The rights at issue are very important to these particular parties, and the principles of law are very important to the commercial marketplace. Therefore, the counterplaintiff comes to this Honorable Court most respectfully to seek a vindication of its rights, and rulings from the Court that protect and enforce the sanctity of contractual relationships.

### PARTIES

2.     Counterplaintiff Tribune Media Services, Inc. ("TMS") is a Delaware corporation with its principal place of business in Chicago, Illinois.   TMS creates, aggregates, and distributes news, information, and entertainment content using print, online, and on-screen mediums.

3.     Counterdefendant Blue Ridge Salvage Company, Inc. ("Blue Ridge") is a Virginia corporation with its principal place of business in Flint Hill, Virginia. Blue Ridge is the owner of the "Shoe" cartoon feature ("Shoe" or the "Feature").

## NON-PARTY

4.     Non-party King Features Syndicate, Inc. ("King Features") is a Delaware corporation with its principal place of business in New York, New York. King Features distributes comics, columns, editorial cartoons, puzzles, and games to newspapers.

## JURISDICTION AND VENUE

5.     This is an action for a declaratory judgment pursuant to 28 U.S.C. § 2201. Jurisdiction of this Court is based upon diversity of citizenship pursuant to 28 U.S.C. § 1332 in that the parties are citizens of different states and the amount in controversy, exclusive of interest and costs, exceeds the sum of $75,000.

6.     Venue is appropriate in this Court pursuant to 28 U.S.C. § 1391(a) in that TMS' principal place of business is in Chicago, Illinois, and a substantial part of the events giving rise to the claim occurred in this jurisdiction.

## FACTUAL ALLEGATIONS

7.     On or about August 25, 1995, TMS, Blue Ridge, and Jeffrey K. MacNelly (now deceased) entered into a "Syndication Agreement" (the "Agreement") with respect to the syndication of the Feature. A true and correct copy of the Agreement is attached hereto and incorporated by reference herein as Exhibit A. Blue Ridge and Jeffrey K. MacNelly are referred to collectively in the Agreement as "Artist."

8.     The Agreement includes provisions governing the method by which the Artist must prepare and furnish the Feature to TMS; TMS' syndication and ancillary rights with regards to the Feature; the Artist's compensation for performing obligations under the Agreement; and TMS' right of first refusal. By its terms, the Agreement is set to expire on March 31, 2008.

9.     TMS was granted a right of first refusal with regard to the rights to syndicate and distribute the Feature upon expiration of the Agreement.  Paragraph 5(b) states: "If Artist desires to grant to anyone the rights to syndicate and distribute the Feature following the expiration of the term of this Agreement, then Artist shall first offer to TMS the right to match a bona fide offer received by Artist for the Feature.  If TMS notifies Artist within thirty (30) days after the receipt of such notice that it accepts the terms and conditions so specified in the bona fide offer to Artist, the notice from Artist and the acceptance by TMS shall constitute a binding agreement."

10.     By letter dated July 16, 2007, Blue Ridge notified TMS that it had "received an offer and [has] reached an agreement in principal for the syndication rights in SHOE commencing on expiration of the current relationship with Tribune Media Services, Inc."  A true and correct copy of the July 16, 2007 letter is attached hereto and incorporated by reference herein as Exhibit B.  The letter did not disclose the identity of the offering person or entity, but summarized that offer in *five* precise terms, and asked whether TMS wished "to discuss a continued relationship with Blue Ridge Salvage Company, Inc. after expiration."

11.     By letter dated July 19, 2007, and in response to the question of whether TMS would like to continue its relationship with Blue Ridge after expiration of the Agreement, TMS referred to its right of first refusal and unequivocally stated: "The answer is yes."  A true and correct copy of the July 19, 2007 letter is attached hereto and incorporated by reference herein as Exhibit C.  In this letter TMS invoked the procedure set forth in Paragraph 5(b) of the Agreement, and requested a copy of the bona fide offer Blue Ridge had already allegedly received.  TMS further stated in this letter its intention to "draft

16

a new syndication agreement in a timely manner." From that point forward, Blue Ridge made clear its intent to interfere with and to nullify TMS' right of first refusal.

12.    By letter dated July 26, 2007, Blue Ridge stated: "It is our opinion that Tribune Media Services, Inc. will be unable to agree with" the terms provided by the then-unidentified third party offeror. A true and correct copy of the July 26, 2007 letter is attached hereto and incorporated by reference herein as Exhibit D.

13.    By letter dated July 30, 2007, TMS informed Blue Ridge that TMS was still awaiting receipt of the bona fide offer from the third party. A true and correct copy of the July 30, 2007 letter is attached hereto and incorporated by reference herein as Exhibit E.

14.    By letter dated August 9, 2007, TMS stated: "TMS today accepts all five terms offered in Mr. Vladem's July 16, 2007 letter." A true and correct copy of the August 9, 2007 letter is attached hereto and incorporated by reference herein as Exhibit F. TMS enclosed a Syndication Agreement similar to the current Agreement, including terms to match the only _five_ precise terms specified in Blue Ridge's July 16, 2007 letter.

15.    By letter dated August 15, 2007, Blue Ridge responded to TMS' request for a copy of the written offer from the third party. A true and correct copy of the August 15, 2007 letter is attached hereto and incorporated by reference herein as Exhibit G. Included with Blue Ridge's letter were: (a) a cover letter dated August 8, 2007 from the President of King Features to Blue Ridge, and (b) an attachment titled "Proposal for Representation of SHOE Comic Strip 8/8/2007" (the "Proposal") with _eight_ specific terms.

16.    In its August 15, 2007 letter to TMS, Blue Ridge attempted to characterize the Proposal from King Features as including both the cover letter and the attached Proposal. In addition, Blue Ridge denied the existence of TMS' right of first refusal

17

under the Agreement, referencing a letter of September 20, 2000, which actually stated nothing about that right at all. A true and correct copy of the September 20, 2000 letter is attached hereto and incorporated by reference herein as Exhibit H. Moreover, in its August 15, 2007 letter, Blue Ridge questioned TMS' ability to match King Features' eight-term Proposal.

17.    The August 8, 2007 cover letter from King Features transmitted with Blue Ridge's August 15, 2007 letter essentially was a marketing pitch. It did not include any contractual obligations, and specifically stated that "[a]ttached is a proposal for the representation of the Shoe Comic Strip." Therefore, TMS considered the Proposal itself as the "bona fide offer" from King Features. Thus, by a letter dated August 24, 2007 entitled "Acceptance of Offer," and in keeping with its previous assertions of its intent to do so, TMS expressly exercised its right of first refusal under Paragraph 5(b). A true and correct copy of the August 24, 2007 letter is attached hereto and incorporated by reference herein as Exhibit I. The letter states in relevant part: "TMS hereby notifies Blue Ridge that it accepts the terms and conditions specified in the bona fide offer that Blue Ridge received from King Features. Accordingly, pursuant to the Syndication Agreement, your notice to TMS and this acceptance 'constitute a binding agreement.'" To memorialize that agreement, TMS attached a new Syndication Agreement incorporating each of the eight terms of the King Features' Proposal.

18.    Despite TMS' clear acceptance of the terms and conditions of King Features' Proposal, by letter dated October 1, 2007, Blue Ridge denied and attempted to nullify TMS' contractual right of first refusal. A true and correct copy of the October 1, 2007 letter is attached hereto and incorporated by reference herein as Exhibit J. Stating among

other things (and without any basis) that King Feature's cover letter of August 8, 2007 was a part of the Proposal, Blue Ridge contended that the relationship which exists under the Agreement will terminate as of March 31, 2008, and that TMS has no right to extend that relationship.

19.    By letter dated October 18, 2007, TMS reiterated that "TMS has unequivocally and unambiguously exercised its right of first refusal," and that pursuant to the Agreement, Blue Ridge's notice to TMS and TMS' subsequent acceptance constitute a binding agreement. A true and correct copy of the October 18, 2007 letter is attached hereto and incorporated by reference herein as Exhibit K. Highlighting the numerous efforts of Blue Ridge to deprive TMS of its contractual rights, the letter advised Blue Ridge to refrain from entering into an agreement with King Features, and further stated TMS' intention to "take all appropriate actions to protect these contractual rights."

## COUNT I – ACTION FOR DECLARATORY JUDGMENT

1-19.    TMS incorporates by reference herein the allegations set forth in Paragraphs 1-19 above.

20.    As of the date of the filing of this Counterclaim for Declaratory Judgment, Blue Ridge has refused to fulfill its contractual obligations. By its refusal, Blue Ridge has stated its belief that it is not contractually bound by the Agreement to take the actions demanded by TMS under Paragraph 5(b) of the Agreement. TMS has a legal interest in ensuring that Blue Ridge complies with its contractual obligations, and as indicated by its refusal to comply with these obligations, Blue Ridge has an opposing interest. Therefore, there is an actual controversy between TMS and Blue Ridge about their respective rights and obligations under Paragraph 5(b) of the Agreement.

21.    For these reasons, TMS seeks a declaration from this Court: (a) that TMS has appropriately exercised its right of first refusal under Paragraph 5(b) of the Agreement; (b) that Blue Ridge has entered, or is obligated to enter, into a new agreement with TMS regarding the Feature, effective as of April 1, 2008; and (c) that Blue Ridge may not enter into an agreement regarding the Feature with any person or entity other than TMS.

WHEREFORE, Tribune Media Services, Inc. ("TMS") respectfully prays that this Court issue a declaratory judgment setting forth the respective rights and obligations of the parties with respect to the right of first refusal contained in Paragraph 5(b) of the parties' Syndication Agreement, including, without limitation: (a) that TMS has a right of first refusal under Paragraph 5(b) of the Syndication Agreement; (b) that TMS has taken the appropriate steps to exercise effectively its right of first refusal; (c) that Blue Ridge Salvage Company, Inc. ("Blue Ridge") is required to immediately deliver a fully executed Syndication Agreement to TMS, and/or must enter into a new agreement with TMS, regarding the "Shoe" comic strip effective as of April 1, 2008, all consistent with TMS' exercise of its right of first refusal; and (d) that Blue Ridge may not enter into an agreement regarding the "Shoe" comic strip with any person or entity other than TMS. TMS further seeks an award in its favor and against Blue Ridge of the attorneys' fees and costs incurred in this matter, and any and all additional and further relief which the Court deems just and appropriate.

## COUNT II – ACTION FOR INJUNCTIVE RELIEF

1-21.    TMS incorporates by reference herein the allegations set forth in Paragraphs 1-21 above.

22.    Based on King Features' Proposal of August 8, 2007 (part of Exhibit G), and Blue Ridge's letter of October 1, 2007 (Exhibit J), it appears that Blue Ridge and King Features intend to enter into an agreement regarding the Feature based on Blue Ridge's erroneous contention that TMS does not have a contractual right of first refusal or, in the alternative, that TMS has failed to exercise effectively its right of first refusal.

23.    Paragraph 9 of the Agreement provides that "[s]o long as this Agreement shall be in effect ... Artist shall not enter into any contract, agreement, understanding, or arrangement to prepare any material similar to the Feature for any newspaper ... or for distribution ... Artist and TMS agree that, in the event of any breach of the covenants contained in this paragraph, TMS will not have an adequate remedy at law and shall, in addition to any other appropriate equitable or legal relief, be entitled to an injunction from a court of competent jurisdiction restraining Artist from any such breach."

24.    In light of these facts, the Court should permanently restrain, enjoin, and prevent Blue Ridge from entering into any agreement relating to the Feature with King Features or any other person or entity that would interfere with and/or purport to supersede the rights of TMS.

25.    The Feature is unique, TMS has no adequate remedy at law, and the public interest would be served by protecting TMS' contractual rights.  Therefore, the Court should assert its equitable jurisdiction to prevent Blue Ridge from avoiding its contractual obligations, and to restrain and prevent Blue Ridge from interfering with TMS' property rights in the Feature.

WHEREFORE, Tribune Media Services, Inc. ("TMS") respectfully prays that this Court permanently restrain, enjoin, and prevent Blue Ridge Salvage Company, Inc.

("Blue Ridge") and its officers, agents, employees, attorneys, and all persons in active

concert or participation with any of them, from entering into any contract, agreement,

understanding, or arrangement for the syndication or distribution of the "Shoe" comic strip

with any person or entity other than TMS. TMS further seeks an award in its favor and

against Blue Ridge of the attorneys' fees and costs incurred in this matter, and any and all

additional and further relief which the Court deems just and appropriate.

TRIBUNE MEDIA SERVICES, INC.


By  /s/ Frederic R. Klein
        One of Its Attorneys

Frederic R. Klein
Chad A. Blumenfield
Kerry K. Donovan
GOLDBERG KOHN BELL BLACK
  ROSENBLOOM & MORITZ, LTD.
55 East Monroe Street
Suite 3300
Chicago, Illinois  60603
(312) 201-4000