# APPENDIX

**Syndication Agreement**
8-25-95................................................................................Ex. A

**Letter to John Twohey at Tribune from Robert Vladem at Blue Ridge Salvage**
7-16-07................................................................................Ex. B

**Letter to Robert Vladem at Blue Ridge Salvage from Beth Fulkerson at Tribune**
7-19-07................................................................................Ex. C

**Letter to Beth Fulkerson at Tribune from Robert Vladem at Blue Ridge Salvage**
7-26-07................................................................................Ex. D

**Letter to Steven Wolf at Wolf Holland & Matern from Beth Fulkerson at Tribune**
7-30-07................................................................................Ex. E

**Letter to Steven Wolf at Wolf Holland & Matern from Beth Fulkerson at Tribune**
8-09-07................................................................................Ex. F

**Letter to Beth Fulkerson at Tribune from Steven Wolf at Wolf Holland & Matern**
8-15-07................................................................................Ex. G

**Letter to Susan MacNelly from David Williams at Tribune**
9-20-00................................................................................Ex. H

**Letter to Steven Wolf at Wolf Holland & Matern from Salvador Karottki**
8-24-07................................................................................Ex. I

**Letter to Beth Fulkerson at Tribune from Steven Wolf at Wolf Holland & Matern**
10-01-07................................................................................Ex. J

**Letter to Steven Wolf at Wolf Holland & Matern from Frederic Klein at Goldberg Kohn, 10-18-07** ................................................................................Ex. K

# EXHIBIT A

# SYNDICATION AGREEMENT

This Agreement is entered into as of the 25th day of August, 1995 between Tribune Media Services, Inc., a Delaware corporation ("TMS"), Blue Ridge Salvage Company, Inc., a Virginia corporation  and Jeffrey K. MacNelly (collectively referred to as "Artist") and, upon its Effective Date (defined below), supersedes the March 10, 1986 agreement between the parties regarding the syndication of the "Shoe" cartoon feature and all amendments thereto.  The parties agree as follows:

1.    The Feature.

During each week of the term of this Agreement, Artist agrees to prepare and furnish to TMS six (6) cartoon panels in black and white suitable for daily newspaper publication and one (1) page per week of cartoon drawings of the Feature in color suitable for Sunday newspaper publication (the "Feature").  The Feature shall be furnished in accordance with the following provisions:

(a)    The Feature shall be entitled "SHOE" or such other title as TMS and Artist shall mutually agree upon .  The Feature shall be based upon characters similar to those portrayed in the " Shoe" cartoon feature that Artist has heretofore submitted for publication through TMS.

(b)    The Feature shall be of the highest quality Artist is capable of producing, shall be suitable for publication in major daily newspapers and shall be of a quality equal to that he has heretofore submitted for publication.

(c)    The Feature shall be delivered to TMS at a place to be designated by TMS, the expense of such delivery to be borne by Artist.

(d)    The Feature shall be delivered to TMS at least eight (8) weeks in advance of the date of publication. Artist acknowledges that TMS is obligated to deliver the Feature to its syndicate customers regularly and at fixed times and that a failure to make such regular and timely delivery might subject TMS to liability. Accordingly, it is expressly agreed that the time for delivery of the Feature to TMS shall be of the essence of this Agreement. Artist further agrees to indemnify TMS against any liability or expense (including reasonable attorneys' fees) caused by any failure by Artist to make such regular and timely delivery.

2.    <u>Syndication and Ancillary Rights.</u>

During the term of this Agreement, and except as otherwise expressly provided herein, TMS shall have the sole right throughout the world to syndicate, distribute, reproduce, sell, license ancillary rights, or otherwise exploit and authorize the use of the Feature and all its elements in print, electronic, or any other media application, and to take such other action, if any, to exploit the Feature as TMS, in its sole discretion, deems appropriate. TMS shall have absolute discretion in selecting purchasers (which may be affiliates of TMS) of any rights in the Feature and in determining prices and terms of sale in any media provided, however, that any arrangements between TMS and purchasers of the Feature who are affiliates of TMS shall be on an arm's length and bona fide basis. All or any part of TMS's rights hereunder may be assigned or reassigned from time to time to any foreign sales or foreign syndication agency or agencies (which may be affiliates of TMS), which may act with respect to the assigned rights in its or their own name or names. TMS shall use good faith and due diligence in marketing the Feature and in exercising the rights set forth herein.

2

3.    Compensation.

(a)    Beginning upon the Effective Date (defined below in paragraph 4), in consideration of the satisfactory performance by Artist of the obligations assumed by Artist under this Agreement, and the rights granted to TMS herein, TMS shall pay to Artist an amount equal to sixty percent (60%) of the "Net Receipts," as defined below, from the syndication of the Feature during the term of this Agreement.    TMS guarantees that the amounts payable to Artist pursuant to this Agreement shall not be less than Eight Hundred Dollars ($800.00) per week, less any amounts due to TMS pursuant to paragraph 3(e), during the term of this Agreement.

(b)    "Net Receipts" as used herein shall mean revenues actually received by TMS from the sale and syndication of the Feature, less the sum of:

(i)    Costs of duplicating, proofs, printing, paper, reproduction, transmission costs, and other similar production, editing, and distribution charges;

(ii)    Commissions, fees or other sales expenses relating to foreign sales or syndication of the Feature;

(iii)    Bad debts arising out of the sale or syndication of the Feature;

(iv)    Rebates or allowances paid or allowed by TMS, or its assignees, to any purchaser of any rights in the Feature;

(v)    Actual promotion expenses; and

(vi)    Other costs, expenses, and liabilities which, pursuant to any provision of this Agreement, are to be deducted from gross revenues.

Within twenty (20) days after the close of each accounting period of TMS (each accounting period being either four (4) or five (5) weeks, as determined by TMS), TMS shall

3

determine and pay to Artist the amount, if any, payable pursuant to subparagraph 3(a) for the "Net Receipts" received by TMS during such accounting period.

(c)    If TMS grants to a third party (including affiliates of TMS) the right to publish the Feature in book form or TMS licenses to a third party the right to reproduce, use or otherwise exploit the Feature or certain fanciful characters contained therein in connection with the manufacture, sale, distribution, presentation or production of merchandise, theatrical or stage plays, television or radio dramatizations or representations or motion pictures (collectively, "Licensing Agreements"), then TMS shall pay to Artist sixty Percent (60%) of the gross amounts actually received by TMS from such third party for the grant of rights, including all advances and royalties, after the deduction of all of TMS's direct and reasonable expenses, if any, in connection with the granting of such rights and the collection of such amounts. Payments pursuant to this subparagraph 3(c) shall be made within thirty (30) days following TMS's receipt of amounts giving rise to such payments.

(d)    TMS shall keep accurate books and records reflecting amounts accrued from the sale of the Feature and shall furnish to Artist monthly statements which shall disclose all sales of the Feature, the purchasers, and the amounts actually received. Artist shall have the right, in person or by duly authorized agents, to examine TMS's records in which the accounts and information relative to this Agreement are maintained and to make photocopies of said records, provided such inspection shall be made during normal business hours and upon reasonable notice.

(e)    In connection with this Agreement and in further consideration of the Artist's satisfactory performance of his obligations and the rights granted to TMS herein and upon fulfillment of conditions in related conditions in related escrow agreement, TMS will loan Blue Ridge Salvage Company (" Blue Ridge" ) $500,000 (in two separate consecutive loans)

4

and the parties will execute appropriate Promissory Notes, a Security Agreements, Trademark Assignments and Copyright Assignments (the "Loan Documents") in connection with those loans.    All amounts due from Artist pursuant to the Loan Documents shall be deducted from the payments due  to Artist under paragraphs 3(a) through 3(c) of this Agreement.

    4.    <u>Term of Agreement</u>.

    (a)    The term of this Agreement shall commence on the Effective Date and shall continue until March 31, 2008, subject to subparagraphs 4(b) and 4(c) below.  The Effective Date for this Agreement shall be the date on which the contingencies described in that certain escrow agreement dated August 25, 1995 are fulfilled and the escrowed documents, including this Agreement, are released from escrow.

    (b)    If, during any two (2) consecutive accounting periods of the term of this Agreement, the average of the amounts of Net Receipts generated by the Feature shall be less than Eight Hundred Dollars ($800.00) per week, then either TMS or Artist may terminate this Agreement by written notice to the other party given no later than sixty (60) days following the end of the second such accounting period, provided, however, that Artist may not elect to terminate under this provision unless Artist has satisfied all of his obligations under the Loan Documents and he has fully repaid all principal and accrued interest thereunder.  Notwithstanding the foregoing, if Artist elects to terminate this Agreement pursuant to this subparagraph 4(b), TMS may keep this Agreement in effect by notifying Artist that TMS will cause payments to Artist pursuant to subparagraph 3(a) to be not less than the minimum weekly guarantee as set forth in subparagraph 3(a) above. TMS may keep this Agreement in effect for so long as TMS maintains such payments, less any amount due pursuant to paragraph 3(e). If this Agreement is terminated pursuant to

this subparagraph 4(b), the termination shall be effective thirty (30) days following the date of notice.

5.    Rights of First Refusal

(a)    During the term of this Agreement, including renewals and extensions thereof, Artist grants to TMS a right of first refusal to acquire such rights as TMS is acquiring in the Feature in any new feature created by Artist for syndication to newspapers or other print media or for electronic transmission. Artist shall not enter into an agreement for the exploitation of the said new feature without offering to TMS the right to match a bona fide offer received by Artist with respect to said new feature. For purposes of this paragraph, a bona fide offer shall consist of a written bid or proposed contract submitted to Artist by a financially responsible third party. TMS shall have thirty (30) business days from its receipt of such bona fide offer and Artist's request for acceptance or rejection thereof by TMS to respond. The terms of the bona fide offer forwarded by Artist and the acceptance by TMS shall constitute a binding agreement. If TMS does not accept said terms and conditions, then Artist may grant the rights contained in the bona fide offer to the offeror; provided, however, that Artist shall not make any such grant on terms more favorable to such other party than the terms specified in Artist's notice of a bona fide offer to TMS without giving TMS another similar opportunity to accept said terms.

(b)    If Artist desires to grant to anyone the rights to syndicate and distribute the Feature following the expiration of the term of this Agreement, then Artist shall first offer to TMS the right to match a bona fide offer received by Artist for the Feature. If TMS notifies Artist within thirty (30) days after the receipt of such notice that it accepts the terms and conditions so specified in the bona fide offer to Artist, the notice from Artist and the acceptance by TMS shall constitute a binding agreement. If TMS does not accept said

6

terms and conditions, then Artist may grant the right previously offered to TMS to any other party; provided, however, that Artist shall not make any such grant on terms more favorable to such other party than the terms specified in Artist's notice to TMS without giving TMS another similar opportunity to accept said terms.

(c)    MacNelly currently produces editorial cartoons pursuant to an employment agreement with Chicago Tribune Company dated March 1, 1990.  Upon termination of MacNelly's employment with Chicago Tribune for any reason, Artist grants TMS for a term that is conterminous with the term of this Agreement the sole right throughout the world to syndicate, distribute, reproduce, sell, license ancillary rights, or otherwise exploit and authorize the use of Artist's editorial cartoons and all of their elements in print, electronic, or any other media application, and to take such other action, if any, to exploit the Feature as TMS, in its sole discretion, deems appropriate.   In exchange for those rights, Artist will receive fifty percent (50%) of the net receipts for those editorial cartoons pursuant to the same terms as set forth in paragraph three of this Agreement.

6.    **Independent Contractor**.

It is understood and agreed that this Agreement is for the purchase of certain rights only and that Artist is an independent contractor.  Artist shall do the work required to produce the Feature on his own time, at his own expense, in his own way, using his own supplies, and he shall furnish his own place of work and his own assistants, if any are required, free from direction and control by TMS.  The means of producing the Feature shall be solely within Artist's control.  Artist agrees to discharge all obligations imposed upon employers and self-employed persons under any applicable union agreement or federal, state, or local law, regulations, or order now or hereafter in force, including, but not limited to, taxes, unemployment compensation or insurance, workers' compensation, and

7

social security, and including the filing of all returns and reports required of any employer and the payment of all assessments, taxes, contributions, or other sums required, since Artist shall not be treated as an employee of TMS for federal, state, or local tax purposes. To the extent permitted by law, Artist further agrees to indemnify and hold TMS harmless against all claims and demands resulting from Artist's failure to comply with the provisions of this paragraph. This Agreement shall not in any way constitute the parties as partners or joint venturers, nor as principal and agent.

7.    Editorial Supervision.

(a)    TMS shall have the entire editorial supervision of the Feature and may make changes, deletions, or additions in or to the Feature with the approval of Artist, which shall not be unreasonably withheld. In the event that TMS and Artist shall be unable to mutually agree on edits, changes, deletions, or additions to the Feature, Artist agrees to furnish a substitute strip for the strip in question.

(b)    TMS shall not be obligated to accept, syndicate, or pay for any materials for the Feature which do not comply with the requirements set forth herein or which in TMS's reasonable opinion might subject TMS to any claim by any third party.

(c)    In the event of rejection of any material for the Feature by TMS, TMS shall give Artist written notice of its reason for rejection and Artist shall be given reasonable time to produce and deliver substitute material; provided, however, that upon the inability or failure of Artist to submit revised material to TMS at least four (4) weeks in advance of the date of publication with respect to daily cartoon panels, and at least six (6) weeks in advance of the date of publication with respect to Sunday color pages, the provisions of paragraphs 1(d) and 15 herein shall apply.

8.    Ownership of Feature.

8

(a)    As between Artist and TMS, Artist shall be the owner of the Feature, including, but not limited to, all materials furnished by Artist to TMS pursuant to this Agreement, and all trademarks and all copyrights and renewals and extensions thereof. Notwithstanding the foregoing, during the term of this Agreement, TMS shall have the sole and exclusive right to exercise all subsidiary rights in the Feature of any kind, and TMS shall have the sole and exclusive right to publish and authorize the publishing and distribution of the Feature in print and other media (including, without limitation, publication and distribution in book, booklet, pamphlet, CD-ROM, cabletext, videotex, audiotex, and electronic data base form, and other forms of electronic transmission) and TMS shall have exclusive stage, motion picture, radio, television, animation, mechanical reproduction, and commercial exploitation rights (including, without limitation, merchandising rights), and may exercise all other rights in the Feature throughout the world. The parties agree that the Feature syndicated to newspapers shall contain the following notice:  ● "19___, Tribune Media Services, Inc. All Rights Reserved." Artist agrees to execute and deliver to TMS, promptly on request, any documents which TMS may reasonably request to evidence TMS's exclusive rights as provided in this paragraph. It is understood and agreed that revenues derived by TMS, during the term hereof, in connection with TMS's exercise of its rights pursuant to this paragraph, after deduction of TMS's direct and reasonable expenses, if any, in connection with the granting of such rights and collection of such amounts, shall be included in calculating Net Receipts pursuant to paragraph 3(a) hereof.

(b)    Notwithstanding the foregoing, TMS shall be entitled to its share of revenues received after the expiration of this Agreement pursuant to Licensing Agreements entered into by TMS during the term of this Agreement including all extensions and renewals.

9

9.    <u>Exclusivity</u>.

So long as this Agreement shall be in effect (including any time during which Artist may be in default hereunder or in breach hereof), Artist shall not enter into any contract, agreement, understanding, or arrangement to prepare any material similar to the Feature for any newspaper or newspapers or magazines distributed with newspapers or for distribution by cabletext, videotape, audiotex, or other form of electronic transmission. Artist and TMS agree that, in the event of any breach of the covenants contained in this paragraph, TMS will not have an adequate remedy at law and shall, in addition to any other appropriate equitable or legal relief, be entitled to an injunction from a court of competent jurisdiction restraining Artist from any such breach.

10.    <u>Enforcement of TMS's Rights</u>.

Artist hereby appoints TMS (and such substitutes as TMS may from time to time select) as Artist's irrevocable attorney in fact, with the right, but not the obligation, to enforce and protect all rights herein granted to or acquired by TMS, and to prevent infringement of any copyrights and trademarks, and to litigate, collect, and receipt for all damages arising from any infringement of such rights, to use Artist's name as being plaintiff or defendant in any proceeding, and Artist agrees to execute such further instruments as TMS may deem appropriate to carry out the provisions of this paragraph.

10

11.    <u>Warranty</u>.

Artist represents and warrants that Artist has the full power and authority to enter into and perform this Agreement, that there is no contract, agreement, or understanding with any other person, firm, or corporation which would interfere with the obligations assumed by Artist hereunder, and that the Feature and all materials furnished to TMS hereunder will be new, original, and unpublished, and that the Feature will not infringe upon or violate any copyright, trademark, tradename, literary, artistic, or other property right, right of privacy, or any other right of any person, firm, or corporation and will not contain any libelous or unlawful material.  Artist agrees to indemnify and hold harmless TMS, its employees, officers, directors, stockholders, licensees, successors, and assigns, from and against any and all losses, damages, costs, and expenses, including the legal fees and expenses incident thereto, arising from any suit, claim, or demand based upon any breach or alleged breach of the warranties contained in this paragraph.

12.    <u>Death</u>.

In the event of the death of MacNelly while this Agreement is in effect, (a) payments pursuant to subparagraph 3(a) hereof shall continue through the date on which material prepared by MacNelly prior to MacNelly's death and not previously published and acceptable to TMS for publication shall be published, and  (b) all payments due to Artist hereunder shall be made to Artist's legal representatives  and TMS shall have no further liability hereunder to Artist's legal representatives, heirs, legatees, or assigns, except to pay Artist's share of revenues received by TMS from materials prepared by Artist prior to Artist's death.

13.    <u>Use of Name; Promotion</u>.

11

During the term of this Agreement, TMS shall have the right, subject to Artist's prior approval which shall not be unreasonably withheld, to use MacNelly's name, likeness, and biography in connection with the Feature and the promotion and sale of the Feature.

14.    Termination.

The obligations assumed by Artist in paragraphs 5(b), 6, 8(b), 10, and 11 hereof shall survive any termination or cancellation of this Agreement.

15.    Failure to Furnish Feature.

If Artist fails to furnish the Feature as required hereunder, TMS shall have the right, at its discretion, to obtain or prepare substitute copy through any means and in whatever manner it chooses.  In such event, TMS shall make reasonable efforts to consult with Artist and make arrangements for the preparation of substitute copy satisfactory to Artist.  TMS may deduct the expenses or the loss of income occasioned by Artist's default from any money then or thereafter due Artist.  If the failure to furnish the Feature continues for a period of fourteen (14) consecutive days, TMS shall have the right to terminate this Agreement by written notice to Artist, unless such failure is caused by Artist's inability to produce the Feature due to disability or serious illness.  In the event that Artist is unable to produce the Feature due to disability or serious illness and the period of such inability exceeds sixty (60) days, TMS shall have the right to terminate this Agreement by written notice delivered to the other party.

16.    Notices.

All notices, requests, consents, and other communications required or permitted to be given hereunder shall be in writing and delivered personally or sent by certified mail, return receipt requested, postage prepaid, as follows:

If to Artist:        Jeffrey MacNelly
                     P.O. Box 188
                     Flint Hill, VA 22627

        If to TMS:       Tribune Media Services, Inc.
                         435 N. Michigan Avenue, Suite 1500
                         Chicago, Illinois 60611
                         Attn: David D. Williams, President/CEO

        cc:              Dale Cohen
                         Senior Counsel
                         Tribune Company
                         435 N. Michigan Avenue
                         Suite 600
                         Chicago, Illinois 60611

Any notice so given shall be deemed received when delivered personally, or, if mailed, when deposited, postage prepaid, in the United States mail. Either party may change the address to which notices are to be sent by giving written notice of such change of address to the other party in the manner herein provided for giving notice.

17.    General.

(a)    This Agreement shall be governed by and construed and enforced in accordance with the laws of the State of Illinois applicable to agreements made and to be performed entirely in Illinois.

(b)    The section headings contained herein are for reference purposes only and shall not in any way affect the meaning or interpretation of this Agreement.

(c)    This Agreement sets forth the entire agreement and understanding of the parties hereto concerning the subject matter hereof, and supersedes all prior agreements, arrangements, and understandings between the parties hereto.

(d)    TMS may assign its rights and obligations under this Agreement to any corporation or other entity controlled by, or under common control with, Tribune Company,

13

or to any entity which succeeds to substantially all of the business and assets of TMS. This Agreement is personal to Artist, however, and neither this Agreement nor any of Artist's rights or obligations hereunder may be assigned, pledged, or encumbered without the prior written approval of TMS.

(e)     This Agreement may be amended, modified, superseded, or cancelled, and the terms and covenants hereof may be waived, only by a written instrument executed by both of the parties hereto, or, in the case of a waiver, by the party waiving compliance. The failure of either party at any time or times to require performance of any provision hereof shall in no manner affect the right at a later time to enforce the same. No waiver by either party of the breach of any term or covenant contained in this Agreement, whether by conduct or otherwise, in any one or more instances, shall be deemed to be, or construed as, a further or continuing waiver of any such breach or a waiver of the breach of any other term or covenant contained in this Agreement.

18.     Status of MacNelly

The parties recognize and acknowledge that MacNelly is the artist responsible for drawing the feature pursuant to an agreement with Blue Ridge.     The parties further acknowledge that MacNelly is solely an agent of Blue Ridge and is not an employee or agent of TMS with respect to the activities contemplated by this Agreement. MacNelly has executed this Agreement for the   limited purposes of evidencing his consent to the Agreement in his status as Artist of the Feature, evidencing his willingness to grant such rights to Blue Ridge and agreeing to observe such restrictions as maybe imposed upon him by Blue Ridge as may be reasonably necessary to enable Blue Ridge to comply with the provisions of this Agreement.

14

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date shown above.

TRIBUNE MEDIA SERVICES, INC.

By: _____
DAVID D. WILLIAMS, President/CEO

BLUE RIDGE SALVAGE COMPANY

By: _____
President

_____
Jeffrey K. MacNelly

\20336\030\MACNELLY.WPS

# EXHIBIT B



July 16, 2007

<u>VIA FEDERAL EXPRESS</u>

Mr. John Twohey
Tribune Media Services, Inc.
435 N. Michigan Avenue, Suite 1500
Chicago, Illinois 60611

Dear John:

      Thanks for returning my call of last Friday this morning and advising me of your limited availability to connect because of your current travel schedule. I will also be traveling this week. The purpose of my call to you was to advise you where we are with SHOE and to discuss with you our relationship with Tribune Media Services, Inc. This letter should bring you up to date in advance of and in anticipation of our conversation.

      We received an offer and have reached an agreement in principal for the syndication rights in SHOE commencing on expiration of the current relationship with Tribune Media Services, Inc. The offer includes licensing and other supplementary and subsidiary rights arising out of the feature including but not limited to the use, sale, publication, or other exploitation of the material, characters, names or ideas in SHOE.

The offer provides for:

- Blue Ridge Salvage Company to deliver six cartoon panels in black and white for daily publication and one page per week of cartoon drawings in color for Sunday publication



- $350,000 signing bonus, payable $175,000 on signing of the agreement and $175,000 on the commencement date of the agreement
- 65% royalty on net receipts from publications licensed to publish and other sources of revenue in existence prior to the commencement date of the agreement
- 50% royalty on net receipts from all new sources of revenue after the commencement date of the agreement
- 20 year term

After considering the terms of the proposed agreement, please contact me if Tribune Media Services, Inc. desires to discuss a continued relationship with Blue Ridge Salvage Company, Inc. after expiration.

Please do not hesitate to contact me if you have any questions.

With best regards,

Blue Ridge Salvage Company, Inc.

Robert J. Madem

cc:    David D. Williams, President/CEO (Via Federal Express)
       Dale Cohen, Senior Counsel (Via Federal Express)
       Susie MacNelly

# EXHIBIT C

Beth A. Fulkerson
Senior Counsel/Intellectual Property & Interactive
312/222-4653

**TRIBUNE**

Tribune Company
435 North Michigan Avenue
Chicago, Illinois 60611-4066
fax: 312/222-4206
e-mail: bfulkerson@tribune.com

July 19, 2007

**VIA FEDERAL EXPRESS**

Mr. Robert J. Vladem
Blue Ridge Salvage Company, Inc.
853 Sheridan Road
Winnetka, Illinois 60093

               Re:     Tribune Media Services Syndication Agreement

Dear Mr. Vladem:

I write on behalf of Tribune Media Services, Inc. (TMS) in response to your July 16, 2007 letter to John Twohey, regarding the March 31, 2008 expiration of the TMS syndication agreement with Blue Ridge Salvage Company, Inc. ("TMS Agreement").

You explain in your letter that Blue Ridge Salvage Company, Inc. ("Blue Ridge") has received an offer for the syndication rights in SHOE, beginning when the TMS Agreement ends. You also ask whether TMS would like to continue its relationship with Blue Ridge after the expiration of the TMS Agreement.

The answer is yes. Under Section 5(b) of the TMS Agreement, TMS has a right of first refusal: "If Artist desires to grant to anyone the rights to syndicate and distribute the Feature following the expiration of the term of this Agreement, then Artist shall first offer to TMS the right to match a bona fide offer received by Artist for the Feature. If TMS notifies Artist within thirty (30) days after the receipt of such notice that it accepts the terms and conditions so specified in the bona fide offer to Artist, the notice from Artist and the acceptance by TMS shall constitute a binding agreement." A bona fide offer is defined as "a written bid or proposed contract submitted to Artist by a financially responsible third party."

Please send a copy of the written bid or proposed contract by Monday, July 23, 2007, so that TMS can consider "the terms and conditions so specified," and draft a new syndication agreement in a timely manner. I look forward to working with you.

Sincerely,

*Beth Fulkerson*

Beth Fulkerson

cc:    Susie MacNelly
       David D. Williams
       John Twohey

# EXHIBIT D



July 26, 2007

VIA FEDERAL EXPRESS

Ms. Beth Fulkerson
Tribune Company
435 N. Michigan Avenue
Chicago, Illinois 60611-4066

Dear Ms. Fulkerson:

I wanted to respond in writing to your letter of July 19, 2007 responding to my letter to John Twohey. As you undoubtedly know from my letter to Mr. Twohey. John and I had traded phone calls in an attempt to discuss our relationship with Tribune Media Services, Inc. The determination of the possibility of a continued relationship between us is an ongoing process. We chose to commence the process by advising John of the most basic material terms of the agreement reached in principal for the syndication and other rights in SHOE commencing on expiration of the current relationship with Tribune Media Services, Inc. with the expectation that we would receive an indication of the acceptability of these terms. If acceptable, we could continue the process, if not, we could all move on.

Further, after considering the content of your letter I have forwarded it to our counsel for further reply as they deem appropriate and necessary. I expect that you will hear from them before the end of the week.

One additional aspect of the possibility of a continued relationship with Tribune Media Services, Inc. for your consideration are the non-monetary and/or performance related terms of the agreement reached in principal for the other

Ms. Beth Fulkerson
July 26, 2007
Page 2

rights and syndication of SHOE.  It is our opinion that Tribune Media Services,
Inc. will be unable to agree with many of them.

After considering the above, we hope Tribune Media Services, Inc.
contacts me to discuss whether is makes sense to proceed.

Please do not hesitate to contact me if you have any questions.

With best regards,

Blue Ridge Salvage Company, Inc.

Robert J. Vladem

cc:    Susie MacNelly
       David D. Williams
       John Twohey

# EXHIBIT E

Beth A. Fulkerson
Senior Counsel/Intellectual Property & Interactive
312/222-4653

# TRIBUNE

Tribune Company
435 North Michigan Avenue
Chicago, Illinois 60611-4066
fax: 312/222-4206
e-mail: bfulkerson@tribune.com

July 30, 2007

VIA FACSIMILE
847-374-0601

Mr. Steven B. Wolf
Wolf Holland & Matern LLP
500 Lake Cook Road
Suite 130
Deerfield, Illinois 60015

Re:     Tribune Media Services Syndication Agreement

Dear Mr. Wolf:

Thank you for calling last week. Since then, TMS has received the July 26, 2007, correspondence you said was in the mail from Mr. Vladem, inquiring whether it makes sense for the parties to proceed with discussions regarding whether TMS will match the terms of the offer Mr. Vladem outlined in his July 16, 2007 letter.

As I stated on the phone, TMS will consider matching the offer. But first TMS has to receive an offer, in writing, submitted to Blue Ridge Salvage Company, Inc., by a financially responsible third party. Only then is the offer deemed a "bona fide offer" under the terms of the current syndication agreement. And only then does the 30-day right of first refusal period begin to run.

You mentioned that you would send over an NDA to cover TMS' review of the offer. I await the NDA, as well as the bona fide offer.

Sincerely,

Beth A Fulk

cc: Susie MacNelly
Robert J. Vladem
David D. Williams
John Twohey

## Confirmation Report — Memory Send

```
                                    Page      : 001
                                    Date & Time: Jul-31-07  11:30am
                                    Line 1    :
                                    Line 2    :
                                    Machine ID :
```

| | | |
|---|---|---|
| Job number | : | 642 |
| Date | : | Jul-31 11:29am |
| To | : | ☎915406751103 |
| Number of pages | : | 001 |
| Start time | : | Jul-31 11:29am |
| End time | : | Jul-31 11:30am |
| Pages sent | : | 001 |
| Status | : | OK |

Job number    : 642          *** SEND SUCCESSFUL ***

Beth A. Fulkerson
Senior Counsel/Intellectual Property & Interactive
312/222-4863

# TRIBUNE

Tribune Company
435 North Michigan Avenue
Chicago, Illinois 60611-4066
fax 312/222-4206
e-mail: bfulkerson@tribune.com

July 30, 2007

VIA FACSIMILE
847-374-0601

Mr. Steven B. Wolf
Wolf Holland & Matern LLP
500 Lake Cook Road
Suite 130
Deerfield, Illinois 60015

        Re:     Tribune Media Services Syndication Agreement

Dear Mr. Wolf:

Thank you for calling last week. Since then, TMS has received the July 26, 2007, correspondence you said was in the mail from Mr. Vladem, inquiring whether it makes sense for the parties to proceed with discussions regarding whether TMS will match the terms of the offer Mr. Vladem outlined in his July 16, 2007 letter.

As I stated on the phone, TMS will consider matching the offer. But first TMS has to receive an offer, in writing, submitted to Blue Ridge Salvage Company, Inc., by a financially responsible third party. Only then is the offer deemed a "bona fide offer" under the terms of the current syndication agreement. And only then does the 30-day right of first refusal period begin to run.

You mentioned that you would send over an NDA to cover TMS' review of the offer. I await the NDA, as well as the bona fide offer.

Sincerely,

*Beth A Fell*

cc: Susie MacNelly
Robert J. Vladem
David D. Williams
John Twohey

.

# EXHIBIT F

Beth A. Fulkerson
Senior Counsel/Intellectual Property & Interactive
312/222-4653

# TRIBUNE

Tribune Company
435 North Michigan Avenue
Chicago, Illinois 60611-4066
fax: 312/222-4206
e-mail: bfulkerson@tribune.com

August 9, 2007

**<u>VIA FACSIMILE AND DHL</u>**
847-374-0601

Mr. Steven B. Wolf
Wolf Holland & Matern LLP
500 Lake Cook Road
Suite 130
Deerfield, Illinois 60015

Re:    Tribune Media Services Syndication Agreement

Dear Mr. Wolf:

Thank you for sending the draft NDA.  There are a few terms TMS finds problematic.

In the interest of time, TMS today accepts all five of the terms offered in Mr. Vladem's July 16, 2007 letter.  A complete syndication agreement is enclosed for your client's signature.  It is virtually identical to the current agreement between the parties.  For your convenience, we highlighted the five terms that match the ones in Mr. Vladem's letter.

As soon as you return one of the signature pages, signed by Ms. MacNelly, we can send over the first check.

Sincerely,

Beth Fulkerson

cc:    Susie MacNelly
       Robert J. Vladem
       David D. Williams
       John Twohey



## SYNDICATION AGREEMENT

This Agreement is entered into as of _____between

**TRIBUNE MEDIA SERVICES, INC.**, a Delaware corporation ("TMS"), and **BLUE**

**RIDGE SALVAGE COMPANY, INC.**, a Virginia corporation ("Blue Ridge Salvage"),

and upon its Effective Date (defined below) it supersedes the September 25, 1995

agreement between the parties regarding the syndication of the "Shoe" cartoon feature

and all amendments thereto. The parties agree as follows:

1.    The Feature.

During each week of the term of this Agreement, Blue Ridge Salvage agrees to

furnish to TMS six (6) cartoon panels in black and white suitable for publication in daily

newspapers and on their companion websites and one (1) color version of the comic strip

suitable for publication in Sunday newspapers and on their companion websites (the

"Feature"). The Feature supplied to TMS by Blue Ridge Salvage pursuant to this

Agreement shall be furnished in accordance with the following provisions:

(a)    The Feature shall be entitled **"Shoe"**;

(b)    The Monday-through-Saturday versions of the Feature shall be provided

to TMS in black and white. The Sunday version shall be provided in color and shall be

prepared in standard Sunday comic-section format.

(c)    Each daily and Sunday version of the Feature shall be of the highest

quality Blue Ridge Salvage is capable of producing and shall be suitable for publication

in major daily newspapers in the United States and abroad, and for posting on their companion websites.

     (d)    The Feature shall be delivered to TMS at a place to be designated by TMS, the expense of such delivery to be borne by Blue Ridge Salvage.

     (e)    The daily and Sunday versions of the Feature shall be delivered to TMS at least eight (8) weeks in advance of the date of publication. Blue Ridge Salvage acknowledges that TMS is obligated to deliver the Feature to its syndicate customers regularly and at fixed times, and a failure to make such regular and timely deliveries might subject TMS to liability. Accordingly, it is expressly agreed that the time for delivery of the Feature to TMS shall be of the essence of this Agreement. Blue Ridge Salvage further agrees to indemnify TMS against any liability or expense (including reasonable attorneys' fees) caused by any failure by Blue Ridge Salvage to make such regular and timely deliveries.

     2.    <u>Syndication.</u>

     During the term of this Agreement and except as otherwise expressly provided herein:

     (a)    TMS shall have the sole and exclusive right to sell, license or otherwise authorize the use of the Feature by newspapers published and circulated throughout the world, and by those newspapers' companion websites, and in all other media, and to take such other action, if any, to exploit the Feature as TMS, in its sole discretion, deems appropriate.

     (b)    TMS shall have the sole and exclusive right to publish or authorize the publication of the Feature on websites, in book form, booklet form, pamphlet form, CD-

2

ROM form, and by electronic databases, online electronic services, wireless services, or in any other form of electronic or mechanical publication or transmission, whether now existing or hereafter developed, and TMS shall be the owner of all exploitation rights in and to the Feature, including, without limitation, all publication rights of any kind, and stage, motion picture, radio, television, mechanical reproduction, consumer products, and commercial exploitation rights.

(c)    TMS shall have the absolute discretion in selecting purchasers or customers (which may be affiliates of TMS) of any rights in the Feature and in determining prices and terms of sale to any media.  All or any part of TMS' rights hereunder may be assigned or reassigned from time to time to any foreign sales or foreign syndication agency or agencies (which may be affiliates of TMS), which may act with respect to the assigned rights in its or their own name or names.

3.    <u>Compensation.</u>

(a)    TMS shall provide Blue Ridge Salvage with a signing bonus of $350,000 payable in two installments: A $175,000 payment upon the signing of this Agreement by both parties, and a $175,000 payment on the Effective Date of this Agreement.

(b)    In consideration of the satisfactory performance by Blue Ridge Salvage of the obligations assumed by Blue Ridge Salvage under this Agreement, and of the rights granted to TMS herein, TMS shall pay to Blue Ridge Salvage (i) sixty-five percent (65%) of the "Net Receipts," as hereinafter defined, received by TMS during the term of this Agreement from (a) entities whose license agreements to publish the Feature were entered into prior to the Effective Date of this Agreement and (b) other sources of revenue under contract prior to the Effective Date of this Agreement;  and (ii) fifty

percent (50%) of the "Net Receipts" received by TMS during the term of this Agreement

from (a) entities whose license agreements to publish the Feature are entered into after

the Effective Date of this Agreement and (b) all new sources of revenue that enter into

contracts with TMS in connection with the Feature after the Effective Date of this

Agreement.

  (c) "Net Receipts" as used herein shall mean revenues actually received by

TMS from the sale and syndication of the Feature, less the sum of:

   (i) Costs of duplicating, proofing, printing, paper, reproduction,

transmission costs and other similar production, editing, and distribution costs;

   (ii) Bad debts arising out of the sale or syndication of the Feature; and

   (iii) Rebates or allowances paid or allowed by TMS, or its assignees, to

any purchaser for any rights in the Feature.

  (d) Within twenty (20) days after the close of each accounting period of TMS

[each accounting period being either four (4) or five (5) weeks, as determined by TMS],

TMS shall determine and pay to Blue Ridge Salvage the amount, if any, payable pursuant

to subparagraph 3(b) hereof for the "Net Receipts" received by TMS during such

accounting period.

  (e) TMS shall keep accurate books and records reflecting amounts accrued

from the syndication and sale of the Feature, and from all other revenue-generating

activities, and shall furnish to Blue Ridge Salvage monthly statements, which shall

disclose all sales of the Feature, and the purchases and the amounts actually received.

Blue Ridge Salvage shall have the right, in person or by duly authorized agents, to

examine TMS' records in which the accounts and information relative to this Agreement

4

are maintained, provided such inspection shall be made during normal business hours and upon reasonable notice.

4.    Term and Termination.

(a)    The term of this Agreement shall begin on April 1, 2008 (the "Effective Date") and shall end on March 31, 2028.

(b)    If Blue Ridge Salvage fails to furnish the Feature as required in this Agreement or fails to furnish the Feature for a period of fourteen (14) consecutive days, TMS shall have the right to terminate this Agreement on thirty (30) days' prior written notice to Blue Ridge Salvage.

(c)    In the event of termination, if Blue Ridge Salvage elects to continue syndication of the Feature in any form or through any means, Blue Ridge Salvage shall pay TMS, as compensation for benefits that will inure to Blue Ridge Salvage as a result of Blue Ridge Salvage's association with TMS, a monthly sum equal to fifty percent (50%) of the Feature's total Net Receipts for the month previous to such termination or non-renewal, such payment to be made for a period of twelve (12) months after the date of termination.

(d)    The indemnification obligations assumed by Blue Ridge Salvage shall survive termination or expiration of this Agreement.

5.    Rights of First Refusal.

If Blue Ridge Salvage desires to grant to anyone the rights to syndicate and distribute the Feature within twelve (12) months following the expiration of the term of this Agreement, then Blue Ridge Salvage shall first offer to TMS the right to match a bona fide offer received by Blue Ridge Salvage for the Feature. For purposes of this

5

Agreement, a bona fide offer shall consist of a written bid or proposed contract submitted to Blue Ridge Salvage by a financially responsible third party. If TMS notifies Blue Ridge Salvage within thirty (30) days after the receipt of such notice that it accepts the terms and conditions so specified in the bona fide offer to Blue Ridge Salvage, the notice from Blue Ridge Salvage and the acceptance by TMS shall constitute a binding agreement. If TMS does not accept said terms and conditions, then Blue Ridge Salvage may grant the right previously offered to TMS to any other party, provided, however, that Blue Ridge Salvage shall not make any such grant on terms more favorable to such other party than the terms specified in Blue Ridge Salvage's notice to TMS without giving TMS another similar opportunity to accept said terms.

      6.    <u>Independent Contractor.</u>

It is understood and agreed that this Agreement is for the purchase of certain rights only and that Blue Ridge Salvage is an independent contractor. Blue Ridge Salvage shall do the work required to produce the Feature on Blue Ridge Salvage's own time, at Blue Ridge Salvage's own expense, in Blue Ridge Salvage's own way, using Blue Ridge Salvage's own supplies, and Blue Ridge Salvage shall furnish Blue Ridge Salvage's own place of work and Blue Ridge Salvage's own assistants, if any are required, free from direction and control by TMS. The means of producing the Feature shall be solely within Blue Ridge Salvage's control. Blue Ridge Salvage agrees to discharge all obligations imposed upon employers and self-employed persons under any applicable union agreement or federal, state, or local law, regulation, or order now or hereafter in force including, but not limited to, taxes, unemployment compensation or insurance, workers' compensation, and Social Security, and including the filing of all

returns and reports required of any self-employed person or employer and the payment of all assessments, taxes, contributions, or other sums required, since Blue Ridge Salvage shall not be treated as an employee of TMS for federal, state, or local taxation purposes. To the extent permitted by law, Blue Ridge Salvage further agrees to indemnify and hold TMS harmless against all claims and demands resulting from Blue Ridge Salvage's failure to comply with the provisions of this paragraph. This Agreement shall not in any way constitute the parties as partners or participants in a joint venture, or as principal and agent.

      7.    <u>Editorial Supervision.</u>

      (a)    TMS shall have the entire editorial supervision of the Feature, provided that TMS shall use commercially reasonable efforts to consult with Blue Ridge Salvage prior to making any changes, deletions, or additions in or to the Feature, subject to TMS' deadlines.

      (b)    TMS shall not be obligated to accept, syndicate or pay for any versions of the Feature which in TMS' reasonable opinion might subject TMS to any claim by any third party.

      (c)    If TMS rejects or declines to accept, syndicate or pay for any material for the reason cited in 7(b), TMS shall so notify Blue Ridge Salvage and shall give Blue Ridge Salvage a reasonable opportunity to cure or remove the basis for said claim and, upon resubmission by Blue Ridge Salvage, shall reasonably reconsider acceptance of said material; provided, however, that upon the inability or failure of Blue Ridge Salvage to submit revised material to TMS at least four (4) weeks in advance of the date of publication with respect to daily cartoon panels, and at least six (6) weeks in advance of

the date of publication with respect to Sunday color versions, the provisions of paragraphs 1(d) and 15 herein shall apply.

    8.    <u>Ownership of Feature.</u>

    (a)    Blue Ridge Salvage shall be the owner of the Feature including, but not limited to, all materials furnished by Blue Ridge Salvage to TMS pursuant to this Agreement. Notwithstanding the foregoing, during the term of this Agreement, TMS shall have the sole and exclusive right to exercise all publication and subsidiary rights in the Feature, as outlined in Paragraph 2. The parties agree that the Feature syndicated to newspapers and their companion website shall contain the following notice: "Copyright (c) 20__ [year] Tribune Media Services, Inc. All Rights Reserved."

    (b)    TMS shall have the right to receive or participate in its share of revenues received after termination of this Agreement pursuant to agreements entered into by Blue Ridge Salvage or TMS prior to termination of this Agreement. All third-party agreements made by TMS pursuant to this Agreement shall survive termination of this Agreement and shall bind Blue Ridge Salvage and TMS. For the avoidance of confusion, all third-party license agreements, for example, shall survive termination of the parties' syndication relationship.

    9.    <u>Exclusivity.</u>

    So long as this Agreement shall be in effect (including any time during which Blue Ridge Salvage may be in default hereunder or in breach hereof), Blue Ridge Salvage shall not enter into any contract, agreement, understanding, or arrangement to prepare any material similar to the Feature for any newspaper or newspapers or their companion websites or for magazines distributed with newspapers, or for distribution by

cabletext, videotex, audiotex, the Internet or other form of electronic transmission

covered by this Agreement. Blue Ridge Salvage agrees that, in the event of any breach of

this provision, TMS will not have an adequate remedy at law and shall, in addition to any

other appropriate equitable or legal relief, be entitled to an injunction from a court of

competent jurisdiction restraining Blue Ridge Salvage from any such breach.

     10.    Enforcement of TMS' Rights.

Blue Ridge Salvage hereby appoints TMS (and such substitutes as TMS may from

time to time select) as Blue Ridge Salvage's attorney-in-fact, with the right, but not the

obligation, to (a) enforce and protect all rights herein granted to or acquired by TMS, (b)

prevent infringement of any copyrights and trademarks, (c) litigate any ensuing claims,

(d) collect all damages arising from any infringement of such rights, and (e) use Blue

Ridge Salvage's name as being plaintiff or defendant in any proceeding. Blue Ridge

Salvage agrees to execute such further instruments as TMS may reasonably deem

appropriate to carry out the provisions of this paragraph.

     11.    Warranty.

Blue Ridge Salvage represents and warrants that Blue Ridge Salvage has the full

power and authority to enter into and perform this Agreement, that there is no contract,

agreement, or understanding with any other person, firm, or corporation which would

interfere with the obligations assumed by Blue Ridge Salvage hereunder, and that the

Feature and all materials furnished to TMS hereunder will be new, original, and

unpublished, and that those materials will not infringe upon or violate any copyright,

trademark, trade name, literary, artistic, or other property right, right of privacy, or any

other right of any person, firm, or corporation, and will not contain any libelous or

unlawful material. Blue Ridge Salvage agrees to indemnify and hold harmless TMS, its employees, officers, directors, stockholders, licensees, successors, and assigns, from and against any and all losses, damages, costs, and expenses, including the reasonable attorneys' fees and expenses incident thereto, arising from any suit, claim, or demand based upon any breach or alleged breach of the warranties contained in this paragraph, or based in any respect on the contents of the Feature syndicated and published pursuant to this Agreement.

12. Use of Names.

TMS shall have the right to use in connection with the promotion and sale the Feature Susan MacNelly's name, likeness and biography. Likewise, it shall have the right to use the names, likenesses and biographies of those assistants to Ms. MacNelly engaged in the production of the Feature for the same purposes.

13.    Failure to Furnish Feature.

If Blue Ridge Salvage fails to furnish the Feature as required hereunder, TMS shall have the right, at its discretion, to obtain or prepare substitute artwork and copy through any means and in whatever manner it chooses. In such event, TMS shall make reasonable efforts to consult with Blue Ridge Salvage and to make arrangements for the preparation of substitute artwork and copy satisfactory to Blue Ridge Salvage. TMS may deduct the expenses occasioned by Blue Ridge Salvage's default from any money then or thereafter due Blue Ridge Salvage.

14.    Notices.

All notices, requests, consents, and other communications required or permitted to be given hereunder shall be in writing and delivered personally, by courier service, by telegraph, or by certified U.S. mail, return receipt requested postage prepaid, as follows:

    (a)    If to Blue Ridge Salvage, to:  Susan MacNelly
                                        P.O. Box 188
                                        Flint Hill, Virginia 22627

            with a copy to:          Robert J. Vladem
                                        Blue Ridge Salvage Company, Inc.
                                        853 Sheridan Road
                                        Winnetka, Illinois 60093

    (b)    If to TMS, to:          Tribune Media Services, Inc.
                                          435 N. Michigan Avenue, Suite 1500
                                        Chicago, Illinois 60611
                                        Attn: David D. Williams, President/CEO

            with a copy to:          General Counsel
                                        Tribune Company
                                        435 N. Michigan Avenue, Suite 600
                                        Chicago, Illinois 60611

Notice so given shall be deemed received when delivered personally or by courier, or, if mailed, five (5) days after the date of deposit, postage prepaid, in the United States mail. Either party may change the address to which notices are to be sent by giving written notice of such change of address to the other party in the manner herein provided for giving notice.

    14.    <u>General</u>.

    (a)    This Agreement shall be governed by and construed and enforced in accordance with the laws of the State of Illinois applicable to agreements made and to be performed entirely in Illinois.

    (b)    The section headings contained herein are for reference purposes only and shall not in any way affect the meaning or interpretation of this Agreement.

(c)    This Agreement sets forth the entire agreement and understanding of the parties hereto, and supersedes all prior agreements, arrangements, and understandings between the parties hereto.

(d)    TMS may assign its rights and obligations under this Agreement to any corporation or other entity controlled by, or under common control with, Tribune Company or to any entity which succeeds to substantially all of the business and assets of TMS. This Agreement is personal to Blue Ridge Salvage, however, and neither this Agreement nor any of Blue Ridge Salvage's rights or obligations hereunder may be assigned, pledged, or encumbered by Blue Ridge Salvage without the prior written approval of TMS.

THIS PAGE INTENTIONALLY LEFT BLANK

(e)    This Agreement may be amended, modified, superseded, or canceled, and the terms or covenants hereof may be waived, only by written instrument executed by both of the parties hereto, or, in the case of a waiver, by the party waiving compliance. The failure of either party at any time or times to require performance of any provision hereof shall in no manner affect the right at a later time to enforce the same. No waiver by either party or the breach of any term or covenant contained in this Agreement, whether by conduct or otherwise, in any one or more instances, shall be deemed to be, or construed as, a further or continuing waiver of any such breach or a waiver of the breach of any other term or covenant contained in this Agreement. This Agreement, and all rights and obligations hereunder, shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, executors, administrators, personal representatives, successors, licensees, and permitted assigns.

**IN WITNESS WHEREOF**, the parties have executed this Agreement as of the date shown above.

TRIBUNE MEDIA SERVICES, INC.

By: _____
    David D. Williams, President/CEO


**BLUE RIDGE SALVAGE COMPANY, INC.**


By: _____
    Susan MacNelly

(e)    This Agreement may be amended, modified, superseded, or canceled, and the terms or covenants hereof may be waived, only by written instrument executed by both of the parties hereto, or, in the case of a waiver, by the party waiving compliance. The failure of either party at any time or times to require performance of any provision hereof shall in no manner affect the right at a later time to enforce the same.  No waiver by either party or the breach of any term or covenant contained in this Agreement, whether by conduct or otherwise, in any one or more instances, shall be deemed to be, or construed as, a further or continuing waiver of any such breach or a waiver of the breach of any other term or covenant contained in this Agreement.  This Agreement, and all rights and obligations hereunder, shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, executors, administrators, personal representatives, successors, licensees, and permitted assigns.

**IN WITNESS WHEREOF**, the parties have executed this Agreement as of the date shown above.

TRIBUNE MEDIA SERVICES, INC.

By: _____
David D. Williams, President/CEO

**BLUE RIDGE SALVAGE COMPANY, INC.**

By: _____
Susan MacNelly

Confirmation Report — Memory Send

Page         : 001
Date & Time: Aug-09-07  03:31pm
Line 1       :
Line 2       :
Machine ID :

| | | |
|---|---|---|
| Job number | : | 721 |
| Date | : | Aug-09 03:28pm |
| To | : | ☎918473740601 |
| Number of pages | : | 017 |
| Start time | : | Aug-09 03:28pm |
| End time | : | Aug-09 03:31pm |
| Pages sent | : | 017 |
| Status | : | OK |

Job number    : 721          *** SEND SUCCESSFUL ***

# TRIBUNE COMPANY
## LAW DEPARTMENT
### 435 North Michigan Avenue
### Chicago, Illinois 60611

PLEASE DELIVER TO:    Steven B. Wolf, Esq.

FAX PHONE:            (847) 374-0601

FROM:                Beth A. Fulkerson

DATE:                August 9, 2007

SENDER'S PHONE:      312-222-4653

SENDER'S FAX:        312-222-4206

PAGES:               17

MESSAGE:

THE INFORMATION CONTAINED IN THIS FACSIMILE IS PROPRIETARY AND CONFIDENTIAL, INTENDED ONLY FOR THE USE OF THE INDIVIDUAL OR ENTITY NAMED ABOVE. IF THE READER OF THIS TRANSMISSION IS NOT THE INTENDED RECIPIENT, OR EMPLOYEE OR AGENT RESPONSIBLE FOR DELIVERING IT TO THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY DISSEMINATION, DISTRIBUTION OR COPYING OF THIS TRANSMISSION IS STRICTLY PROHIBITED.

IN CASE OF TRANSMISSION DIFFICULTIES, PLEASE CALL SHIRLEY BLASZCZYK AT 312-222-3976.

# EXHIBIT G



**WOLF**
**HOLLAND &**
**MATERN LLP**
Attorneys at Law

REPLY TO:
500 LAKE COOK ROAD
SUITE 130
DEERFIELD, ILLINOIS 60015
(847) 374-0600
FACSIMILE (847) 374-0601

CHICAGO OFFICE
205 WEST WACKER DRIVE
SUITE 1600
CHICAGO, ILLINOIS 60606
(312) 236-3510
FACSIMILE (312) 236-3820

August 15, 2007

VIA FACSIMILE TRANSMISSION AND FIRST CLASS MAIL

Ms. Beth Fulkerson
Tribune Company
435 N. Michigan Avenue
Chicago, Illinois 60611-4066

Dear Beth:

As we move forward, in order to minimize any risk of miscommunications or misunderstandings, I respectfully request that you refrain from directing any further communications to my client, Blue Ridge Salvage Company, Inc., including Susie MacNelly and Robert J. Vladem. Please put all communications in written form and direct them to me without copy to my clients.

As to your letter of August 14, 2007, I do not believe Tribune Media has a right of first refusal in light of its letter of September 20, 2000. However, we need not address that issue at this time. If Tribune Media will not or cannot match the King Features proposal, then there is no need to address the existence of any right of first refusal.

In the interest of a prompt resolution of this matter, I am forwarding a letter of August 8, 2007 from the President of King Features to Mr. Robert Vladem with an attachment titled "Proposal for Representation of SHOE Comic Strip 8/8/07" sent in response to our request. We consider the letter and attachment to be the written proposal. Please indicate whether Tribune Media is willing to and can meet each and every one of the terms therein. To the extent Tribune Media believes it can meet each of these terms, I must request that you explain in writing how Tribune Media expects to provide the same services to my client as contemplated under the King Features proposal.

Lastly, I do not agree to your proposed changes to the NDA. I prefer to just move forward without an NDA.

With best regards,

Steven B. Wolf

Enclosure

A Partnership including Professional Corporations

T.R. SHEPARD III
PRESIDENT

August 8, 2007

Mr. Bob Vladem
Manager
SHOE
853 Sheridan Road
Winnetka, IL 60093

Dear Bob:

Attached is a proposal for the representation of the Shoe comic strip. This proposal was requested by Blue Ridge Salvage Company, Inc. for the purpose of entering into an agreement with King Features after the expiration of the current TMS contract.

Other benefits to Shoe are the following: King Features has 20 international syndication agents covering 122 countries. Our international syndication sales manager also handles 18 direct accounts in 18 Caribbean countries. King Features has 19 international licensing agents covering 70 countries. Shoe would be added to the robust kingfeatures.com website to build both syndication and licensing awareness. Shoe would be able to link the cartoonist's website from either location. King Features would include Shoe in our consumer subscription site, dailyink.com, and in our store powered by Café Press which offers "on demand" product such as tee shirts, coffee mugs, character art, cartoonist favorite strips, etc. able to be ordered online, by phone, or by mail.

Of course, no other syndicate has the overall domestic (US and Canada) syndication and licensing sales prowess of King Features.

Please let me know if you have any other questions.

Sincerely,

*[signature]*

# KING FEATURES

A UNIT OF THE HEARST CORPORATION

300 W. 57TH ST., NEW YORK, NY 10019-5238

TEL: (212) 969-7547  FAX: (646) 280-1547  EMAIL: TRSHEPARD@HEARST.COM

WWW.KINGFEATURES.COM

Proposal for Representation of SHOE Comic Strip
8/8/07

1.   <u>Rights</u>:  Syndicate to represent all rights (syndication, merchandising, and entertainment) on an exclusive basis.

2.   <u>Territory</u>:  Worldwide

3.   <u>Term</u>:  20 years

4.   <u>First Negotiation/Matching Rights</u>:  45 day right of first negotiation and then right to match any third party offer for the continued syndication and licensing of the feature.

5.   <u>Revenue Splits</u>:  50/50 (except pre-existing syndication deals which shall be 65/35) based on the gross receipts from all syndication, merchandising and entertainment rights licensing, less foreign agent commissions, and currency conversion (and for syndication receipts only, less costs and expenses for color separations and proofs).

6.   <u>Signing Bonus</u>:  $350,000, non-recoupable, payable ½ on signing of representation agreement and ½ on commencement date of the term.

7.   <u>Ownership</u>:  Blue Ridge to own

8.   <u>Approvals</u>:  Blue Ridge to have right to approve the terms of all merchandising and entertainment licenses.

# EXHIBIT H


**MEDIA SERVICES**
www.tms.tr.bune.com

**David D. Williams**
President and
Chief Executive Officer
312.222.8658 (phone)
312.329.9818 (fax)
ddwilliams@tribune.com

*Walker*
*cc: Carol*
*Gordon*

September 20, 2000

Ms. Susan MacNelly
322 Ben Venue Road
Flint Hill, VA 22627

Dear Susie:

I am writing to confirm some matters related to the current Syndication Agreement for SHOE.

Tribune Media Services and Blue Ridge Salvage will maintain their relationship under the Syndication Agreement. Blue Ridge will continue to provide the Feature, and TMS will retain sole syndication rights through the term of the Agreement. In addition, the financial arrangements (60% of Net Receipts subject to repayment of the loan and permitted deductions) will also stay in place.

Would you please indicate your agreement with these arrangements by signing below and returning this letter back to me. Of course, please do not hesitate to call me if you have any questions at all.

Hope all is well.

Sincerely,

David D. Williams
President and CEO

Agreed on behalf of
the Estate of Jeff MacNelly and
Blue Ridge Salvage Company

By: *Susan MacNelly*

Date: 9/20/2000

# EXHIBIT I

Salvador K. Karottki
Senior Counsel/Intellectual Property & Interactive
312/222-3290

Tribune Company
435 North Michigan Avenue
Chicago, Illinois 60611-4066
fax: 312/222-4206
e-mail: skarottki@tribune.com

# TRIBUNE

August 24, 2007

**VIA FACSIMILE, CERTIFIED MAIL, AND ELECTRONIC MAIL**

Steven B. Wolf
Wolf Holland & Matern LLP
500 Lake Cook Road, Suite 130
Deerfield, Illinois 60015

Re:     **Acceptance of Offer to Artist and Response to Your Letter of August 15, 2007**

Dear Mr. Wolf:

I am responding on behalf of Tribune Media Services, Inc. ("TMS") to your letter dated August 15, 2007, giving notice to TMS of a bona fide offer from King Features to your client, Blue Ridge Salvage Company, Inc. ("Blue Ridge"), and attaching such bona fide offer (entitled "Proposal for Representation of SHOE Comic Strip 8/8/07"). Pursuant to Section 5(b) of the Syndication Agreement between TMS and your client dated August 25, 1995, TMS hereby notifies Blue Ridge that it accepts the terms and conditions specified in the bona fide offer that Blue Ridge received from King Features. Accordingly, pursuant to the Syndication Agreement, your notice to TMS and this acceptance "constitute a binding agreement." In light of the foregoing and to memorialize the agreement, we have attached a signed Syndication Agreement that we believe incorporates all of the terms of King Features' offer. Please contact us if you have any questions and to coordinate signatures on the document. We sent this acceptance letter directly to you because you expressly stated in your letter that you and your client want all communications on this matter to be sent to you.

Your letter also addresses a September 20, 2000, letter that expressly reiterates the continuance of the Syndication Agreement between the parties. You seem to imply that this letter has some impact on TMS' right of first refusal under Section 5(b) of the Syndication Agreement. So there is no miscommunication on this point, TMS rejects any such implication. Section 5(b) of the Syndication Agreement between the parties clearly grants TMS a right of first refusal, which TMS has hereby exercised. Nothing in the September 20, 2000, letter alters this right of first refusal. We assume any implication by you to the contrary was unintentional or mistaken.

In light of TMS' acceptance of the offer you sent us on behalf of Blue Ridge, TMS looks forward to working with Blue Ridge for the mutual benefit of both parties during the next phase of our relationship under the new terms accepted herein.

Very truly yours,

Salvador K. Karottki

Encl.

cc:     David D. Williams
        John C. Twohey
        Beth A. Fulkerson



## SYNDICATION AGREEMENT

This Agreement is entered into as of the Effective Date (defined below) between **TRIBUNE MEDIA SERVICES, INC.**, a Delaware corporation ("TMS"), and **BLUE RIDGE SALVAGE COMPANY, INC.**, a Virginia corporation ("Blue Ridge Salvage"), and supersedes the September 25, 1995, agreement between the parties regarding the syndication of the "Shoe" cartoon feature and all amendments thereto. The parties agree as follows:

1.   The Feature.

During each week of the term of this Agreement, Blue Ridge Salvage agrees to furnish to TMS six (6) comic strips in black and white suitable for publication in daily newspapers and on their companion websites and one (1) color version of the comic strip suitable for publication in Sunday newspapers and on their companion websites (the "Feature"). The Feature supplied to TMS by Blue Ridge Salvage pursuant to this Agreement shall be furnished in accordance with the following provisions:

(a)   The Feature shall be entitled **"Shoe"**;

(b)   The Monday-through-Saturday versions of the Feature shall be provided to TMS in black and white. The Sunday version shall be provided in color and shall be prepared in standard Sunday comic-section formats.

(c)   Each daily and Sunday version of the Feature shall be of the highest quality Blue Ridge Salvage is capable of producing and shall be suitable for publication

in major daily newspapers in the United States and abroad, and for posting on their companion websites.

(d)    The Feature shall be delivered to TMS at a place to be designated by TMS, the expense of such delivery to be borne by Blue Ridge Salvage.

(e)    The daily and Sunday versions of the Feature shall be delivered to TMS at least eight (8) weeks in advance of the dates of publication. Blue Ridge Salvage acknowledges that TMS is obligated to deliver the Feature to its syndicate customers regularly and at fixed times, and a failure to make such regular and timely deliveries might subject TMS to liability. Accordingly, it is expressly agreed that the time for delivery of the Feature to TMS shall be of the essence of this Agreement. Blue Ridge Salvage further agrees to indemnify TMS against any liability or expense (including reasonable attorneys' fees) caused by any failure by Blue Ridge Salvage to make such regular and timely deliveries.

2.    <u>TMS Rights.</u>

During the term of this Agreement and except as otherwise expressly provided herein:

(a)    TMS shall have the sole and exclusive right to sell, license or otherwise authorize the use of the Feature by newspapers published and circulated throughout the world, and by those newspapers' companion websites, and in all other media worldwide, and to take such other action, if any, to exploit the Feature as TMS, in its sole discretion, deems appropriate.

(b)    TMS shall have the sole and exclusive right to publish or authorize the publication of the Feature on websites and in books, booklets, pamphlets and CD-ROMs,

and via electronic databases, online electronic services, wireless services, or any other forms of electronic or mechanical publication or transmission, whether now existing or hereafter developed.

(c)     TMS shall be the owner of all exploitation rights in and to the Feature, including, without limitation, all merchandising and entertainment rights of any kind, including stage, motion picture, radio, television, consumer products and commercial exploitation rights.  Notwithstanding the rights granted to TMS herein, Blue Ridge Salvage shall have the right to approve the terms of all merchandising and entertainment licenses, which approval shall not be unreasonably withheld.

(d)     TMS shall have the absolute discretion in selecting purchasers or customers (which may be affiliates of TMS) of any rights in the Feature and in determining prices and terms of sale to any media.  All or any part of TMS' rights hereunder may be assigned or reassigned from time to time to any foreign or domestic sales, marketing or syndication agency or agencies (which may be affiliates of TMS), which may act with respect to the assigned rights in its or their own name or names.

3.     Compensation.

(a)     TMS shall provide Blue Ridge Salvage with a signing bonus of $350,000 payable in two installments: A $175,000 payment upon the signing of this Agreement by both parties, and a $175,000 payment on the Effective Date of this Agreement.

(b)     In consideration of the satisfactory performance by Blue Ridge Salvage of the obligations assumed by Blue Ridge Salvage under this Agreement, and of the rights granted to TMS herein, TMS shall pay to Blue Ridge Salvage (i) sixty-five percent (65%) of the "Net Receipts," as hereinafter defined, received by TMS during the term of this

Agreement from (a) entities whose license agreements to publish the Feature were entered into prior to the Effective Date of this Agreement and (b) other sources of revenue under the September 25, 1995, agreement between the parties prior to the Effective Date of this Agreement;  and (ii) fifty percent (50%) of the "Net Receipts" received by TMS during the term of this Agreement from (a) entities whose license agreements to publish the Feature are entered into after April 1, 2008, the Effective Date of this Agreement, and (b) all new sources of revenue that enter into contracts with  TMS in connection with the Feature after April 1, 2008.

(c)    "Net Receipts" as used herein shall mean gross receipts from all syndication, merchandising and entertainment-rights licensing, less the sum of:

(i)    The costs and expenses for color separations and proofs (for syndication receipts only);

(ii)    Foreign agent commissions; and

(iii)    Currency conversions.

(d)    Within twenty (20) days after the close of each accounting period of TMS (each accounting period being either four (4) or five (5) weeks, as determined by TMS), TMS shall determine and pay to Blue Ridge Salvage the amount, if any, payable pursuant to subparagraph 3(b) hereof for the "Net Receipts" received by TMS during such accounting period.

(e)    TMS shall keep accurate books and records reflecting amounts accrued from the syndication and sale of the Feature, and from all other revenue-generating activities. and shall furnish to Blue Ridge Salvage monthly statements, which shall disclose all sales of the Feature. and the purchases and the amounts actually received.

4

Blue Ridge Salvage shall have the right, in person or by duly authorized agents, to examine TMS' records in which the accounts and information relative to this Agreement are maintained, provided such inspection shall be made during normal business hours and upon reasonable notice.

4.    Term and Termination.

(a)    The term of this Agreement shall begin on April 1, 2008 (the "Effective Date") and shall end on March 31, 2028.

(b)    If Blue Ridge Salvage fails to furnish the Feature as required in this Agreement or fails to furnish the Feature for a period of fourteen (14) consecutive days, TMS shall have the right to terminate this Agreement on thirty (30) days' prior written notice to Blue Ridge Salvage.

(c)    In the event of termination, if Blue Ridge Salvage elects to continue syndication of the Feature in any form or through any means, Blue Ridge Salvage shall pay TMS, as compensation for benefits that will inure to Blue Ridge Salvage as a result of Blue Ridge Salvage's association with TMS, a monthly sum equal to fifty percent (50%) of the Feature's total Net Receipts for the month previous to such termination or non-renewal, such payment to be made for a period of twelve (12) months after the date of termination.

(d)    The indemnification obligations assumed by Blue Ridge Salvage shall survive termination or expiration of this Agreement.

5.    Rights of First Negotiation and First Refusal.

(a)    For forty-five (45) days following the expiration of the term of this Agreement, Blue Ridge Salvage grants to TMS the right of first negotiation to continue its relationship with Blue Ridge Salvage hereunder and to continue, among other things, syndicating the Feature.

(b)    Thereafter, if Blue Ridge Salvage desires to grant to anyone the rights to syndicate and distribute the Feature within twelve (12) months following the expiration of the term of this Agreement, then Blue Ridge Salvage shall first offer to TMS the right to match a bona fide offer received by Blue Ridge Salvage for the Feature. For purposes of this Agreement, a bona fide offer shall consist of a written bid or proposed contract submitted to Blue Ridge Salvage by a financially responsible third party. If TMS notifies Blue Ridge Salvage within thirty (30) days after the receipt of such notice that it accepts the terms and conditions so specified in the bona fide offer to Blue Ridge Salvage, the notice from Blue Ridge Salvage and the acceptance by TMS shall constitute a binding agreement. If TMS does not accept said terms and conditions, then Blue Ridge Salvage may grant the right previously offered to TMS to any other party, provided, however, that Blue Ridge Salvage shall not make any such grant on terms more favorable to such other party than the terms specified in Blue Ridge Salvage's notice to TMS without giving TMS another similar opportunity to accept said terms.

6.    Independent Contractor.

It is understood and agreed that this Agreement is for the purchase of certain rights only and that Blue Ridge Salvage is an independent contractor. Blue Ridge Salvage shall do the work required to produce the Feature on Blue Ridge Salvage's own

time, at Blue Ridge Salvage's own expense, in Blue Ridge Salvage's own way, using Blue Ridge Salvage's own supplies, and Blue Ridge Salvage shall furnish Blue Ridge Salvage's own place of work and Blue Ridge Salvage's own assistants, if any are required, free from direction and control by TMS. The means of producing the Feature shall be solely within Blue Ridge Salvage's control. Blue Ridge Salvage agrees to discharge all obligations imposed upon employers and self-employed persons under any applicable union agreement or federal, state, or local law, regulation, or order now or hereafter in force including, but not limited to, taxes, unemployment compensation or insurance, workers' compensation, and Social Security, and including the filing of all returns and reports required of any self-employed person or employer and the payment of all assessments, taxes, contributions, or other sums required, since Blue Ridge Salvage shall not be treated as an employee of TMS for federal, state, or local taxation purposes. To the extent permitted by law, Blue Ridge Salvage further agrees to indemnify and hold TMS harmless against all claims and demands resulting from Blue Ridge Salvage's failure to comply with the provisions of this paragraph. This Agreement shall not in any way constitute the parties as partners or participants in a joint venture, or as principal and agent.

      7.    Editorial Supervision.

      (a)    TMS shall have the entire editorial supervision of the Feature, provided that TMS shall use commercially reasonable efforts to consult with Blue Ridge Salvage prior to making any changes, deletions, or additions in or to the Feature, subject to TMS' deadlines.

(b)    TMS shall not be obligated to accept, syndicate or pay for any versions of the Feature which in TMS' reasonable opinion might subject TMS to any claim by any third party.

(c)    If TMS rejects or declines to accept, syndicate or pay for any material for the reason cited in 7(b), TMS shall so notify Blue Ridge Salvage and shall give Blue Ridge Salvage a reasonable opportunity to cure or remove the basis for said claim and, upon resubmission by Blue Ridge Salvage, shall reasonably reconsider acceptance of said material; provided, however, that upon the inability or failure of Blue Ridge Salvage to submit revised material to TMS at least four (4) weeks in advance of the date of publication with respect to daily cartoon panels, and at least six (6) weeks in advance of the date of publication with respect to Sunday color versions, the provisions of paragraphs 1(d) and 15 herein shall apply.

8.    <u>Ownership of Feature.</u>

(a)    Blue Ridge Salvage shall be the owner of the Feature including, but not limited to, all materials furnished by Blue Ridge Salvage to TMS pursuant to this Agreement. Notwithstanding the foregoing, during the term of this Agreement, TMS shall have the sole and exclusive right to exercise all publication and subsidiary rights in the Feature, as outlined in Paragraph 2. The parties agree that the Feature syndicated to newspapers and their companion websites shall contain the following notice: "Copyright (c) 20__ [year] Tribune Media Services, Inc. All Rights Reserved."

(b)    TMS shall have the right to receive or participate in its share of revenues received after termination of this Agreement pursuant to agreements entered into by Blue Ridge Salvage or TMS prior to termination of this Agreement.  All third-party

agreements made by TMS pursuant to this Agreement shall survive termination of this Agreement and shall bind Blue Ridge Salvage and TMS. For the avoidance of confusion, all third-party license agreements, for example, shall survive termination of the parties' syndication relationship.

9.    Exclusivity.

So long as this Agreement shall be in effect (including any time during which Blue Ridge Salvage may be in default hereunder or in breach hereof), Blue Ridge Salvage shall not enter into any contract, agreement, understanding, or arrangement to prepare any material similar to the Feature for any newspaper or newspapers or their companion websites or for magazines distributed with newspapers, or for distribution by cabletext, videotex, audiotex, the Internet or other forms of electronic transmission covered by this Agreement. Blue Ridge Salvage agrees that, in the event of any breach of this provision, TMS will not have an adequate remedy at law and shall, in addition to any other appropriate equitable or legal relief, be entitled to an injunction from a court of competent jurisdiction restraining Blue Ridge Salvage from any such breach.

10.    Enforcement of TMS' Rights.

Blue Ridge Salvage hereby appoints TMS (and such substitutes as TMS may from time to time select) as Blue Ridge Salvage's attorney-in-fact, with the right, but not the obligation, to (a) enforce and protect all rights herein granted to or acquired by TMS, (b) prevent infringement of any copyrights and trademarks, (c) litigate any ensuing claims, (d) collect all damages arising from any infringement of such rights, and (e) use Blue Ridge Salvage's name as being plaintiff or defendant in any proceeding. Blue Ridge

Salvage agrees to execute such further instruments as TMS may reasonably deem appropriate to carry out the provisions of this paragraph.

11.    Warranty.

Blue Ridge Salvage represents and warrants that Blue Ridge Salvage has the full power and authority to enter into and perform this Agreement, that there is no contract, agreement, or understanding with any other person, firm, or corporation which would interfere with the obligations assumed by Blue Ridge Salvage hereunder, and that the Feature and all materials furnished to TMS hereunder will be new, original, and previously unpublished, and that those materials will not infringe upon or violate any copyright, trademark, trade name, literary, artistic, or other property right, right of privacy, or any other right of any person, firm, or corporation, and will not contain any libelous or unlawful material. Blue Ridge Salvage agrees to indemnify and hold harmless TMS, its employees, officers, directors, stockholders, licensees, successors, and assigns, from and against any and all losses, damages, costs, and expenses, including the reasonable attorneys' fees and expenses incident thereto, arising from any suit, claim, or demand based upon any breach or alleged breach of the warranties contained in this paragraph, or based in any respect on the contents of the Feature syndicated and published pursuant to this Agreement.

12.    Use of Names.

TMS shall have the right to use in connection with the promotion and sale of the Feature Susan MacNelly's name, likeness and biography. Likewise, it shall have the right to use the names, likenesses and biographies of those associates of Ms. MacNelly engaged in the production of the Feature for the same purposes.

13.    Failure to Furnish Feature.

If Blue Ridge Salvage fails to furnish the Feature as required hereunder, TMS shall have the right, at its discretion, to obtain or prepare substitute artwork and copy through any means and in whatever manner it chooses. In such event, TMS shall make reasonable efforts to consult with Blue Ridge Salvage and to make arrangements for the preparation of substitute artwork and copy satisfactory to Blue Ridge Salvage. TMS may deduct the expenses occasioned by Blue Ridge Salvage's default from any money then or thereafter due Blue Ridge Salvage.

14.    Notices.

All notices, requests, consents, and other communications required or permitted to be given hereunder shall be in writing and delivered personally, by courier service, by telegraph, or by certified U.S. mail, return receipt requested postage prepaid, as follows:

(a)    If to Blue Ridge Salvage, to:    Susan MacNelly
P.O. Box 188
Flint Hill, Virginia 22627

with a copy to:    Robert J. Vladem
Blue Ridge Salvage Company, Inc.
853 Sheridan Road
Winnetka, Illinois 60093

(b)    If to TMS, to:    Tribune Media Services, Inc.
435 N. Michigan Avenue, Suite 1500
Chicago, Illinois 60611
Attn: David D. Williams, President/CEO

with a copy to:    General Counsel
Tribune Company
435 N. Michigan Avenue, Suite 600
Chicago, Illinois 60611

11

Notice so given shall be deemed received when delivered personally or by courier, or, if mailed, five (5) days after the date of deposit, postage prepaid, in the United States mail. Either party may change the address to which notices are to be sent by giving written notice of such change of address to the other party in the manner herein provided for giving notice.

14.   General.

(a)   This Agreement shall be governed by and construed and enforced in accordance with the laws of the State of Illinois applicable to agreements made and to be performed entirely in Illinois.

(b)   The section headings contained herein are for reference purposes only and shall not in any way affect the meaning or interpretation of this Agreement.

(c)   This Agreement sets forth the entire agreement and understanding of the parties hereto, and supersedes all prior agreements, arrangements, and understandings between the parties hereto.

(d)   TMS may assign its rights and obligations under this Agreement to any corporation or other entity controlled by, or under common control with, Tribune Company or to any entity that succeeds to substantially all of the business and assets of TMS.  This Agreement is personal to Blue Ridge Salvage, however, and neither this Agreement nor any of Blue Ridge Salvage's rights or obligations hereunder may be assigned, pledged, or encumbered by Blue Ridge Salvage without the prior written approval of TMS.

(e)   This Agreement may be amended, modified, superseded, or canceled, and the terms or covenants hereof may be waived. only by written instrument executed by

both of the parties hereto, or, in the case of a waiver, by the party waiving compliance. The failure of either party at any time or times to require performance of any provision hereof shall in no manner affect the right at a later time to enforce the same. No waiver by either party or the breach of any term or covenant contained in this Agreement, whether by conduct or otherwise, in any one or more instances, shall be deemed to be, or construed as, a further or continuing waiver of any such breach or a waiver of the breach of any other term or covenant contained in this Agreement. This Agreement, and all rights and obligations hereunder, shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, executors, administrators, personal representatives, successors, licensees, and permitted assigns.

[BALANCE OF THIS PAGE INTENTIONALLY LEFT BLANK]

**IN WITNESS WHEREOF,** the parties have executed this Agreement as of the dates shown below.

TRIBUNE MEDIA SERVICES, INC.

By: _____

David D. Williams, President/CEO

Date: _8/23/07_____

**BLUE RIDGE SALVAGE COMPANY, INC.**

By: _____

Susan MacNelly

Date: _____

[SIGNATURE PAGE TO SYNDICATION AGREEMENT]

14

# EXHIBIT J



**WOLF**
**HOLLAND &**
**MATERN LLP**
Attorneys at Law

40 SKOKIE BOULEVARD
SUITE 105
NORTHBROOK, IL 60062
(224) 330-1717
FACSIMILE (224) 330-1715

**RECEIVED**

October 1, 2007

OCT   4 2007

**B A F**

VIA FACSIMILE TRANSMISSION AND FIRST CLASS MAIL

Ms. Beth Fulkerson
Tribune Company
435 N. Michigan Avenue
Chicago, Illinois 60611-4066

Dear Beth:

Upon review of Mr. Karottki's August 24, 2007 letter and attached proposed Syndication Agreement, it is clear that Tribune Media Services, Inc. ("TMS") has failed to exercise its right of first refusal.

First, Mr. Karottki's letter and attached Syndication Agreement failed to respond to my August 15, 2007 letter which defined the "written proposal" requested by TMS to be both the King Features document titled "Proposal for Representation of SHOE Comic Strip 8/8/07" and the cover letter thereto. TMS attempted to redefine the written proposal and ignored the terms contained in the cover letter. TMS further ignored my client's legitimate concerns as to TMS' ability to actually perform all the terms and the extensive scope of services contemplated by the written proposal.

Second, the attached Syndication Agreement contains terms not included in the terms of the written proposal from King Features. Such additional terms include but are not limited to Paragraph 4(c), which provides for an oppressive post termination payment. King Features' written proposal does not contain such a post termination payment.

Accordingly, the Syndication Agreement between TMS and Blue Ridge Salvage shall terminate by its own terms on March 31, 2008.

Please feel free to contact me by email or written letter if you have any questions.

With best regards,

Steven B. Wolf

cc:   Blue Ridge Salvage Company

# EXHIBIT K

# GOLDBERG KOHN

GOLDBERG KOHN BELL BLACK ROSENBLOOM & MORITZ, LTD

October 18, 2007

frederic.klein@goldbergkohn.com
direct phone:  312.201.3908
direct fax:  312.863.7408

**BY FACSIMILE &
REGULAR U.S. MAIL**

Mr. Steven B. Wolf
Wolf Holland & Matern LLP
500 Lake Cook Road
Suite 130
Deerfield, IL 60015

Re:   **Tribune Media Services Syndication Agreement**

Dear Mr. Wolf:

This firm represents Tribune Media Services, Inc. ("TMS"). I am responding to your letter dated October 1, 2007, first received by TMS on October 4, 2007, stating that Blue Ridge Salvage Company, Inc. ("Blue Ridge") contends that the relationship which exists under the Syndication Agreement between TMS and Blue Ridge will terminate as of March 31, 2008, and that TMS has no right to extend that relationship.

Let me begin by reiterating that TMS has unequivocally and unambiguously exercised its right of first refusal pursuant to Section 5(b) of the Syndication Agreement -- twice -- once under each party's interpretation of what constitutes a bona fide offer. See Ms. Fulkerson's August 9, 2007 letter ("TMS today accepts all five of the terms offered ... As soon as you return one of the signature pages, signed by Ms. MacNelly, we can send over the first check"); and Mr. Karottki's August 24, 2007 letter (entitled "Acceptance of Offer," and stating that TMS "accepts the terms and conditions specified in the bona fide offer that Blue Ridge received from King Features. Accordingly, pursuant to the Syndication Agreement, your notice to TMS and this acceptance 'constitute a binding agreement.'"). TMS has taken the appropriate and necessary steps to avail itself of its contractual rights; it has not refused but accepted the offer; and your contention that TMS "has failed to exercise its right of first refusal" is erroneous for many reasons.

First, while Blue Ridge has attempted to characterize King Features' August 8, 2007 cover letter as part of King Features' "written proposal," a literal reading of the letter belies such an interpretation. King Features' cover letter notes that "[a]ttached is a proposal for the representation of the Shoe Comic Strip." Thus the attachment, not the cover letter, sets forth King Features' proposal. In addition, there is no indication that the marketing pitch contained in King Features' cover letter itself comprises part of the financial terms of the offer. Moreover, Blue Ridge has no right to determine what constitutes King Features' "written bid or proposed contract." Indeed, Illinois case law reflects that an attempt on the part of a grantor of a right of first refusal to add to or alter the terms of a third party's offer is a breach of contract. See Vincent v. Doebert, 183 Ill. App. 3d 1080 (2nd Dist. 1989). Blue Ridge's attempt to incorporate King

TEL 312.201.4000   FAX 312.332.2196   WEB WWW.GOLDBERGKOHN.COM
55 EAST MONROE STREET SUITE 3300 CHICAGO ILLINOIS 60603-5792

MERITAS LAW FIRMS WORLDWIDE

GOLDBERG KOHN BELL BLACK ROSENBLOOM & MORITZ, LTD

Mr. Steven B. Wolf
October 18, 2007
Page 2

Features' cover letter into King Features' actual proposal is a thinly veiled effort by Blue Ridge to deprive TMS of its rights under the Syndication Agreement.

Second, the Syndication Agreement enclosed with Mr. Karottki's August 24, 2007 letter includes all of the terms of King Features' single-page, eight term proposal. The additional verbiage merely incorporated the skeletal terms of King Features' proposal into the pre-existing contract between TMS and Blue Ridge. TMS hereby removes Paragraph 4(c), an immaterial provision.

Third, a right of first refusal will be enforced so long as the material terms and conditions of the third party's offer are met. *See Kellner v. Bartman*, 250 Ill. App. 3d 1030, 1035-36 (4th Dist. 1993). As clearly communicated most recently in Mr. Karottki's letter of August 24, 2007, TMS has accepted each of the eight terms contained within King Features' "Proposal for Representation of SHOE Comic Strip." Pursuant to Section 5(b) of the Syndication Agreement, this acceptance constitutes a "binding agreement" between the parties.

Blue Ridge's cursory dismissal of TMS' acceptance of the terms of King Features' proposal is invalid. Indeed, it seems apparent that Blue Ridge has always wished to impede TMS from exercising the right of first refusal, and has attempted to dissuade TMS from doing so. For example, Mr. Vladem's July 26, 2007 letter states: "It is our opinion that Tribune Media Services, Inc. will be unable to agree with" the terms provided by a then-unidentified offeror not yet even disclosed to TMS. Indeed, Mr. Vladem's letter was written one week after Ms. Fulkerson had unequivocally said "yes" in her July 19, 2007 letter when asked if TMS would like to continue its relationship with Blue Ridge. *See* Ms. Fulkerson's letter of July 19, 2007 ("You also ask whether TMS would like to continue its relationship with Blue Ridge after the expiration of the TMS Agreement. The answer is yes."). From the first, therefore, Blue Ridge refused to accept TMS' willingness to exercise TMS' contractual rights. Similarly, your letter of August 15, 2007 reflects an unsupported (and unsupportable) position that TMS had somehow forfeited its contractual rights seven years ago: "I do not believe Tribune Media has a right of first refusal in light of its letter of September 20, 2000." There is not a single word in the September 20, 2000 letter -- or yours of August 15, 2007 -- that would lead any neutral person to the conclusion that TMS' right of refusal no longer existed. Moreover, the July 19, 2007 and July 26, 2007 letters from Mr. Vladem to TMS clearly reflected his understanding that TMS held an enforceable right of first refusal. Your subsequent letter of August 15, 2007 did not undercut Mr. Vladem's earlier concessions, and your subsequent correspondence concedes this position by waiving it.

The communications over the Non-Disclosure Agreement ("NDA") similarly demonstrate Blue Ridge's efforts to frustrate and impede TMS' exercise of its right of first refusal. Ms. Fulkerson noted in her July 30, 2007 letter that you refused to disclose a third-party offer until TMS executed an NDA, and she closed by saying: "I await the NDA, as well as the bona fide offer." On August 6, 2007, you sent a draft NDA which you stated "is required prior to the additional disclosures." Ms. Fulkerson then made changes to the draft NDA and returned it to you, signed, on August 14, 2007. On August 15, 2007, however, you

GOLDBERG KOHN BELL BLACK ROSENBLOOM & MORITZ, LTD

Mr. Steven B. Wolf
October 18, 2007
Page 3

wrote to say that "I do not agree to your proposed changes to the NDA. I prefer to just move forward without an NDA." Only after having wasted two weeks of effort did you release the King Features proposal to TMS, revealing that the NDA was merely a stall tactic. This again shows that Blue Ridge had no intention of acting in good faith, and instead wished to erect hurdles to TMS' exercise of the right of first refusal.

What is transparent from this series of letters, and the history of these communications, is the effort of Blue Ridge and its counsel to do or say anything they could imagine to interfere with and to deprive TMS of its contractual rights. This is just the kind of bad faith conduct a court will not allow. *See Vincent v. Doebert,* 183 Ill. App. 3d 1080 (2nd Dist. 1989).

Therefore, Blue Ridge will commit a clear breach of contract if it attempts, or purports to attempt, to enter into a binding agreement with King Features for the "Shoe Comic Strip." Please let us know, within the next 14 days, when Blue Ridge will execute the Syndication Agreement sent under cover of Mr. Karottki's letter of August 24, 2007, with Paragraph 4(c) thereof deleted. If Blue Ridge refuses to do so, TMS will take all appropriate actions to protect these important contractual rights. In the meantime, we advise you and Blue Ridge to inform King Features immediately that its offer must be rejected by Blue Ridge due to the exercise of TMS' right of first refusal.

Sincerely yours,

Frederic R. Klein

FRK/bsm