.

**APPENDIX**

Letter to John Twohey at Tribune from Robert Vladem at Blue Ridge Salvage
7/16/07……………………………………………………………………..……….. **Ex. 1**

8/25/95 Syndication Agreement……..………………………………………………**Ex. 2**

Letter to Robert Vladem at Blue Ridge Salvage from Beth Fulkerson at Tribune
7/19/07…………………………………………………………………………...**Ex. 3**

Letter to Steven Wolf at Wolf Holland & Matern from Beth Fulkerson at Tribune
7/30/07………………………………………………………….………………….**Ex. 4**

Letter to Beth Fulkerson at Tribune from Steven Wolf at Wolf Holland & Matern
8/15/07……………………………………………………...……………………**Ex. 5**

Letter to Steven Wolf at Wolf Holland & Matern from Salvador Karottki
8/24/07………………………………………………………...…………………**Ex. 6**

Letter to Beth Fulkerson at Tribune from Steven Wolf at Wolf Holland & Matern
10/1/07………………………………………………………….……………….**Ex. 7**

Letter to Steven Wolf at Wolf Holland & Matern from Frederic Klein at Goldberg
10/18/07……………………………………………………….…………………**Ex. 8**

Hicks Road Corp. v. Marathon Oil Co., 1994 WL 327361
(N.D. Ill. 1994, Norgle, J.)………………………………...……………………**Ex. 9**

Trading Technologies, Inc. v. Refco Group, Ltd, 2006 WL 794766
(N.D. Ill. 2006, Anderson, J.) …………………………………………….……**Ex. 10**

**EXHIBIT 1**

**EXHIBIT 1**



July 16, 2007

VIA FEDERAL EXPRESS

Mr. John Twohey
Tribune Media Services, Inc.
435 N. Michigan Avenue, Suite 1500
Chicago, Illinois 60611

Dear John:

      Thanks for returning my call of last Friday this morning and advising me of your limited availability to connect because of your current travel schedule. I will also be traveling this week. The purpose of my call to you was to advise you where we are with SHOE and to discuss with you our relationship with Tribune Media Services, Inc. This letter should bring you up to date in advance of and in anticipation of our conversation.

      We received an offer and have reached an agreement in principal for the syndication rights in SHOE commencing on expiration of the current relationship with Tribune Media Services, Inc. The offer includes licensing and other supplementary and subsidiary rights arising out of the feature including but not limited to the use, sale, publication, or other exploitation of the material, characters, names or ideas in SHOE.

The offer provides for:

- Blue Ridge Salvage Company to deliver six cartoon panels in black and white for daily publication and one page per week of cartoon drawings in color for Sunday publication

- $350,000 signing bonus, payable $175,000 on signing of the agreement and $175,000 on the commencement date of the agreement
- 65% royalty on net receipts from publications licensed to publish and other sources of revenue in existence prior to the commencement date of the agreement
- 50% royalty on net receipts from all new sources of revenue after the commencement date of the agreement
- 20 year term

After considering the terms of the proposed agreement, please contact me if Tribune Media Services, Inc. desires to discuss a continued relationship with Blue Ridge Salvage Company, Inc. after expiration.

Please do not hesitate to contact me if you have any questions.

With best regards,

Blue Ridge Salvage Company, Inc.

Robert J. Vladem

cc:     David D. Williams, President/CEO (Via Federal Express)
        Dale Cohen, Senior Counsel (Via Federal Express)
        Susie MacNelly

**EXHIBIT 2**

**EXHIBIT 2**

## SYNDICATION AGREEMENT

This Agreement is entered into as of the 25th day of August, 1995 between Tribune Media Services, Inc., a Delaware corporation ("TMS"), Blue Ridge Salvage Company, Inc., a Virginia corporation  and Jeffrey K. MacNelly (collectively referred to as "Artist") and, upon its Effective Date (defined below), supersedes the March 10, 1986 agreement between the parties regarding the syndication of the "Shoe" cartoon feature and all amendments thereto.  The parties agree as follows:

1.    The Feature.

During each week of the term of this Agreement, Artist agrees to prepare and furnish to TMS six (6) cartoon panels in black and white suitable for daily newspaper publication and one (1) page per week of cartoon drawings of the Feature in color suitable for Sunday newspaper publication (the "Feature").  The Feature shall be furnished in accordance with the following provisions:

(a)    The Feature shall be entitled "SHOE" or such other title as TMS and Artist shall mutually agree upon .  The Feature shall be based upon characters similar to those portrayed in the "Shoe" cartoon feature that Artist has heretofore submitted for publication through TMS.

(b)    The Feature shall be of the highest quality Artist is capable of producing, shall be suitable for publication in major daily newspapers and shall be of a quality equal to that he has heretofore submitted for publication.

(c)    The Feature shall be delivered to TMS at a place to be designated by TMS, the expense of such delivery to be borne by Artist.

(d)    The Feature shall be delivered to TMS at least eight (8) weeks in advance of the date of publication. Artist acknowledges that TMS is obligated to deliver the Feature to its syndicate customers regularly and at fixed times and that a failure to make such regular and timely delivery might subject TMS to liability. Accordingly, it is expressly agreed that the time for delivery of the Feature to TMS shall be of the essence of this Agreement. Artist further agrees to indemnify TMS against any liability or expense (including reasonable attorneys' fees) caused by any failure by Artist to make such regular and timely delivery.

2.    <u>Syndication and Ancillary Rights.</u>

During the term of this Agreement, and except as otherwise expressly provided herein, TMS shall have the sole right throughout the world to syndicate, distribute, reproduce, sell, license ancillary rights, or otherwise exploit and authorize the use of the Feature and all its elements in print, electronic, or any other media application, and to take such other action, if any, to exploit the Feature as TMS, in its sole discretion, deems appropriate. TMS shall have absolute discretion in selecting purchasers (which may be affiliates of TMS) of any rights in the Feature and in determining prices and terms of sale in any media provided, however, that any arrangements between TMS and purchasers of the Feature who are affiliates of TMS shall be on an arm's length and bona fide basis. All or any part of TMS's rights hereunder may be assigned or reassigned from time to time to any foreign sales or foreign syndication agency or agencies (which may be affiliates of TMS), which may act with respect to the assigned rights in its or their own name or names. TMS shall use good faith and due diligence in marketing the Feature and in exercising the rights set forth herein.

2

3.    <u>Compensation.</u>

(a)    Beginning upon the Effective Date (defined below in paragraph 4), in consideration of the satisfactory performance by Artist of the obligations assumed by Artist under this Agreement, and the rights granted to TMS herein, TMS shall pay to Artist an amount equal to sixty percent (60%) of the "Net Receipts," as defined below, from the syndication of the Feature during the term of this Agreement.    TMS guarantees that the amounts payable to Artist pursuant to this Agreement shall not be less than Eight Hundred Dollars ($800.00) per week, less any amounts due to TMS pursuant to paragraph 3(e), during the term of this Agreement.

(b)    "Net Receipts" as used herein shall mean revenues actually received by TMS from the sale and syndication of the Feature, less the sum of:

(i)    Costs of duplicating, proofs, printing, paper, reproduction, transmission costs, and other similar production, editing, and distribution charges;

(ii)    Commissions, fees or other sales expenses relating to foreign sales or syndication of the Feature;

(iii)    Bad debts arising out of the sale or syndication of the Feature;

(iv)    Rebates or allowances paid or allowed by TMS, or its assignees, to any purchaser of any rights in the Feature;

(v)    Actual promotion expenses; and

(vi)    Other costs, expenses, and liabilities which, pursuant to any provision of this Agreement, are to be deducted from gross revenues.

Within twenty (20) days after the close of each accounting period of TMS (each accounting period being either four (4) or five (5) weeks, as determined by TMS), TMS shall

3

determine and pay to Artist the amount, if any, payable pursuant to subparagraph 3(a) for the "Net Receipts" received by TMS during such accounting period.

(c)    If TMS grants to a third party (including affiliates of TMS) the right to publish the Feature in book form or TMS licenses to a third party the right to reproduce, use or otherwise exploit the Feature or certain fanciful characters contained therein in connection with the manufacture, sale, distribution, presentation or production of merchandise, theatrical or stage plays, television or radio dramatizations or representations or motion pictures (collectively, "Licensing Agreements"), then TMS shall pay to Artist sixty Percent (60%) of the gross amounts actually received by TMS from such third party for the grant of rights, including all advances and royalties, after the deduction of all of TMS's direct and reasonable expenses, if any, in connection with the granting of such rights and the collection of such amounts. Payments pursuant to this subparagraph 3(c) shall be made within thirty (30) days following TMS's receipt of amounts giving rise to such payments.

(d)    TMS shall keep accurate books and records reflecting amounts accrued from the sale of the Feature and shall furnish to Artist monthly statements which shall disclose all sales of the Feature, the purchasers, and the amounts actually received. Artist shall have the right, in person or by duly authorized agents, to examine TMS's records in which the accounts and information relative to this Agreement are maintained and to make photocopies of said records, provided such inspection shall be made during normal business hours and upon reasonable notice.

(e)    In connection with this Agreement and in further consideration of the Artist's satisfactory performance of his obligations and the rights granted to TMS herein and upon fulfillment of conditions in related conditions in related escrow agreement, TMS will loan Blue Ridge Salvage Company (" Blue Ridge" ) $500,000 (in two separate consecutive loans)

4

and the parties will execute appropriate Promissory Notes, a Security Agreements, Trademark Assignments and Copyright Assignments (the "Loan Documents") in connection with those loans.     All amounts due from Artist pursuant to the Loan Documents shall be deducted from the payments due  to Artist under paragraphs 3(a) through 3(c) of this Agreement.

4.     <u>Term of Agreement</u>.

(a)     The term of this Agreement shall commence on the Effective Date and shall continue until March 31, 2008, subject to subparagraphs 4(b) and 4(c) below. The Effective Date for this Agreement shall be the date on which the contingencies described in that certain escrow agreement dated August 25, 1995 are fulfilled and the escrowed documents, including this Agreement, are released from escrow.

(b)     If, during any two (2) consecutive accounting periods of the term of this Agreement, the average of the amounts of Net Receipts generated by the Feature shall be less than Eight Hundred Dollars ($800.00) per week, then either TMS or Artist may terminate this Agreement by written notice to the other party given no later than sixty (60) days following the end of the second such accounting period, provided, however, that Artist may not elect to terminate under this provision unless Artist has satisfied all of his obligations under the Loan Documents and he has fully repaid all principal and accrued interest thereunder.   Notwithstanding the foregoing, if Artist elects to terminate this Agreement pursuant to this subparagraph 4(b), TMS may keep this Agreement in effect by notifying Artist that TMS will cause payments to Artist pursuant to subparagraph 3(a) to be not less than the minimum weekly guarantee as set forth in subparagraph 3(a) above. TMS may keep this Agreement in effect for so long as TMS maintains such payments, less any amount due pursuant to paragraph 3(e).  If this Agreement is terminated pursuant to

5

this subparagraph 4(b), the termination shall be effective thirty (30) days following the date of notice.

5.   <u>Rights of First Refusal</u>

(a)   During the term of this Agreement, including renewals and extensions thereof, Artist grants to TMS a right of first refusal to acquire such rights as TMS is acquiring in the Feature in any new feature created by Artist for syndication to newspapers or other print media or for electronic transmission.  Artist shall not enter into an agreement for the exploitation of the said new feature without offering to TMS the right to match a bona fide offer received by Artist with respect to said new feature.  For purposes of this paragraph, a bona fide offer shall consist of a written bid or proposed contract submitted to Artist by a financially responsible third party.  TMS shall have thirty (30) business days from its receipt of such bona fide offer and Artist's request for acceptance or rejection thereof by TMS to respond.  The terms of the bona fide offer forwarded by Artist and the acceptance by TMS shall constitute a binding agreement.  If TMS does not accept said terms and conditions, then Artist may grant the rights contained in the bona fide offer to the offeror; provided, however, that Artist shall not make any such grant on terms more favorable to such other party than the terms specified in Artist's notice of a bona fide offer to TMS without giving TMS another similar opportunity to accept said terms.

(b)   If Artist desires to grant to anyone the rights to syndicate and distribute the Feature following the expiration of the term of this Agreement, then Artist shall first offer to TMS the right to match a bona fide offer received by Artist for the Feature.  If TMS notifies Artist within thirty (30) days after the receipt of such notice that it accepts the terms and conditions so specified in the bona fide offer to Artist, the notice from Artist and the acceptance by TMS shall constitute a binding agreement.  If TMS does not accept said

6

terms and conditions, then Artist may grant the right previously offered to TMS to any other party; provided, however, that Artist shall not make any such grant on terms more favorable to such other party than the terms specified in Artist's notice to TMS without giving TMS another similar opportunity to accept said terms.

(c)     MacNelly currently produces editorial cartoons pursuant to an employment agreement with Chicago Tribune Company dated March 1, 1990.  Upon termination of MacNelly's employment with Chicago Tribune for any reason, Artist grants TMS for a term that is conterminous with the term of this Agreement the sole right throughout the world to syndicate, distribute, reproduce, sell, license ancillary rights, or otherwise exploit and authorize the use of Artist's editorial cartoons and all of their elements in print, electronic, or any other media application, and to take such other action, if any, to exploit the Feature as TMS, in its sole discretion, deems appropriate.   In exchange for those rights, Artist will receive fifty percent (50%) of the net receipts for those editorial cartoons pursuant to the same terms as set forth in paragraph three of this Agreement.

6.     Independent Contractor.

It is understood and agreed that this Agreement is for the purchase of certain rights only and that Artist is an independent contractor.  Artist shall do the work required to produce the Feature on his own time, at his own expense, in his own way, using his own supplies, and he shall furnish his own place of work and his own assistants, if any are required, free from direction and control by TMS.  The means of producing the Feature shall be solely within Artist's control.  Artist agrees to discharge all obligations imposed upon employers and self-employed persons under any applicable union agreement or federal, state, or local law, regulations, or order now or hereafter in force, including, but not limited to, taxes, unemployment compensation or insurance, workers' compensation, and

7

social security, and including the filing of all returns and reports required of any employer and the payment of all assessments, taxes, contributions, or other sums required, since Artist shall not be treated as an employee of TMS for federal, state, or local tax purposes. To the extent permitted by law, Artist further agrees to indemnify and hold TMS harmless against all claims and demands resulting from Artist's failure to comply with the provisions of this paragraph. This Agreement shall not in any way constitute the parties as partners or joint venturers, nor as principal and agent.

7.    Editorial Supervision.

(a)    TMS shall have the entire editorial supervision of the Feature and may make changes, deletions, or additions in or to the Feature with the approval of Artist, which shall not be unreasonably withheld. In the event that TMS and Artist shall be unable to mutually agree on edits, changes, deletions, or additions to the Feature, Artist agrees to furnish a substitute strip for the strip in question.

(b)    TMS shall not be obligated to accept, syndicate, or pay for any materials for the Feature which do not comply with the requirements set forth herein or which in TMS's reasonable opinion might subject TMS to any claim by any third party.

(c)    In the event of rejection of any material for the Feature by TMS, TMS shall give Artist written notice of its reason for rejection and Artist shall be given reasonable time to produce and deliver substitute material; provided, however, that upon the inability or failure of Artist to submit revised material to TMS at least four (4) weeks in advance of the date of publication with respect to daily cartoon panels, and at least six (6) weeks in advance of the date of publication with respect to Sunday color pages, the provisions of paragraphs 1(d) and 15 herein shall apply.

8.    Ownership of Feature.

8

(a)    As between Artist and TMS, Artist shall be the owner of the Feature, including, but not limited to, all materials furnished by Artist to TMS pursuant to this Agreement, and all trademarks and all copyrights and renewals and extensions thereof. Notwithstanding the foregoing, during the term of this Agreement, TMS shall have the sole and exclusive right to exercise all subsidiary rights in the Feature of any kind, and TMS shall have the sole and exclusive right to publish and authorize the publishing and distribution of the Feature in print and other media (including, without limitation, publication and distribution in book, booklet, pamphlet, CD-ROM, cabletext, videotex, audiotex, and electronic data base form, and other forms of electronic transmission) and TMS shall have exclusive stage, motion picture, radio, television, animation, mechanical reproduction, and commercial exploitation rights (including, without limitation, merchandising rights), and may exercise all other rights in the Feature throughout the world. The parties agree that the Feature syndicated to newspapers shall contain the following notice: © "19___, Tribune Media Services, Inc. All Rights Reserved." Artist agrees to execute and deliver to TMS, promptly on request, any documents which TMS may reasonably request to evidence TMS's exclusive rights as provided in this paragraph. It is understood and agreed that revenues derived by TMS, during the term hereof, in connection with TMS's exercise of its rights pursuant to this paragraph, after deduction of TMS's direct and reasonable expenses, if any, in connection with the granting of such rights and collection of such amounts, shall be included in calculating Net Receipts pursuant to paragraph 3(a) hereof.

(b)    Notwithstanding the foregoing, TMS shall be entitled to its share of revenues received after the expiration of this Agreement pursuant to Licensing Agreements entered into by TMS during the term of this Agreement including all extensions and renewals.

9

9.    Exclusivity.

So long as this Agreement shall be in effect (including any time during which Artist may be in default hereunder or in breach hereof), Artist shall not enter into any contract, agreement, understanding, or arrangement to prepare any material similar to the Feature for any newspaper or newspapers or magazines distributed with newspapers or for distribution by cabletext, videotape, audiotex, or other form of electronic transmission. Artist and TMS agree that, in the event of any breach of the covenants contained in this paragraph, TMS will not have an adequate remedy at law and shall, in addition to any other appropriate equitable or legal relief, be entitled to an injunction from a court of competent jurisdiction restraining Artist from any such breach.

10.    Enforcement of TMS's Rights.

Artist hereby appoints TMS (and such substitutes as TMS may from time to time select) as Artist's irrevocable attorney in fact, with the right, but not the obligation, to enforce and protect all rights herein granted to or acquired by TMS, and to prevent infringement of any copyrights and trademarks, and to litigate, collect, and receipt for all damages arising from any infringement of such rights, to use Artist's name as being plaintiff or defendant in any proceeding, and Artist agrees to execute such further instruments as TMS may deem appropriate to carry out the provisions of this paragraph.

10

11.    <u>Warranty</u>.

Artist represents and warrants that Artist has the full power and authority to enter into and perform this Agreement, that there is no contract, agreement, or understanding with any other person, firm, or corporation which would interfere with the obligations assumed by Artist hereunder, and that the Feature and all materials furnished to TMS hereunder will be new, original, and unpublished, and that the Feature will not infringe upon or violate any copyright, trademark, tradename, literary, artistic, or other property right, right of privacy, or any other right of any person, firm, or corporation and will not contain any libelous or unlawful material. Artist agrees to indemnify and hold harmless TMS, its employees, officers, directors, stockholders, licensees, successors, and assigns, from and against any and all losses, damages, costs, and expenses, including the legal fees and expenses incident thereto, arising from any suit, claim, or demand based upon any breach or alleged breach of the warranties contained in this paragraph.

12.    <u>Death</u>.

In the event of the death of MacNelly while this Agreement is in effect, (a) payments pursuant to subparagraph 3(a) hereof shall continue through the date on which material prepared by MacNelly prior to MacNelly's death and not previously published and acceptable to TMS for publication shall be published, and (b) all payments due to Artist hereunder shall be made to Artist's legal representatives and TMS shall have no further liability hereunder to Artist's legal representatives, heirs, legatees, or assigns, except to pay Artist's share of revenues received by TMS from materials prepared by Artist prior to Artist's death.

13.    <u>Use of Name; Promotion</u>.

11

During the term of this Agreement, TMS shall have the right, subject to Artist's prior approval which shall not be unreasonably withheld, to use MacNelly' s name, likeness, and biography in connection with the Feature and the promotion and sale of the Feature.

14.     Termination.

The obligations assumed by Artist in paragraphs 5(b), 6, 8(b), 10, and 11 hereof shall survive any termination or cancellation of this Agreement.

15.     Failure to Furnish Feature.

If Artist fails to furnish the Feature as required hereunder, TMS shall have the right, at its discretion, to obtain or prepare substitute copy through any means and in whatever manner it chooses.   In such event, TMS shall make reasonable efforts to consult with Artist and make arrangements for the preparation of substitute copy satisfactory to Artist.  TMS may deduct the expenses or the loss of income occasioned by Artist's default from any money then or thereafter due Artist.  If the failure to furnish the Feature continues for a period of fourteen (14) consecutive days, TMS shall have the right to terminate this Agreement by written notice to Artist, unless such failure is caused by Artist's inability to produce the Feature due to disability or serious illness.  In the event that Artist is unable to produce the Feature due to disability or serious illness and the period of such inability exceeds sixty (60) days, TMS shall have the right to terminate this Agreement by written notice delivered to the other party.

16.     Notices.

All notices, requests, consents, and other communications required or permitted to be given hereunder shall be in writing and delivered personally or sent by certified mail, return receipt requested, postage prepaid, as follows:

12

If to Artist:    Jeffrey MacNelly
                 P.O. Box 188
                 Flint Hill, VA 22627


If to TMS:       Tribune Media Services, Inc.
                 435 N. Michigan Avenue, Suite 1500
                 Chicago, Illinois 60611
                 Attn:  David D. Williams, President/CEO

    cc:          Dale Cohen
                 Senior Counsel
                 Tribune Company
                 435 N. Michigan Avenue
                 Suite 600
                 Chicago, Illinois  60611

Any notice so given shall be deemed received when delivered personally, or, if mailed, when deposited, postage prepaid, in the United States mail. Either party may change the address to which notices are to be sent by giving written notice of such change of address to the other party in the manner herein provided for giving notice.

17.    General.

(a)    This Agreement shall be governed by and construed and enforced in accordance with the laws of the State of Illinois applicable to agreements made and to be performed entirely in Illinois.

(b)    The section headings contained herein are for reference purposes only and shall not in any way affect the meaning or interpretation of this Agreement.

(c)    This Agreement sets forth the entire agreement and understanding of the parties hereto concerning the subject matter hereof, and supersedes all prior agreements, arrangements, and understandings between the parties hereto.

(d)    TMS may assign its rights and obligations under this Agreement to any corporation or other entity controlled by, or under common control with, Tribune Company,

13

or to any entity which succeeds to substantially all of the business and assets of TMS. This Agreement is personal to Artist, however, and neither this Agreement nor any of Artist's rights or obligations hereunder may be assigned, pledged, or encumbered without the prior written approval of TMS.

(e)    This Agreement may be amended, modified, superseded, or cancelled, and the terms and covenants hereof may be waived, only by a written instrument executed by both of the parties hereto, or, in the case of a waiver, by the party waiving compliance. The failure of either party at any time or times to require performance of any provision hereof shall in no manner affect the right at a later time to enforce the same. No waiver by either party of the breach of any term or covenant contained in this Agreement, whether by conduct or otherwise, in any one or more instances, shall be deemed to be, or construed as, a further or continuing waiver of any such breach or a waiver of the breach of any other term or covenant contained in this Agreement.

18.    Status of MacNelly

The parties recognize and acknowledge that MacNelly is the artist responsible for drawing the feature pursuant to an agreement with Blue Ridge. The parties further acknowledge that MacNelly is solely an agent of Blue Ridge and is not an employee or agent of TMS with respect to the activities contemplated by this Agreement. MacNelly has executed this Agreement for the limited purposes of evidencing his consent to the Agreement in his status as Artist of the Feature, evidencing his willingness to grant such rights to Blue Ridge and agreeing to observe such restrictions as maybe imposed upon him by Blue Ridge as may be reasonably necessary to enable Blue Ridge to comply with the provisions of this Agreement.

14

AUG 24 '95 16:40 FR TO 17036751103 P.23/23
08/24/95 14:08:07  McDermott, Will & Em->

Page 817

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date shown above.

TRIBUNE MEDIA SERVICES, INC.

By:_____
DAVID D. WILLIAMS, President/CEO

BLUE RIDGE SALVAGE COMPANY

By:_____
president

Jeffrey K. MacNelly

\20336\030\MACNELLY.WPS

15

**EXHIBIT 3**

**EXHIBIT 3**

Beth A. Fulkerson
Senior Counsel/Intellectual Property & Interactive
312/222-4653

# TRIBUNE

435 North Michigan Avenue
Chicago, Illinois 60611-4066
fax: 312/222-4206
e-mail: bfulkerson@tribune.com

July 19, 2007

**VIA FEDERAL EXPRESS**

Mr. Robert J. Vladem
Blue Ridge Salvage Company, Inc.
853 Sheridan Road
Winnetka, Illinois 60093

Re:     Tribune Media Services Syndication Agreement

Dear Mr. Vladem:

I write on behalf of Tribune Media Services, Inc. (TMS) in response to your July 16, 2007 letter to John Twohey, regarding the March 31, 2008 expiration of the TMS syndication agreement with Blue Ridge Salvage Company, Inc. ("TMS Agreement").

You explain in your letter that Blue Ridge Salvage Company, Inc. ("Blue Ridge") has received an offer for the syndication rights in SHOE, beginning when the TMS Agreement ends. You also ask whether TMS would like to continue its relationship with Blue Ridge after the expiration of the TMS Agreement.

The answer is yes. Under Section 5(b) of the TMS Agreement, TMS has a right of first refusal: "If Artist desires to grant to anyone the rights to syndicate and distribute the Feature following the expiration of the term of this Agreement, then Artist shall first offer to TMS the right to match a bona fide offer received by Artist for the Feature. If TMS notifies Artist within thirty (30) days after the receipt of such notice that it accepts the terms and conditions so specified in the bona fide offer to Artist, the notice from Artist and the acceptance by TMS shall constitute a binding agreement." A bona fide offer is defined as "a written bid or proposed contract submitted to Artist by a financially responsible third party."

Please send a copy of the written bid or proposed contract by Monday, July 23, 2007, so that TMS can consider "the terms and conditions so specified," and draft a new syndication agreement in a timely manner. I look forward to working with you.

Sincerely,

Beth Fulkerson

cc:     Susie MacNelly
        David D. Williams
        John Twohey

**EXHIBIT 4**

**EXHIBIT 4**

Beth A. Fulkerson
Senior Counsel/Intellectual Property & Interactive
312/222-4653

# TRIBUNE

Tribune Company
435 North Michigan Avenue
Chicago, Illinois 60611-4066
fax: 312/222-4206
e-mail: bfulkerson@tribune.com

July 30, 2007

VIA FACSIMILE
847-374-0601

Mr. Steven B. Wolf
Wolf Holland & Matern LLP
500 Lake Cook Road
Suite 130
Deerfield, Illinois 60015

Re:     Tribune Media Services Syndication Agreement

Dear Mr. Wolf:

Thank you for calling last week. Since then, TMS has received the July 26, 2007, correspondence you said was in the mail from Mr. Vladem, inquiring whether it makes sense for the parties to proceed with discussions regarding whether TMS will match the terms of the offer Mr. Vladem outlined in his July 16, 2007 letter.

As I stated on the phone, TMS will consider matching the offer. But first TMS has to receive an offer, in writing, submitted to Blue Ridge Salvage Company, Inc., by a financially responsible third party. Only then is the offer deemed a "bona fide offer" under the terms of the current syndication agreement. And only then does the 30-day right of first refusal period begin to run.

You mentioned that you would send over an NDA to cover TMS' review of the offer. I await the NDA, as well as the bona fide offer.

Sincerely,

*Beth A Fulk*

cc: Susie MacNelly
Robert J. Vladem
David D. Williams
John Twohey

## Confirmation Report — Memory Send

```
Page        : 001
Date & Time : Jul-31-07  11:30am
Line 1      :
Line 2      :
Machine ID  :
```

| | | |
|---|---|---|
| Job number | : | 642 |
| Date | : | Jul-31 11:29am |
| To | : | ☎915406751103 |
| Number of pages | : | 001 |
| Start time | : | Jul-31 11:29am |
| End time | : | Jul-31 11:30am |
| Pages sent | : | 001 |
| Status | : | OK |

Job number    : 642              *** SEND SUCCESSFUL ***

Beth A. Fulkerson
Senior Counsel/Intellectual Property & Interactive
312/222-4853

# TRIBUNE

Tribune Company
435 North Michigan Avenue
Chicago, Illinois 60611-4066
fax 312/222-4206
e-mail bfulkerson@tribune.com

July 30, 2007

VIA FACSIMILE
847-374-0601

Mr. Steven B. Wolf
Wolf Holland & Mavern LLP
500 Lake Cook Road
Suite 130
Deerfield, Illinois 60015

Re:     Tribune Media Services Syndication Agreement

Dear Mr. Wolf:

Thank you for calling last week.  Since then, TMS has received the July 26, 2007, correspondence you said was in the mail from Mr. Vladem, inquiring whether it makes sense for the parties to proceed with discussions regarding whether TMS will match the terms of the offer Mr. Vladem outlined in his July 16, 2007 letter.

As I stated on the phone, TMS will consider matching the offer.  But first TMS has to receive an offer, in writing, submitted to Blue Ridge Salvage Company, Inc., by a financially responsible third party.  Only then is the offer deemed a "bona fide offer" under the terms of the current syndication agreement.  And only then does the 30-day right of first refusal period begin to run.

You mentioned that you would send over an NDA to cover TMS' review of the offer. I await the NDA, as well as the bona fide offer.

Sincerely,

Beth A. Fulkerson

cc: Susie MacNelly
Robert J. Vladem
David D. Williams
John Twohey

**EXHIBIT 5**

**EXHIBIT 5**

08/15/2007 16:54 FAX 8473740601 WOLF HOLLAND & MATERN LLP
Case 1:07-cv-06497    Document 16-2    Filed 01/02/2008    Page 27 of 62    002/004

Case 1:07-cv-06497    Document 9-2    Filed 12/11/2007    Page 48 of 74



# WOLF
# HOLLAND &
# MATERN LLP
**Attorneys at Law**

REPLY TO:
500 LAKE COOK ROAD
SUITE 130
DEERFIELD, ILLINOIS 60015
(847) 374-0600
FACSIMILE (847) 374-0601

CHICAGO OFFICE
205 WEST WACKER DRIVE
SUITE 1600
CHICAGO, ILLINOIS 60606
(312) 236-3510
FACSIMILE (312) 236-3820

August 15, 2007

**VIA FACSIMILE TRANSMISSION AND FIRST CLASS MAIL**

Ms. Beth Fulkerson
Tribune Company
435 N. Michigan Avenue
Chicago, Illinois 60611-4066

Dear Beth:

As we move forward, in order to minimize any risk of miscommunications or misunderstandings, I respectfully request that you refrain from directing any further communications to my client, Blue Ridge Salvage Company, Inc., including Susie MacNelly and Robert J. Vladem. Please put all communications in written form and direct them to me without copy to my clients.

As to your letter of August 14, 2007, I do not believe Tribune Media has a right of first refusal in light of its letter of September 20, 2000. However, we need not address that issue at this time. If Tribune Media will not or cannot match the King Features proposal, then there is no need to address the existence of any right of first refusal.

In the interest of a prompt resolution of this matter, I am forwarding a letter of August 8, 2007 from the President of King Features to Mr. Robert Vladem with an attachment titled "Proposal for Representation of SHOE Comic Strip 8/8/07" sent in response to our request. We consider the letter and attachment to be the written proposal. Please indicate whether Tribune Media is willing to and can meet each and every one of the terms therein. To the extent Tribune Media believes it can meet each of these terms, I must request that you explain in writing how Tribune Media expects to provide the same services to my client as contemplated under the King Features proposal.

Lastly, I do not agree to your proposed changes to the NDA. I prefer to just move forward without an NDA.

With best regards,

Steven B. Wolf

Enclosure

Case 1:07-cv-06497    Document 16-2    Filed 01/02/2008    Page 28 of 62
08/15/2007 15:54 FAX  8473740601          WOLFHOLLANDHATERNLLP          @003/004
Case 1:07-cv-06497    Document 9-2    Filed 12/11/2007    Page 49 of 74

**T.R. SHEPARD III**
PRESIDENT

August 8, 2007

Mr. Bob Vladem
Manager
SHOB
853 Sheridan Road
Winnetka, IL 60093

Dear Bob:

Attached is a proposal for the representation of the Shoe comic strip. This proposal was requested by Blue Ridge Salvage Company, Inc. for the purpose of entering into an agreement with King Features after the expiration of the current TMS contract.

Other benefits to Shoe are the following: King Features has 20 international syndication agents covering 122 countries. Our international syndication sales manager also handles 18 direct accounts in 18 Caribbean countries. King Features has 19 international licensing agents covering 70 countries. Shoe would be added to the robust kingfeatures.com website to build both syndication and licensing awareness. Shoe would be able to link the cartoonist's website from either location. King Features would include Shoe in our consumer subscription site, dailyink.com, and in our store powered by Café Press which offers "on demand" product such as tee shirts, coffee mugs, character art, cartoonist favorite strips, etc. able to be ordered online, by phone, or by mail.

Of course, no other syndicate has the overall domestic (US and Canada) syndication and licensing sales prowess of King Features.

Please let me know if you have any other questions.

Sincerely,

*Rocky*

# KING FEATURES

A UNIT OF THE HEARST CORPORATION

300 W. 57TH ST., NEW YORK, NY 10019-5238
TEL: (212) 969-7547   FAX: (646) 280-1547   EMAIL: TRSHEPARD@HEARST.COM
WWW.KINGFEATURES.COM

Case 1:07-cv-06497    Document 16-2    Filed 01/02/2008    Page 29 of 62
08/15/2007  15:54 FAX  6473740601          WOLFHOLLANDMATERNLLP                    ☒004/004

Case 1:07-cv-06497    Document 9-2    Filed 12/11/2007    Page 50 of 74

Proposal for Representation of SHOE Comic Strip
8/8/07

1.  <u>Rights</u>:  Syndicate to represent all rights (syndication, merchandising, and entertainment) on an exclusive basis.

2.  <u>Territory</u>:  Worldwide

3.  <u>Term</u>:  20 years

4.  <u>First Negotiation/Matching Rights</u>:  45 day right of first negotiation and then right to match any third party offer for the continued syndication and licensing of the feature.

5.  <u>Revenue Splits</u>:  50/50 (except pre-existing syndication deals which shall be 65/35) based on the gross receipts from all syndication, merchandising and entertainment rights licensing, less foreign agent commissions, and currency conversion (and for syndication receipts only, less costs and expenses for color separations and proofs).

6.  <u>Signing Bonus</u>:  $350,000, non-recoupable, payable ½ on signing of representation agreement and ½ on commencement date of the term.

7.  <u>Ownership</u>:  Blue Ridge to own

8.  <u>Approvals</u>:  Blue Ridge to have right to approve the terms of all merchandising and entertainment licenses.

**EXHIBIT 6**

.

**EXHIBIT 6**

Salvador K. Karottki
Senior Counsel/Intellectual Property & Interactive
312/222-3290



Tribune Company
435 North Michigan Avenue
Chicago, Illinois 60611-4066
fax: 312/222-4206
e-mail: skarottki@tribune.com

August 24, 2007

**VIA FACSIMILE, CERTIFIED MAIL, AND ELECTRONIC MAIL**

Steven B. Wolf
Wolf Holland & Matern LLP
500 Lake Cook Road, Suite 130
Deerfield, Illinois 60015

Re:    **Acceptance of Offer to Artist and Response to Your Letter of August 15, 2007**

Dear Mr. Wolf:

I am responding on behalf of Tribune Media Services, Inc. ("TMS") to your letter dated August 15, 2007, giving notice to TMS of a bona fide offer from King Features to your client, Blue Ridge Salvage Company, Inc. ("Blue Ridge"), and attaching such bona fide offer (entitled "Proposal for Representation of SHOE Comic Strip 8/8/07"). Pursuant to Section 5(b) of the Syndication Agreement between TMS and your client dated August 25, 1995, TMS hereby notifies Blue Ridge that it accepts the terms and conditions specified in the bona fide offer that Blue Ridge received from King Features. Accordingly, pursuant to the Syndication Agreement, your notice to TMS and this acceptance "constitute a binding agreement." In light of the foregoing and to memorialize the agreement, we have attached a signed Syndication Agreement that we believe incorporates all of the terms of King Features' offer. Please contact us if you have any questions and to coordinate signatures on the document. We sent this acceptance letter directly to you because you expressly stated in your letter that you and your client want all communications on this matter to be sent to you.

Your letter also addresses a September 20, 2000, letter that expressly reiterates the continuance of the Syndication Agreement between the parties. You seem to imply that this letter has some impact on TMS' right of first refusal under Section 5(b) of the Syndication Agreement. So there is no miscommunication on this point, TMS rejects any such implication. Section 5(b) of the Syndication Agreement between the parties clearly grants TMS a right of first refusal, which TMS has hereby exercised. Nothing in the September 20, 2000, letter alters this right of first refusal. We assume any implication by you to the contrary was unintentional or mistaken.

In light of TMS' acceptance of the offer you sent us on behalf of Blue Ridge, TMS looks forward to working with Blue Ridge for the mutual benefit of both parties during the next phase of our relationship under the new terms accepted herein.

Very truly yours,

Salvador K. Karottki

Encl.

cc:    David D. Williams
       John C. Twohey
       Beth A. Fulkerson



## SYNDICATION AGREEMENT

This Agreement is entered into as of the Effective Date (defined below) between **TRIBUNE MEDIA SERVICES, INC.**, a Delaware corporation ("TMS"), and **BLUE RIDGE SALVAGE COMPANY, INC.**, a Virginia corporation ("Blue Ridge Salvage"), and supersedes the September 25, 1995, agreement between the parties regarding the syndication of the "Shoe" cartoon feature and all amendments thereto. The parties agree as follows:

1.     The Feature.

During each week of the term of this Agreement, Blue Ridge Salvage agrees to furnish to TMS six (6) comic strips in black and white suitable for publication in daily newspapers and on their companion websites and one (1) color version of the comic strip suitable for publication in Sunday newspapers and on their companion websites (the "Feature"). The Feature supplied to TMS by Blue Ridge Salvage pursuant to this Agreement shall be furnished in accordance with the following provisions:

(a)     The Feature shall be entitled **"Shoe"**;

(b)     The Monday-through-Saturday versions of the Feature shall be provided to TMS in black and white. The Sunday version shall be provided in color and shall be prepared in standard Sunday comic-section formats.

(c)     Each daily and Sunday version of the Feature shall be of the highest quality Blue Ridge Salvage is capable of producing and shall be suitable for publication

in major daily newspapers in the United States and abroad, and for posting on their companion websites.

(d)    The Feature shall be delivered to TMS at a place to be designated by TMS, the expense of such delivery to be borne by Blue Ridge Salvage.

(e)    The daily and Sunday versions of the Feature shall be delivered to TMS at least eight (8) weeks in advance of the dates of publication. Blue Ridge Salvage acknowledges that TMS is obligated to deliver the Feature to its syndicate customers regularly and at fixed times, and a failure to make such regular and timely deliveries might subject TMS to liability. Accordingly, it is expressly agreed that the time for delivery of the Feature to TMS shall be of the essence of this Agreement. Blue Ridge Salvage further agrees to indemnify TMS against any liability or expense (including reasonable attorneys' fees) caused by any failure by Blue Ridge Salvage to make such regular and timely deliveries.

2.    TMS Rights.

During the term of this Agreement and except as otherwise expressly provided herein:

(a)    TMS shall have the sole and exclusive right to sell, license or otherwise authorize the use of the Feature by newspapers published and circulated throughout the world, and by those newspapers' companion websites, and in all other media worldwide, and to take such other action, if any, to exploit the Feature as TMS, in its sole discretion, deems appropriate.

(b)    TMS shall have the sole and exclusive right to publish or authorize the publication of the Feature on websites and in books, booklets, pamphlets and CD-ROMs,

2

and via electronic databases, online electronic services, wireless services, or any other forms of electronic or mechanical publication or transmission, whether now existing or hereafter developed.

(c)    TMS shall be the owner of all exploitation rights in and to the Feature, including, without limitation, all merchandising and entertainment rights of any kind, including stage, motion picture, radio, television, consumer products and commercial exploitation rights. Notwithstanding the rights granted to TMS herein, Blue Ridge Salvage shall have the right to approve the terms of all merchandising and entertainment licenses, which approval shall not be unreasonably withheld.

(d)    TMS shall have the absolute discretion in selecting purchasers or customers (which may be affiliates of TMS) of any rights in the Feature and in determining prices and terms of sale to any media. All or any part of TMS' rights hereunder may be assigned or reassigned from time to time to any foreign or domestic sales, marketing or syndication agency or agencies (which may be affiliates of TMS), which may act with respect to the assigned rights in its or their own name or names.

3.    Compensation.

(a)    TMS shall provide Blue Ridge Salvage with a signing bonus of $350,000 payable in two installments: A $175,000 payment upon the signing of this Agreement by both parties, and a $175,000 payment on the Effective Date of this Agreement.

(b)    In consideration of the satisfactory performance by Blue Ridge Salvage of the obligations assumed by Blue Ridge Salvage under this Agreement, and of the rights granted to TMS herein. TMS shall pay to Blue Ridge Salvage (i) sixty-five percent (65%) of the "Net Receipts," as hereinafter defined, received by TMS during the term of this

Agreement from (a) entities whose license agreements to publish the Feature were entered into prior to the Effective Date of this Agreement and (b) other sources of revenue under the September 25, 1995, agreement between the parties prior to the Effective Date of this Agreement; and (ii) fifty percent (50%) of the "Net Receipts" received by TMS during the term of this Agreement from (a) entities whose license agreements to publish the Feature are entered into after April 1, 2008, the Effective Date of this Agreement, and (b) all new sources of revenue that enter into contracts with TMS in connection with the Feature after April 1, 2008.

    (c)    "Net Receipts" as used herein shall mean gross receipts from all syndication, merchandising and entertainment-rights licensing, less the sum of:

        (i)    The costs and expenses for color separations and proofs (for syndication receipts only);

        (ii)    Foreign agent commissions; and

        (iii)    Currency conversions.

    (d)    Within twenty (20) days after the close of each accounting period of TMS (each accounting period being either four (4) or five (5) weeks, as determined by TMS), TMS shall determine and pay to Blue Ridge Salvage the amount, if any, payable pursuant to subparagraph 3(b) hereof for the "Net Receipts" received by TMS during such accounting period.

    (e)    TMS shall keep accurate books and records reflecting amounts accrued from the syndication and sale of the Feature, and from all other revenue-generating activities. and shall furnish to Blue Ridge Salvage monthly statements, which shall disclose all sales of the Feature. and the purchases and the amounts actually received.

4

Blue Ridge Salvage shall have the right, in person or by duly authorized agents, to examine TMS' records in which the accounts and information relative to this Agreement are maintained, provided such inspection shall be made during normal business hours and upon reasonable notice.

    4.    <u>Term and Termination.</u>

    (a)    The term of this Agreement shall begin on April 1, 2008 (the "Effective Date") and shall end on March 31, 2028.

    (b)    If Blue Ridge Salvage fails to furnish the Feature as required in this Agreement or fails to furnish the Feature for a period of fourteen (14) consecutive days, TMS shall have the right to terminate this Agreement on thirty (30) days' prior written notice to Blue Ridge Salvage.

    (c)    In the event of termination, if Blue Ridge Salvage elects to continue syndication of the Feature in any form or through any means, Blue Ridge Salvage shall pay TMS, as compensation for benefits that will inure to Blue Ridge Salvage as a result of Blue Ridge Salvage's association with TMS, a monthly sum equal to fifty percent (50%) of the Feature's total Net Receipts for the month previous to such termination or non-renewal, such payment to be made for a period of twelve (12) months after the date of termination.

    (d)    The indemnification obligations assumed by Blue Ridge Salvage shall survive termination or expiration of this Agreement.

5.     Rights of First Negotiation and First Refusal.

(a)     For forty-five (45) days following the expiration of the term of this Agreement, Blue Ridge Salvage grants to TMS the right of first negotiation to continue its relationship with Blue Ridge Salvage hereunder and to continue, among other things, syndicating the Feature.

(b)     Thereafter, if Blue Ridge Salvage desires to grant to anyone the rights to syndicate and distribute the Feature within twelve (12) months following the expiration of the term of this Agreement, then Blue Ridge Salvage shall first offer to TMS the right to match a bona fide offer received by Blue Ridge Salvage for the Feature. For purposes of this Agreement, a bona fide offer shall consist of a written bid or proposed contract submitted to Blue Ridge Salvage by a financially responsible third party. If TMS notifies Blue Ridge Salvage within thirty (30) days after the receipt of such notice that it accepts the terms and conditions so specified in the bona fide offer to Blue Ridge Salvage, the notice from Blue Ridge Salvage and the acceptance by TMS shall constitute a binding agreement. If TMS does not accept said terms and conditions, then Blue Ridge Salvage may grant the right previously offered to TMS to any other party, provided, however, that Blue Ridge Salvage shall not make any such grant on terms more favorable to such other party than the terms specified in Blue Ridge Salvage's notice to TMS without giving TMS another similar opportunity to accept said terms.

6.     Independent Contractor.

It is understood and agreed that this Agreement is for the purchase of certain rights only and that Blue Ridge Salvage is an independent contractor. Blue Ridge Salvage shall do the work required to produce the Feature on Blue Ridge Salvage's own

time, at Blue Ridge Salvage's own expense, in Blue Ridge Salvage's own way, using

Blue Ridge Salvage's own supplies, and Blue Ridge Salvage shall furnish Blue Ridge

Salvage's own place of work and Blue Ridge Salvage's own assistants, if any are

required, free from direction and control by TMS. The means of producing the Feature

shall be solely within Blue Ridge Salvage's control. Blue Ridge Salvage agrees to

discharge all obligations imposed upon employers and self-employed persons under any

applicable union agreement or federal, state, or local law, regulation, or order now or

hereafter in force including, but not limited to, taxes, unemployment compensation or

insurance, workers' compensation, and Social Security, and including the filing of all

returns and reports required of any self-employed person or employer and the payment of

all assessments, taxes, contributions, or other sums required, since Blue Ridge Salvage

shall not be treated as an employee of TMS for federal, state, or local taxation purposes.

To the extent permitted by law, Blue Ridge Salvage further agrees to indemnify and hold

TMS harmless against all claims and demands resulting from Blue Ridge Salvage's

failure to comply with the provisions of this paragraph. This Agreement shall not in any

way constitute the parties as partners or participants in a joint venture, or as principal and

agent.

  7.  <u>Editorial Supervision.</u>

  (a)  TMS shall have the entire editorial supervision of the Feature, provided

that TMS shall use commercially reasonable efforts to consult with Blue Ridge Salvage

prior to making any changes, deletions, or additions in or to the Feature, subject to TMS'

deadlines.

(b)    TMS shall not be obligated to accept, syndicate or pay for any versions of the Feature which in TMS' reasonable opinion might subject TMS to any claim by any third party.

(c)    If TMS rejects or declines to accept, syndicate or pay for any material for the reason cited in 7(b), TMS shall so notify Blue Ridge Salvage and shall give Blue Ridge Salvage a reasonable opportunity to cure or remove the basis for said claim and, upon resubmission by Blue Ridge Salvage, shall reasonably reconsider acceptance of said material; provided, however, that upon the inability or failure of Blue Ridge Salvage to submit revised material to TMS at least four (4) weeks in advance of the date of publication with respect to daily cartoon panels, and at least six (6) weeks in advance of the date of publication with respect to Sunday color versions, the provisions of paragraphs 1(d) and 15 herein shall apply.

8.    <u>Ownership of Feature.</u>

(a)    Blue Ridge Salvage shall be the owner of the Feature including, but not limited to, all materials furnished by Blue Ridge Salvage to TMS pursuant to this Agreement. Notwithstanding the foregoing, during the term of this Agreement, TMS shall have the sole and exclusive right to exercise all publication and subsidiary rights in the Feature, as outlined in Paragraph 2. The parties agree that the Feature syndicated to newspapers and their companion websites shall contain the following notice: "Copyright (c) 20__ [year] Tribune Media Services, Inc. All Rights Reserved."

(b)    TMS shall have the right to receive or participate in its share of revenues received after termination of this Agreement pursuant to agreements entered into by Blue Ridge Salvage or TMS prior to termination of this Agreement.  All third-party

8

agreements made by TMS pursuant to this Agreement shall survive termination of this

Agreement and shall bind Blue Ridge Salvage and TMS. For the avoidance of confusion,

all third-party license agreements, for example, shall survive termination of the parties'

syndication relationship.

     9.    <u>Exclusivity</u>.

     So long as this Agreement shall be in effect (including any time during which

Blue Ridge Salvage may be in default hereunder or in breach hereof), Blue Ridge

Salvage shall not enter into any contract, agreement, understanding, or arrangement to

prepare any material similar to the Feature for any newspaper or newspapers or their

companion websites or for magazines distributed with newspapers, or for distribution by

cabletext, videotex, audiotex, the Internet or other forms of electronic transmission

covered by this Agreement. Blue Ridge Salvage agrees that, in the event of any breach of

this provision, TMS will not have an adequate remedy at law and shall, in addition to any

other appropriate equitable or legal relief, be entitled to an injunction from a court of

competent jurisdiction restraining Blue Ridge Salvage from any such breach.

     10.    <u>Enforcement of TMS' Rights</u>.

     Blue Ridge Salvage hereby appoints TMS (and such substitutes as TMS may from

time to time select) as Blue Ridge Salvage's attorney-in-fact, with the right, but not the

obligation, to (a) enforce and protect all rights herein granted to or acquired by TMS, (b)

prevent infringement of any copyrights and trademarks, (c) litigate any ensuing claims,

(d) collect all damages arising from any infringement of such rights, and (e) use Blue

Ridge Salvage's name as being plaintiff or defendant in any proceeding.  Blue Ridge

Salvage agrees to execute such further instruments as TMS may reasonably deem appropriate to carry out the provisions of this paragraph.

11.   Warranty.

Blue Ridge Salvage represents and warrants that Blue Ridge Salvage has the full power and authority to enter into and perform this Agreement, that there is no contract, agreement, or understanding with any other person, firm, or corporation which would interfere with the obligations assumed by Blue Ridge Salvage hereunder, and that the Feature and all materials furnished to TMS hereunder will be new, original, and previously unpublished, and that those materials will not infringe upon or violate any copyright, trademark, trade name, literary, artistic, or other property right, right of privacy, or any other right of any person, firm, or corporation, and will not contain any libelous or unlawful material. Blue Ridge Salvage agrees to indemnify and hold harmless TMS, its employees, officers, directors, stockholders, licensees, successors, and assigns, from and against any and all losses, damages, costs, and expenses, including the reasonable attorneys' fees and expenses incident thereto, arising from any suit, claim, or demand based upon any breach or alleged breach of the warranties contained in this paragraph, or based in any respect on the contents of the Feature syndicated and published pursuant to this Agreement.

12.   Use of Names.

TMS shall have the right to use in connection with the promotion and sale of the Feature Susan MacNelly's name, likeness and biography. Likewise, it shall have the right to use the names, likenesses and biographies of those associates of Ms. MacNelly engaged in the production of the Feature for the same purposes.

13.     <u>Failure to Furnish Feature.</u>

If Blue Ridge Salvage fails to furnish the Feature as required hereunder, TMS

shall have the right, at its discretion, to obtain or prepare substitute artwork and copy

through any means and in whatever manner it chooses.  In such event, TMS shall make

reasonable efforts to consult with Blue Ridge Salvage and to make arrangements for the

preparation of substitute artwork and copy satisfactory to Blue Ridge Salvage. TMS may

deduct the expenses occasioned by Blue Ridge Salvage's default from any money then or

thereafter due Blue Ridge Salvage.


14.     <u>Notices.</u>

All notices, requests, consents, and other communications required or permitted to

be given hereunder shall be in writing and delivered personally, by courier service, by

telegraph, or by certified U.S. mail, return receipt requested postage prepaid, as follows:

|  |  |  |
|---|---|---|
| (a) | If to Blue Ridge Salvage, to: | Susan MacNelly<br>P.O. Box 188<br>Flint Hill, Virginia 22627 |
|  | with a copy to: | Robert J. Vladem<br>Blue Ridge Salvage Company, Inc.<br>853 Sheridan Road<br>Winnetka, Illinois 60093 |
| (b) | If to TMS, to: | Tribune Media Services, Inc.<br>435 N. Michigan Avenue, Suite 1500<br>Chicago, Illinois 60611<br>Attn: David D. Williams, President/CEO |
|  | with a copy to: | General Counsel<br>Tribune Company<br>435 N. Michigan Avenue, Suite 600<br>Chicago, Illinois 60611 |

Notice so given shall be deemed received when delivered personally or by courier, or, if mailed, five (5) days after the date of deposit, postage prepaid, in the United States mail. Either party may change the address to which notices are to be sent by giving written notice of such change of address to the other party in the manner herein provided for giving notice.

14.    General.

(a)    This Agreement shall be governed by and construed and enforced in accordance with the laws of the State of Illinois applicable to agreements made and to be performed entirely in Illinois.

(b)    The section headings contained herein are for reference purposes only and shall not in any way affect the meaning or interpretation of this Agreement.

(c)    This Agreement sets forth the entire agreement and understanding of the parties hereto, and supersedes all prior agreements, arrangements, and understandings between the parties hereto.

(d)    TMS may assign its rights and obligations under this Agreement to any corporation or other entity controlled by, or under common control with, Tribune Company or to any entity that succeeds to substantially all of the business and assets of TMS. This Agreement is personal to Blue Ridge Salvage, however, and neither this Agreement nor any of Blue Ridge Salvage's rights or obligations hereunder may be assigned, pledged, or encumbered by Blue Ridge Salvage without the prior written approval of TMS.

(e)    This Agreement may be amended, modified, superseded, or canceled, and the terms or covenants hereof may be waived, only by written instrument executed by

both of the parties hereto, or, in the case of a waiver, by the party waiving compliance. The failure of either party at any time or times to require performance of any provision hereof shall in no manner affect the right at a later time to enforce the same. No waiver by either party or the breach of any term or covenant contained in this Agreement, whether by conduct or otherwise, in any one or more instances, shall be deemed to be, or construed as, a further or continuing waiver of any such breach or a waiver of the breach of any other term or covenant contained in this Agreement. This Agreement, and all rights and obligations hereunder, shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, executors, administrators, personal representatives, successors, licensees, and permitted assigns.

[BALANCE OF THIS PAGE INTENTIONALLY LEFT BLANK]

13

IN WITNESS WHEREOF, the parties have executed this Agreement as of the dates shown below.

TRIBUNE MEDIA SERVICES, INC.

By: _____

David D. Williams, President/CEO

Date: _8/23/07_____

BLUE RIDGE SALVAGE COMPANY, INC.

By: _____

Susan MacNelly

Date: _____

[SIGNATURE PAGE TO SYNDICATION AGREEMENT]

14

**EXHIBIT 7**

**EXHIBIT 7**



**WOLF
HOLLAND &
MATERN LLP**
Attorneys at Law

40 SKOKIE BOULEVARD
SUITE 105
NORTHBROOK, IL 60062
(224) 330-1717
FACSIMILE (224) 330-1715

**RECEIVED**

October 1, 2007

OCT  4 2007

**B A F**

VIA FACSIMILE TRANSMISSION AND FIRST CLASS MAIL

Ms. Beth Fulkerson
Tribune Company
435 N. Michigan Avenue
Chicago, Illinois 60611-4066

Dear Beth:

Upon review of Mr. Karottki's August 24, 2007 letter and attached proposed Syndication Agreement, it is clear that Tribune Media Services, Inc. ("TMS") has failed to exercise its right of first refusal.

First, Mr. Karottki's letter and attached Syndication Agreement failed to respond to my August 15, 2007 letter which defined the "written proposal" requested by TMS to be both the King Features document titled "Proposal for Representation of SHOE Comic Strip 8/8/07" and the cover letter thereto. TMS attempted to redefine the written proposal and ignored the terms contained in the cover letter. TMS further ignored my client's legitimate concerns as to TMS' ability to actually perform all the terms and the extensive scope of services contemplated by the written proposal.

Second, the attached Syndication Agreement contains terms not included in the terms of the written proposal from King Features. Such additional terms include but are not limited to Paragraph 4(c), which provides for an oppressive post termination payment. King Features' written proposal does not contain such a post termination payment.

Accordingly, the Syndication Agreement between TMS and Blue Ridge Salvage shall terminate by its own terms on March 31, 2008.

Please feel free to contact me by email or written letter if you have any questions.

With best regards,

Steven B. Wolf

cc:    Blue Ridge Salvage Company

**EXHIBIT 8**

**EXHIBIT 8**

**GOLDBERG KOHN**                                    GOLDBERG KOHN BELL BLACK ROSENBLOOM & MORITZ, LTD

October 18, 2007                                      frederic.klein@goldbergkohn.com
                                                      direct phone: 312.201.3908
                                                      direct fax: 312.863.7408

**BY FACSIMILE &**
**REGULAR U.S. MAIL**

Mr. Steven B. Wolf
Wolf Holland & Matern LLP
500 Lake Cook Road
Suite 130
Deerfield, IL 60015

Re:    Tribune Media Services Syndication Agreement

Dear Mr. Wolf:

This firm represents Tribune Media Services, Inc. ("TMS"). I am responding to your letter dated October 1, 2007, first received by TMS on October 4, 2007, stating that Blue Ridge Salvage Company, Inc. ("Blue Ridge") contends that the relationship which exists under the Syndication Agreement between TMS and Blue Ridge will terminate as of March 31, 2008, and that TMS has no right to extend that relationship.

Let me begin by reiterating that TMS has unequivocally and unambiguously exercised its right of first refusal pursuant to Section 5(b) of the Syndication Agreement -- twice -- once under each party's interpretation of what constitutes a bona fide offer. See Ms. Fulkerson's August 9, 2007 letter ("TMS today accepts all five of the terms offered ... As soon as you return one of the signature pages, signed by Ms. MacNelly, we can send over the first check"); and Mr. Karottki's August 24, 2007 letter (entitled "Acceptance of Offer," and stating that TMS "accepts the terms and conditions specified in the bona fide offer that Blue Ridge received from King Features. Accordingly, pursuant to the Syndication Agreement, your notice to TMS and this acceptance 'constitute a binding agreement.'"). TMS has taken the appropriate and necessary steps to avail itself of its contractual rights; it has not refused but accepted the offer; and your contention that TMS "has failed to exercise its right of first refusal" is erroneous for many reasons.

First, while Blue Ridge has attempted to characterize King Features' August 8, 2007 cover letter as part of King Features' "written proposal," a literal reading of the letter belies such an interpretation. King Features' cover letter notes that "[a]ttached is a proposal for the representation of the Shoe Comic Strip." Thus the attachment, not the cover letter, sets forth King Features' proposal. In addition, there is no indication that the marketing pitch contained in King Features' cover letter itself comprises part of the financial terms of the offer. Moreover, Blue Ridge has no right to determine what constitutes King Features' "written bid or proposed contract." Indeed, Illinois case law reflects that an attempt on the part of a grantor of a right of first refusal to add to or alter the terms of a third party's offer is a breach of contract. See Vincent v. Doebert, 183 Ill. App. 3d 1080 (2nd Dist. 1989). Blue Ridge's attempt to incorporate King

1110510v1 10/18/2007 11:26:01 AM      8999.151      TEL 312.201.4000   FAX 312.332.2196   WEB WWW.GOLDBERGKOHN.COM
55 EAST MONROE STREET SUITE 3300   CHICAGO ILLINOIS   60603-5792

𝕄 MERITAS LAW FIRMS WORLDWIDE

GOLDBERG KOHн BELL BLACK ROSENBLOOM & MORITZ, LTD

Mr. Steven B. Wolf
October 18, 2007
Page 2

Features' cover letter into King Features' actual proposal is a thinly veiled effort by Blue Ridge to deprive TMS of its rights under the Syndication Agreement.

Second, the Syndication Agreement enclosed with Mr. Karottki's August 24, 2007 letter includes all of the terms of King Features' single-page, eight term proposal. The additional verbiage merely incorporated the skeletal terms of King Features' proposal into the pre-existing contract between TMS and Blue Ridge. TMS hereby removes Paragraph 4(c), an immaterial provision.

Third, a right of first refusal will be enforced so long as the material terms and conditions of the third party's offer are met. *See Kellner v. Bartman*, 250 Ill. App. 3d 1030, 1035-36 (4th Dist. 1993). As clearly communicated most recently in Mr. Karottki's letter of August 24, 2007, TMS has accepted each of the eight terms contained within King Features' "Proposal for Representation of SHOE Comic Strip." Pursuant to Section 5(b) of the Syndication Agreement, this acceptance constitutes a "binding agreement" between the parties.

Blue Ridge's cursory dismissal of TMS' acceptance of the terms of King Features' proposal is invalid. Indeed, it seems apparent that Blue Ridge has always wished to impede TMS from exercising the right of first refusal, and has attempted to dissuade TMS from doing so. For example, Mr. Vladem's July 26, 2007 letter states: "It is our opinion that Tribune Media Services, Inc. will be unable to agree with" the terms provided by a then-unidentified offeror not yet even disclosed to TMS. Indeed, Mr. Vladem's letter was written one week after Ms. Fulkerson had unequivocally said "yes" in her July 19, 2007 letter when asked if TMS would like to continue its relationship with Blue Ridge. *See* Ms. Fulkerson's letter of July 19, 2007 ("You also ask whether TMS would like to continue its relationship with Blue Ridge after the expiration of the TMS Agreement. The answer is yes."). From the first, therefore, Blue Ridge refused to accept TMS' willingness to exercise TMS' contractual rights. Similarly, your letter of August 15, 2007 reflects an unsupported (and unsupportable) position that TMS had somehow forfeited its contractual rights seven years ago: "I do not believe Tribune Media has a right of first refusal in light of its letter of September 20, 2000." There is not a single word in the September 20, 2000 letter -- or yours of August 15, 2007 -- that would lead any neutral person to the conclusion that TMS' right of refusal no longer existed. Moreover, the July 19, 2007 and July 26, 2007 letters from Mr. Vladem to TMS clearly reflected his understanding that TMS held an enforceable right of first refusal. Your subsequent letter of August 15, 2007 did not undercut Mr. Vladem's earlier concessions, and your subsequent correspondence concedes this position by waiving it.

The communications over the Non-Disclosure Agreement ("NDA") similarly demonstrate Blue Ridge's efforts to frustrate and impede TMS' exercise of its right of first refusal. Ms. Fulkerson noted in her July 30, 2007 letter that you refused to disclose a third-party offer until TMS executed an NDA, and she closed by saying: "I await the NDA, as well as the bona fide offer." On August 6, 2007, you sent a draft NDA which you stated "is required prior to the additional disclosures." Ms. Fulkerson then made changes to the draft NDA and returned it to you, signed, on August 14, 2007. On August 15, 2007, however, you

GOLDBERG KOHN BELL BLACK ROSENBLOOM & MORITZ, LTD

Mr. Steven B. Wolf
October 18, 2007
Page 3

wrote to say that "I do not agree to your proposed changes to the NDA. I prefer to just move forward without an NDA." Only after having wasted two weeks of effort did you release the King Features proposal to TMS, revealing that the NDA was merely a stall tactic. This again shows that Blue Ridge had no intention of acting in good faith, and instead wished to erect hurdles to TMS' exercise of the right of first refusal.

What is transparent from this series of letters, and the history of these communications, is the effort of Blue Ridge and its counsel to do or say anything they could imagine to interfere with and to deprive TMS of its contractual rights. This is just the kind of bad faith conduct a court will not allow. *See Vincent v. Doebert,* 183 Ill. App. 3d 1080 (2nd Dist. 1989).

Therefore, Blue Ridge will commit a clear breach of contract if it attempts, or purports to attempt, to enter into a binding agreement with King Features for the "Shoe Comic Strip." Please let us know, within the next 14 days, when Blue Ridge will execute the Syndication Agreement sent under cover of Mr. Karottki's letter of August 24, 2007, with Paragraph 4(c) thereof deleted. If Blue Ridge refuses to do so, TMS will take all appropriate actions to protect these important contractual rights. In the meantime, we advise you and Blue Ridge to inform King Features immediately that its offer must be rejected by Blue Ridge due to the exercise of TMS' right of first refusal.

Sincerely yours,

Frederic R. Klein

FRK/bsm

**EXHIBIT 9**

**EXHIBIT 9**

Westlaw.

Not Reported in F.Supp.                                                                    Page 1

Not Reported in F.Supp., 1994 WL 327361 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.)**

H
Hicks Road Corp. v. Marathon Oil Co.
N.D.Ill. 1994
Only the Westlaw citation is currently available.
United States District Court, N.D. Illinois, Eastern
Division.
HICKS ROAD CORPORATION, Plaintiff,
v.
MARATHON OIL COMPANY, Defendant.
**No. 93 C 3409.**

July 6, 1994.

OPINION AND ORDER
NORGLE, District Judge:
*1 Before the court is the motion of plaintiff Hicks
Road Corporation ("Hicks") for summary judgment
on Count II. For the following reasons, the motion
is denied.

FACTS[FN1]

On July 14, 1971, Hicks' predecessor and defendant
Marathon Oil Company ("Marathon") entered into a
lease agreement which authorized Marathon to erect
and operate a service station in Mount Prospect,
Illinois ("service station"). The lease expired on
March 31, 1992. Marathon's twenty years of
operation of its petroleum-related business
contaminated the soil and ground water underneath
and nearby the service station. The extent of the
contamination remains an issue.

Upon discovering the contamination, Hicks and
Marathon negotiated certain terms and reduced their
understanding to a written agreement titled "
Agreement and License to Enter Private Property" ("
Agreement"). The purpose of the Agreement was
to grant Marathon access to the service station for a
period of six months to perform remediation.

On August 24, 1992, a duly authorized agent of

Marathon signed the Agreement and the next day
submitted the same to Hicks for its
counter-signature and acceptance. When the
Agreement was sent to Hicks, the preamble of the
Agreement stated that "THIS AGREEMENT AND
LICENSE TO ENTER PRIVATE PROPERTY ...
is made and entered into as of the *24th* day of
August, 1992, by and between [Hicks], ... and
[Marathon]." (Compl. Ex. B at 1.) (Emphasis in
original.) Paragraph 4 of the Agreement, however,
provides as follows:
[Marathon] is hereby granted a license to enter upon
the [service station] commencing August ___, 1992
in order to complete the Remedial Work. Said
License shall expire on the sooner to occur of the
date hereof, unless said time period is hereafter
extended in writing by [Hicks] in its sole discretion.
[Marathon] shall pay [Hicks] a license fee of five
hundred dollars ($500.00) per month due and
payable on the 1st day of each month during the
term of the License. Said fee will be prorated for
any partial month. [Hicks] covenants, subject to
any preexisting rights of third parties, that during
the term of said license, [Hicks] will not lease the
Property for a term commencing during the term
hereof, or grant a license to currently use the
Property, to any person or entity other than
[Marathon].

(Compl. Ex. B at 2.) The date of commencement
under paragraph 4 remained blank when Marathon
mailed the Agreement to Hicks.

On October 9, 1992, forty-six days after Marathon
signed the Agreement, a duly authorized agent of
Hicks counter-signed the Agreement and inserted "
24" in the aforementioned blank in paragraph 4.
Hicks then mailed the counter-signed Agreement on
October 9, 1992, to Marathon. On October 13,
1992, Marathon received the counter-signed
Agreement. (*See* Def.'s 12(N) Stmt. Ex. 1.)

On November 20, 1992, Bob Francus, an employee
of Marathon who was asked to provide the Real

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                        Page 2

Not Reported in F.Supp., 1994 WL 327361 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.)**

Estate Department with guidelines on the remediation effort, transmitted a six page facsimile to Hicks. The cover sheet for the facsimile contained a hand written note which states "Cannot complete cleanup per time frame on 8/24/92 Agreement. Need to get time frame ammended [sic]." (Pl.'s Summ.J.Mot. Ex. A at 1.) The pages attached to the cover sheet were copies of various inter-office correspondence and letters containing various estimates on the time necessary to complete the remediation process at the service station.

**\*2** After Hicks sent the counter-signed Agreement to Marathon, Marathon made no attempts to gain access to the service station or perform any of the remediation work specified in the body of the Agreement. Subsequently, on June 9, 1993, Hicks filed a complaint against Marathon, and under Count II, Hicks alleges that Marathon breached the terms of the Agreement by failing to complete the remediation work within six months. In the instant motion, Hicks asserts that Marathon breached the material terms of the Agreement as a matter of law.

## DISCUSSION

Rule 56(c) of the Federal Rules of Civil Procedure provides that a summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *Associated Milk Producers, Inc. v. Meadow Gold Dairies, Inc.,* No. 93-1350, 1994 WL 265162, at \*2 (7th Cir. June 17, 1994). Even though all reasonable inferences are drawn in favor of the party opposing the motion, *Beraha v. Baxter Health Care Corp.,* 956 F.2d 1436, 1440 (7th Cir.1992), presenting only a scintilla of evidence will not suffice to oppose a motion for summary judgment. *Brownell v. Figel,* 950 F.2d 1285, 1289 (7th Cir.1991). Nor will some metaphysical doubt as to the material facts suffice. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986).

Moreover, the disputed facts must be those that might affect the outcome of the suit to properly preclude summary judgment, *First Ind. Bank v. Baker,* 957 F.2d 506, 508 (7th Cir.1992), and a dispute about a material fact is "genuine" only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). Accordingly, the nonmoving party is required to go beyond the pleadings, affidavits, depositions, answers to interrogatories, and admissions on file to designate specific facts showing a genuine issue for trial. *Bank Leumi Le-Israel, B.M. v. Lee,* 928 F.2d 232, 236 (7th Cir.1991).

The pivotal factual issue raised in the instant motion for summary judgment is whether the Agreement became a binding contract on October 9, 1992.[FN2] To resolve this issue, the court must consider the necessary elements for contract formation, rather than the general principles governing contract construction. *See Martin v. Government Employees Ins. Co.,* 206 Ill.App.3d 1031, 565 N.E.2d 197, 199 (Ill.App.Ct.1990). A contract is formed only after there is an offer, acceptance, and consideration. *Serpe v. Williams,* 776 F.Supp. 1285, 1287 (N.D.Ill.1991); *Faulkner v. Gilmore,* 251 Ill.App.3d 34, 621 N.E.2d 908, 912 (Ill.App.Ct.1993). The burden of proving the necessary elements to contract formation is on the party seeking to enforce the agreement. *Commonwealth Edison Co. v. Industrial Comm'n,* 167 Ill.App.3d 229, 521 N.E.2d 159, 161 (Ill.App.Ct.1988).

**\*3** Marathon does not contest that there was an offer and proper consideration for the Agreement; however, Marathon argues that there was never a timely acceptance of its offer. In support, Marathon refers to the facts that it signed the Agreement and mailed it to Hicks on August 25, 1992, but did not receive the counter-signed Agreement from Hicks until October 13, 1992: almost seven weeks after the Agreement was sent to Hicks. Thus, Marathon argues that the offer contained in the Agreement lapsed before Hicks accepted the terms of the Agreement.

Under Illinois law, "[i]f an offer does not state a definite time for acceptance, it lapses if not

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp., 1994 WL 327361 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.)**

accepted within a reasonable time." *Kirchhoff v. Rosen,* 227 Ill.App.3d 870, 592 N.E.2d 371, 376 (Ill.App.Ct.), *appeal denied,* 146 Ill.2d 629, 602 N.E.2d 455 (1992). In *Kirchhoff,* the offeror indicated that it expected a response to its offer within seven days. *Kirchhoff,* 592 N.E.2d at 374. Relying on this factor, the plaintiff in *Kirchhoff* argued that the offer was only good for seven days, and the defendants' failure to accept the offer within that prescribed period resulted in lapse of the offer by operation of time. *Id.* at 376. The appellate court disagreed. The *Kirchhoff* court held that the seven day response period was not an expiration date for the offer; rather, it was merely a method of acceptance not precluding an alternative method of acceptance. *Id.* Accordingly, the *Kirchhoff* court concluded that the offer in that case did not specify a definite time for acceptance and, thus, subject to acceptance within a reasonable period of time. *Id.*

Whether an acceptance was made within a reasonable period "depends upon a multiplicity of circumstances." *Zaniecki v. P.A. Bergner & Co. of Illinois,* 143 Ill.App.3d 668, 493 N.E.2d 419, 423 (Ill.App.Ct.1986). In *Kirchhoff,* the defendants accepted the plaintiff's offer within eighteen days. *Kirchhoff,* 592 N.E.2d at 376. Additionally, after the defendants communicated their acceptance, the plaintiff did nothing to indicate to the defendants that the offer had expired. *Id.* Furthermore, the offer did not suggest to the defendants that the time was of the essence. *Id.* Relying on these factors, the *Kirchhoff* court held as a matter of law that the offer was accepted within a reasonable period of time. *Id.*

In contrast, the court in *Zaniecki,* declined to hold as a matter of law that the plaintiff's acceptance of the offer nine months later was reasonable. *Zaniecki,* 493 N.E.2d at 423. The *Zaniecki* court instead held that the issue of reasonableness should be resolved by the trier of fact. *Id.*

In this case, Hicks counter-signed the Agreement approximately seven weeks after it was mailed by Marathon. Nonetheless, the actual time taken by the offeree to accept is not dispositive of whether the original offer expired before the acceptance as indicated by *Kirchhoff* and *Zaniecki.* There are

other factors the court must consider. The offer made by Marathon was not an offer Hicks did not expect. In fact, after the revelation of the contamination, the parties actively negotiated the terms of the Agreement, and Hicks anticipated the arrival of the written offer. The Agreement contained terms agreed upon by the parties. Further, the preamble to the Agreement stated the date of August 24, 1992, and also, paragraph 4 of the Agreement indicated the month of August 1992. From these factors, one may reasonably conclude that Marathon expected Hicks' acceptance immediately after the receipt of the Agreement in August 1992. Yet, Hicks failed to respond to the offer until seven weeks after the offer was tendered.

*4 Nonetheless, as held by the *Kirchhoff* court, an offeror's expectation is not a proper measure for the life of the offer. Marathon does not dispute that it never specified a period of time in which the offer must be accepted. Further, there is no indication from the terms of the Agreement that time was of the essence. The purpose of the Agreement was to perform remediation at the service station. Marathon does not adduce any evidence that its access to the service station during the latter part of August or early part of September 1992 was crucial to the performance of the contract. Under these circumstances, Marathon's offer, tendered on August 25, 1992, remained open for a reasonable period of time.

But before resolving the related issue of whether Hicks' acceptance was timely made, the court must first address the issue of whether the proposed acceptance was a valid acceptance or a counteroffer. Under Illinois law, it is axiomatic that a proposed acceptance that contains terms different from the original offer is not a valid acceptance; rather, such acceptance is treated as a counteroffer requiring an acceptance by the original offeror to create a contract. *Dawson v. General Motors Corp.,* 977 F.2d 369, 374 (7th Cir.1992). " Illinois law demands that an acceptance 'comply strictly with the terms of the offer[.]' " *Venture Associates v. Zenith Data Systems,* 987 F.2d 429, 432 (7th Cir.1993) (quoting *Ebert v. Dr. Scholl's Foot Comfort Shops, Inc.,* 137 Ill.App.3d 550, 484 N.E.2d 1178, 1185 (Ill.App.Ct.1985)). Even a

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                Page 4

Not Reported in F.Supp., 1994 WL 327361 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.)**

minor change in the terms of the offer invalidates the acceptance. *Id.*

Pursuant to this rule, commonly referred to as the " mirror image rule," Hicks' proposed acceptance was a counteroffer, not a valid acceptance. When Marathon mailed the Agreement to Hicks, paragraph 4 contained an unfixed term: the commencement date for the six-month period. Viewing the uncontested facts in favor of Marathon, the non-movant, the court must infer that the reason Marathon left the commencement date blank was so that Hicks would counter-sign the Agreement and contemporaneously fill in the blank with the date of the acceptance. Under this method of acceptance, the delay in Hicks' signature would not shorten the six-month period of access.

Hicks, however, inserted the date of August 24, 1992, when it executed the Agreement instead of fixing the date of commencement at October 9, 1992, the date of Hicks' counter-signature. Understandably, the date of August 24, 1992, may have been inserted to be consistent with the date reflected in the preamble of the Agreement. Nevertheless, pre-dating the commencement date materially changed the terms of the contract and the inherent purpose of entering into the Agreement. By pre-dating the commencement date, Marathon had less than six months time of access to the service station when it received the Agreement on October 13, 1992. Furthermore, the terms as prescribed by Hicks required Marathon to compensate Hicks at the rate of $500 per month for the license to enter beginning on August 24, 1992, rather than on October 9, 1992. The mirror image rule dictates that on October 9, 1992, Hicks rejected the original offer made on August 25, 1992, and instead tendered a counteroffer which Marathon did not accept. *See Venture,* 987 F.2d at 432. Thus, the proposed acceptance on October 9, 1992, did not complete the formation of a contract between Hicks and Marathon on October 9, 1992.

**\*5** Further, "a rejected offer cannot be revived by later acceptance." *D'Agostino v. Bank of Ravenswood,* 205 Ill.App.3d 898, 563 N.E.2d 886, 889 (Ill.App.Ct.1990), *appeal denied,*137 Ill.2d 664, 571 N.E.2d 147 (1991). Hicks'

communication to Marathon that Hicks would provide additional time to complete the six month clean-up does not remedy the invalid acceptance. This only amounted to an offer which required Marathon's acceptance. Because the proposed acceptance was not a valid acceptance, the court need not resolve the issue of whether the proposed acceptance was made within a reasonable period.

*CONCLUSION*

For the foregoing reasons, the motion for summary judgment on Count II is denied.

IT IS SO ORDERED.

> FN1. The following uncontested facts are drawn from the statements submitted by the parties in accordance with the Rules of the United States District Court for the Northern District of Illinois ("Local Rules" ) 12(M) and 12(N). The court will consider only those statements that are in compliance with the Local Rules. Furthermore, additional facts of the case may be found in the court's earlier opinion, *Hicks v. Marathon,* No. 93 C 3409, slip op. (N.D.Ill. June 30, 1994), addressing Hicks' motion for partial judgment on the pleadings.

> FN2. The court will apply Illinois law to resolve the issue presented in this motion. *See Hicks,* slip op. at 3-4.

N.D.Ill. 1994
Hicks Road Corp. v. Marathon Oil Co.
Not Reported in F.Supp., 1994 WL 327361 (N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 10

**EXHIBIT 10**

Westlaw.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2006 WL 794766 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

**C**
Trading Technologies, Inc. v. REFCO Group Ltd., LLC
N.D.Ill.,2006.
Only the Westlaw citation is currently available.
United States District Court,N.D. Illinois, Eastern Division.
TRADING TECHNOLOGIES, INC.,
Plaintiff/Counter-Defendant,
v.
REFCO GROUP LTD, LLC, et al.,
Defendants/Counter-Plaintiff.
**No. 05 C 1079.**

March 23, 2006.

Paul H. Berghoff, Dennis David Crouch, Jennifer M. Kurcz, Leif R. Sigmond, Jr., Matthew J. Sampson, Michelle Lynn McMullen-Tack, Stephen Richard Carden, McDonnell, Boehnen, Hulbert & Berghoff, LLP., Michael M. Conway, Foley & Lardner, Steven F. Borsand, Trading Technologies International, Inc., Chicago, IL, for Plaintiff/Counter-Defendant.
Thomas Gerard Pasternak, Garrett B. Johnson, Imron T. Aly, Karen J. Nelson, Lauren Hennessey Breit, Kirkland & Ellis LLP, Chicago, IL, Gregory F. Corbett, Kirkland & Ellis LLP, Washington, DC, for Defendants/Counter-Plaintiff.

MEMORANDUM, OPINION AND ORDER
ANDERSEN, J.
**\*1** This case is before the Court on the plaintiff's motion to dismiss defendants' first and second counterclaims and strike the affirmative defense of patent misuse. For the following reasons, the plaintiff's motion is granted in part and dismissed in part.

*BACKGROUND*

Plaintiff, Trading Technologies International, Inc. ("

TT") and defendants REFCO Group Ltd., LLC, REFCO LLC, and REFCO EasySolutions, LLC (collectively referred to herein as "REFCO") provide software capable of entering orders for futures contracts traded on the nation's futures exchanges. TT's primary assets are its patented software, which it licenses to numerous firms. REFCO also sells software. However, REFCO's business is much broader than simply providing software solutions. REFCO is a futures brokerage firm that provides software, hardware, and networking support to its customers, individuals and firms engaged in trading futures contracts. Accordingly, REFCO is both a competitor to and a previous customer of TT. When REFCO was a TT customer, REFCO clients could choose between TT software solutions and REFCO software solutions. According to REFCO's counterclaims, its software, while less expensive than TT's, contains additional features and is gaining popularity with REFCO clients who previously used TT's software.

Prior to the commencement of this litigation, TT initiated several other patent infringement suits which, along with the present suit, are consolidated for common issues with *Trading Technologies Int'l, et al., v. eSpeed, Inc.,* No 04 C 5312. TT attempted to avert litigation by offering the "big four" exchanges, which are the Chicago Board of Trade ("CBOT"), the Chicago Mercantile Exchange ("CME"), EUREX, and Euronet, an agreement entitling it to 5 cents for each trade of a futures contract forever, or more precisely, 2.5 cents from each side engaged in the exchange of a futures contract. After none of the exchanges accepted this offer, TT brought the same deal to its customers such as REFCO. TT proposed that REFCO and its competitors pay 2.5 cents per executed contract forever in exchange for unlimited use and unfettered access to TT's software.

REFCO refused this proposal; shortly thereafter TT exercised its right to terminate, without cause, the licencing agreement under which REFCO marketed TT's software. REFCO's counterclaim lists two

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2006 WL 794766 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

firms, Goldenberg, Hehmeyer & Co. ("Goldenberg, Hehmeyer") and Kingstree Trading LLC (" Kingstree"), that supposedly settled with TT on terms which presumably require them to pay TT royalty payments for all trades, regardless of whether they are using TT's technology.

REFCO uses TT's own statements to demonstrate that TT has "captured more than a 50% volume share" of the market for electronic trading software and "has built itself into an integral piece of the futures industry."No mention, however, is made as to how TT has captured that market share. As pled in REFCO's counterclaim, TT is the owner of several patents and is entitled to control the market for those products that are covered by its patents. The only two instances of TT allegedly profiting from, controlling, or adversely impacting the market for products not covered by its patents are the settlements reached with Goldenberg, Hehmeyer and Kingstree. REFCO fails to assert that Goldenberg, Hehmeyer and/or Kingstree are involved in a significant portion of the relevant market.

*STANDARD OF REVIEW*

**\*2** Pursuant to Federal Rule of Civil Procedure 12(b)(6), when deciding a motion to dismiss, this Court must assume the truth of all facts alleged in the complaint, construing the allegations liberally and viewing them in the light most favorable to the plaintiff. *Jones v. General Electric Co.,* 87 F.3d 209, 211 (7th Cir.1996); *Wilson v. Formigoni,* 42 F.3d 1060, 1062 (7th Cir.1994). Federal notice pleading only requires the plaintiff to set out in its complaint a short and plain statement of the claim that will serve to provide fair notice to the counter-defendants. *See Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit,* 507 U.S. 163, 168, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993). The plaintiff is not required to plead all the facts in support of its claims, as a short and plain statement of the claim will suffice. *See Trevino v. Union Pacific Railroad Co.,* 916 F.2d 1230, 1234 (7th Cir.1990); *American Nurses' Ass'n v. Illinois,* 783 F.3d 716, 723 (7th Cir.1986).

*DISCUSSION*

TT asserts that REFCO's affirmative defense of patent misuse should be stricken as insufficiently pled and its antitrust and contract counterclaims dismissed for failure to state a claim. TT's argument is simple; it had an absolute right to terminate its licencing agreement with REFCO and breached no contractual duty, violated no antitrust law, and engaged in no conduct giving rise to a claim of patent misuse in doing so. Essentially, TT posits it was entitled to take every action REFCO accused it of taking, including demanding payment in perpetuity of royalties for the use of products not covered by its patents..

*I. Breach of Contract Claim*

The licencing agreement TT entered into with REFCO contained a clause allowing either party to terminate the relationship without cause. REFCO concedes this means TT has no obligation to show good faith in terminating the licensing agreement. However, REFCO claims this does not entitle TT to engage in conduct amounting to "bad faith."

Under Illinois law, an implied covenant of good faith and fair dealing is included in every contract unless expressly disavowed. *Martindell v. Lake Shore Nat'l Bank,* 15 Ill.2d 272, 154 N.E.2d 683, 690 (Ill.1958); *Dayan v. McDonald's Corp.,* 125 Ill.App.3d 972, 81 Ill.Dec. 156, 466 N.E.2d 958 (Ill.1984) (a covenant of good faith and fair dealing is implied into every contract unless expressly disavowed). Illinois courts have observed that " [p]roblems involving the obligation of good faith and fair dealing generally arise where one party to a contract is given broad discretion in performance." *Northern Trust Co. v. VIII South Michigan Associates,* 276 Ill.App.3d 355, 367, 212 Ill.Dec. 750, 657 N.E.2d 1095 (Ill.App. 1st Dist.1995). This is because the covenant requires that a party who is given broad discretion under the terms of a contract not act unreasonably or arbitrarily so as to thwart the expectations of the parties at the time of contracting. *Cromeens, Holloman, Sibert, Inc v. AB Volvo,* 349 F.3d 376, 395 (7th Cir.2003).

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2006 WL 794766 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d)

**\*3** The Illinois Supreme Court recently reiterated that the covenant of good faith and fair dealing is a guide to construction, not an independent cause of action. *Voyles v. Sandia Mortgage Corporation,* 196 Ill.2d 288, 256 Ill.Dec. 289, 751 N.E.2d 1126 (Ill.2001).*Voyles* involved allegations that the defendant mortgage company intentionally reported false and defamatory information to credit reporting agencies in an effort to compel the plaintiff to capitulate to its terms in paying a mortgage. The *Voyles* court found that the defendant did nothing wrong in reporting the information it did to the credit reporting agencies. However, the Illinois high court first addressed, and rejected, the plaintiff's claim that defendant's conduct gave rise to a cause of action under the implied covenant of good faith and fair dealing.*Id.*

The *Voyles* court pointed to another Illinois Supreme Court case, *Cramer v. Insurance Exchange Agency.* 174 Ill.2d 513, 221 Ill.Dec. 473, 675 N.E.2d 897 (Ill.1996).*Cramer* stressed that the covenant of good faith and fair dealing "is not generally recognized as an independent source of duties giving rise to a cause of action in tort" before carving out a narrow exception to that rule when an insurer breaches its duty to defend a lawsuit brought against an insured. *Id. Voyles* reiterated that *Cramer* created a very narrow exception, reinforced that the covenant was merely an aid to construction, and observed that "[a] cause of action for violation of a duty of good faith and fair dealing would, as a practical matter, add little to this or any plaintiff's remedial repertoire."*Voyles,* 196 Ill.2d at 295, 256 Ill.Dec. 289, 751 N.E.2d 1126. After the Illinois Supreme Court's repeated assertions that the covenant does not create an independent cause of action, the Seventh Circuit has predicably refused to invoke the covenant as anything more than an aid to construction. *See, e.g., APS Sports Collectibles, Inc. v. Sports Time, Inc.,* 299 F.3d 624, 628 (7th Cir.2002) (accepting defendant's argument that under Illinois law, "the covenant of good faith and fair dealing is not an independent source of duties for parties to a contract, but instead an implied term that guides the construction of explicit terms in an agreement.").

The Seventh Circuit, in construing analogous Wisconsin law, has stated, "[a] contract at will may be terminated for any reason (including bad faith) or no reason, without judicial review; the only exception is a termination that violates a fundamental and well-defined public policy as evidenced by existing law."*Kumpf v. Steinhaus,* 779 F.2d 1323, 1326 (7th Cir.1985) (internal quotations and citations omitted). However, this was said in reviewing a tort claim, not a breach of contract claim. No recent Illinois or Seventh Circuit case has allowed a breach of contract claim to rely solely on the covenant of good faith and fair dealing.

REFCO seemingly acknowledged the rule that the covenant of good faith and fair dealing is a guide to construction and not an independent cause of action for tort by suing for breach of contract. However, REFCO is still seeking to maintain an independent cause of action under the covenant. REFCO's counterclaim states "[a]ll contracts have an implied term and covenant of good faith and fair dealing, and the parties are subject to this duty. TT has breached each [contract] by issuing in bad faith notices purporting to terminate those agreements." The present case differs from *Voyles* in that REFCO has claimed, and we assume for the present motion it is true, that TT had a "bad faith" motive for ending its relationship with REFCO which may have violated a well defined public policy against potentially monopolistic behavior. (We note that whether TT's conduct amounted to a violation of the antitrust laws is a more complicated question involving the probable impact its actions portend, which is discussed below.) However, that does not justify this Court creating an independent cause of action that is currently unrecognized in Illinois law. Accordingly, REFCO's counterclaim for breach of contract is dismissed.

*II. Antitrust Counterclaims*

**\*4** REFCO's second counterclaim alleges that TT violated Section 2 of the Sherman Act, 15 U.S.C. § 2, by "attempting to monopolize the market for order entry software for electronically trading futures on major futures exchanges, and submarkets thereof."REFCO's antitrust claim relies primarily upon TT's attempt to implement a global settlement

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2006 WL 794766 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

or "solution" whereby it obtains 2.5 cents from each side to a futures transaction forever, regardless of whether the means used to order and execute the contract are covered by TT's patents or occur during the lifetime of its patent.

To adequately plead a cause of action for attempted monopolization, a plaintiff must allege "(1) specific intent to achieve monopoly power, (2) predatory or anticompetitive conduct directed to accomplishing this unlawful purpose, and most important for purposes of this case, (3) a dangerous probability that the attempt to monopolize will be successful." *Indiana Grocery, Inc. v. Super Valu Stores, Inc.* 864 F.2d 1409, 1413 (7th Cir.1989)."The ' dangerous probability' element of the attempted monopolization offense reflects the well-established notion that section 2 of the Sherman Act governs single-firm conduct only when it threatens actual monopolization."*Id.* However, "the Sherman Act's prohibition against attempted monopolization does not require that the attempt in fact ripen into an actual monopoly. It is the attempt which is the offense."*Lektro-Vend Corp. v. Vendo Co.* 660 F.2d 255, 270 (7th Cir.1981). To answer the question of whether there is a dangerous probably that a party will obtain a result forbidden by the antitrust laws we look to "the alleged offender's ability to achieve the forbidden result, his intent, and the nature of his overt actions."*Id.* Consistent with the underlying principles of antitrust laws, "[t]he ultimate concern is the firm's actual or threatened impact on competition in the relevant market."*Id.*

In *Rosenthal Collins Group, LLC v. Trading Technologies,* No. 05 C 4088, with which this case is consolidated for common issues, the plaintiff's antitrust claims against TT were dismissed. In that case, the court found that "[a]cceptance or probable acceptance of the 2.5 cent proposal must occur before plaintiff has standing to pursue an antitrust violation based on the proposal. Therefore, defendant's 2.5 cent proposal cannot be the basis for [antitrust damages]."*Rosenthal Collins Group, LLC v. Trading Technologies Intern., Inc.,* 2005 WL 3557947, 4 (N.D.Ill.2005) (Moran, J.). REFCO asks us to distinguish the decision in the *Rosenthal Collins* case on the grounds that TT actually terminated REFCO's contract. Thus, unlike

*Rosenthal Collins* a concrete harm occurred. This, we are unwilling to do. While REFCO may have suffered a concrete harm, which was absent in *Rosenthal Collins,* there remains a complete lack of probable monopolization. REFCO has merely pled that two firms, neither of which are among the "big four" exchanges, have accepted TT's offer. In fact, the instant spate of litigation and REFCO's refusal to cave to TT's demands demonstrate that TT is unlikely to obtain any monopoly, unless it is entitled to do so under the patent laws. The threat REFCO complains of, acceptance of an industry-wide demand that market participants pay 2.5 cents per trade forever, simply has not come to bear and REFCO pleads no facts indicating TT is likely to obtain such a result through prohibited behavior. As such, REFCO has failed to state a claim for attempted monopolization.

### III. Patent Misuse

**\*5** REFCO claims patent misuse as an affirmative defense, relying primarily on TT's attempt to obtain royalties for every futures trade forever thereby impermissibly broadening the "physical or temporal scope" of its patent. It is well established that royalty agreements that apply to transactions not covered by the patent may, depending on a variety of factors surrounding the negotiations, constitute an antitrust violation and patent misuse. *See, e.g., Zenith Radio Corp. v. Hazeltine Research, Inc.,* 395 U.S. 100, 135, 89 S.Ct. 1562, 1583, 23 L.Ed.2d 129 (1969) ("We hold that conditioning the grant of a patent license upon payment of royalties on products which do not use the teaching of the patent does amount to patent misuse."). As stated in *Rosenthal Collins,*"[a]lthough a finding of an antitrust violation requires a finding of patent misuse, the same is not true in reverse. Patent misuse is considered a broader wrong than antitrust violation and a patent misuse claim is easier to prove than an antitrust violation."Accordingly, we deny TT's motion to strike REFCO's affirmative defense of patent misuse.

### CONCLUSION

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Page 6 of 6

Not Reported in F.Supp.2d                                                          Page 5

Not Reported in F.Supp.2d, 2006 WL 794766 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**


For the reasons set forth above, TT's motion to
dismiss counterclaims and strike the affirmative
defense of patent misuse [27-1] is denied in part
and granted in part. REFCO's counterclaims are
dismissed and its affirmative defense of patent
misuse remains.

It is so ordered.

N.D.Ill.,2006.
Trading Technologies, Inc. v. REFCO Group Ltd.,
LLC
Not Reported in F.Supp.2d, 2006 WL 794766
(N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.